# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>NUMALE CORPORATION,<br><br>AFFECTS THIS DEBTOR, ☐<br><br>AFFECTS FELICIANO NUMALE NEVADA PLLC, ☐<br><br>NUMEDICAL SC, ☐<br><br>NUMALE COLORADO SC, ☐<br><br>NUMALE FLORIDA TB PLLC, ☐<br><br>NUMALE NEBRASKA LLC, ☐<br><br>NUMALE NEW MEXICO SC, ☐<br><br>NUMALE ALL DEBTORS, ☒<br><br>Debtors. | Lead Case No.: 25-10341-nmc<br>Chapter 11<br><br>*Jointly administered with:*<br><br>Feliciano NuMale Nevada PLLC<br>Case No. 25-10342-nmc<br><br>NuMedical SC<br>Case No. 25-10343-nmc<br><br>NuMale Colorado SC<br>Case No. 25-10344-nmc<br><br>NuMale Florida TB PLLC<br>Case No. 25-10345-nmc<br><br>NuMale Nebraska LLC<br>Case No. 25-10346-nmc<br><br>NuMale New Mexico SC<br>Case No. 25-10347-nmc<br><br>**SUBPOENA IN A CASE UNDER THE BANKRUPTCY CODE FOR EXAMINATION AND PRODUCTION OF DOCUMENTS PURSUANT TO FED. R. BANKR. P. 2004 AND 9016** |

**TO:**

**Quintairos, Prieto, Wood & Boyer, P.A.**
**c/o Eric Boyer, Resident Agent**
**9300 South Dadeland Blvd., 4th Floor**
**Miami, Florida 33156**

☐ YOU ARE COMMANDED to appear in the United States Bankruptcy Court at the place, date, and time specified below to testify in the above case.

| PLACE | COURTROOM |
|---|---|
| | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify in this bankruptcy case. If you are an organization, you must designate one or more officers directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| PLACE | DATE AND TIME: |
|---|---|
| Berger Singerman<br>1450 Brickell Avenue, Suite 1900<br>Miami, Florida 33131 | October 5, 2026<br>9:00 a.m. (Eastern) |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the documents requested on **Exhibit "A"** hereto.

| PLACE | DATE AND TIME |
|---|---|
| Responsive documents shall be provided in electronic format to tgray@gtg.legal on or before October 1, 2026, at 10:00 a.m. (Eastern). | October 1, 2026<br>10:00 a.m. (Eastern) |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any subpoenaed organization not a party to this proceeding case shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify, Fed. R. Civ. P. 30(b)(6) made applicable to this proceeding by Rule 7030, Fed. R. Bankr. P. See Rules 1018 and 9014, Fed. R. Bankr. P.

| ISSUING OFFICER SIGNATURE AND TITLE | DATE |
|---|---|
| */s/ Talitha Gray Kozlowski* | September 17, 2026 |

**ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER**

Gregory E. Garman, Esq.
Talitha Gray Kozlowski, Esq.
Mary Langsner, Ph.D.
Garman Turner Gordon LLP
7251 Amigo Street, Suite 210
Las Vegas, NV 89119
(725) 777-3000

**PROOF OF SERVICE**

| SERVED | DATE | PLACE |
|---|---|---|
| SERVED ON (PRINT NAME) | MANNER OF SERVICE | |
| SERVED BY (PRINT NAME) | TITLE | |

**DECLARATION OF SERVER**

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on ____________________
(Date)

____________________
SIGNATURE OF SERVER

____________________
ADDRESS OF SERVER

**Federal Rules of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)**
**(made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)**

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person

(i) is a party or a party's officer; or

(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:

(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees —on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*

*(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

*(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises —or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*

*(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

*(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

*(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

*(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

*(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

*(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

*(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*

*(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

*(B) Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

...

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

**EXHIBIT A**

**DEFINITIONS**

1. "Beazley" means Beazley Group, Beazley Insurance Company, Inc., any Beazley-managed Lloyd's syndicate, and each of their affiliates, and their respective claims professionals, employees, agents, and outside coverage counsel, including Joe Cianflone and Adam Moser.

2. "Communications" shall mean, without limitation, any transmittal, conveyance or exchange of a word, statement, fact, thing, idea, Document, instruction, information, demand, question or other information by any medium, whether by written, oral or other means, including but not limited to personal conversations, phone calls, written correspondence, memoranda, letters, reports, publications, electronic communications, instant messaging, messages via e-mail, direct messaging on social media platforms, text messaging (SMS, MMS, iMessage), WhatsApp, Signal, Telegram, Microsoft Teams, Slack, or other messaging or collaboration platforms, voicemail, audio or video recordings, and notes or summaries of telephone calls, video conferences, or meetings, and is to be interpreted broadly.

3. "Covered Lawyer" means each of the following persons, at any time during the Transfer Period: (a) each shareholder, stockholder, or other equity holder of QPWB; (b) each officer or director of QPWB; (c) each member of any executive, management, operating, or compensation committee of QPWB; (d) each managing partner or office managing partner of any QPWB office; (e) each practice group or other firm-related group leader, chair, or co-chair; and (f) each member of the Sanchez Team.

4. "Date" means the exact day, month, and year, if known, or if not known, Your best approximation thereof. Exact dates shall be given in all answers except where it is explicitly indicated than an approximate date may be given.

5. "Debtors" shall, collectively, mean and refer to NuMale Corporation; Feliciano NuMale Nevada PLLC; NuMedical SC; NuMale Colorado SC; NuMale Florida TB PLLC; NuMale Nebraska LLC; and NuMale New Mexico SC.

6. "Document" is intended to be as broad as it is used in FRCP 26 and 34, and includes, without limitation:

a. the original (or an identical duplicate if the original is not available) and any non-identical copies (whether non-identical because of notes made on copies or attached comments, annotations, marks, transmission notations, or highlighting

of any kind) of writings of every kind and description that are fixed in any kind of physical media;[1]

b. any printed, typewritten, handwritten, electronic, or otherwise recorded matter of whatever character of communications, letters, correspondence, electronic mail, text messages, memoranda, notes, Post-Its, media releases or articles, photographs, tape or sound recordings, contracts, agreements, telephone records, diaries, desk calendars, appointment calendar, group scheduler calendars, statements, reports, journal, minutes, working paper, financial report, accounting report, work papers, facsimile, facsimile transmission, drafts, logs, chart, graph, index, directory, scheduling data, databases, spreadsheets, presentations, word processed Documents, bulletins, design schedules, supplemental instructions, time cards, drawings, shop drawings, progress payments, progress schedules, estimates, equipment time cards, design calculations, design meeting minutes, coordination meeting minutes, and material similar to any of the foregoing, however denominated and to whomever addressed, computer directory, computer disk, computer tape, or any written, printed, typed, punched, taped, filmed, or graphic matter however produced or reproduced. Documents also include the file, folder tabs, and labels appended to or containing any Documents.

c. For the avoidance of doubt, electronically-stored information with all metadata intact shall be produced whenever available in the format described below.

7. "Family Member" means a person's spouse or domestic partner, former spouse, child, stepchild, parent, sibling, and the spouse of any of the foregoing, and any trust or entity established for the benefit of, or owned or controlled by, any of the foregoing.

8. "Identify" shall mean to state the nature and subject matter of the Document, the Date, if any, appearing thereon, the identity of each Person who prepared and received the Document, and the present location of the Document. In all cases where identification of a Document is requested, in lieu of such specification, You may supply legible copies of such Documents.

9. "NuMale Defendants" means the Defendants in the Sanchez Action, that is the Debtors, NuMale Albuquerque LLC, NuMale Medical Center, LLC, Christopher Asandra, M.D., Carlos Feliciano, M.D., Brad Palubicki, Justin Pulliam, and Mike Rivera, and each of them.

10. "Partner-Titled Lawyer" means each attorney employed by, affiliated with, or holding an ownership interest in QPWB at any time during the Transfer Period whose title at any

---

[1] Physical media includes, but is not limited to, paper media, photographic media (including pictures, films, slides and microfilm), phonographic media, magnetic media (including, but not limited to hard drives, floppy disks, compact disks, and magnetic tapes of any kind), computer memory, optical media, magneto-optical media, and other physical media on which notations or marking of any kind can be affixed.

time during the Transfer Period included the word "partner" or any derivative or variation of it (including "Partner," "Managing Partner," "Senior Partner," "Equity Partner," "Non-Equity Partner," "Income Partner," "Junior Partner," "Associate Partner," and "Office Managing Partner"), or the word "shareholder," "principal," or "director."

11. "Person" shall mean any natural person, legal entity, or association of legal entities and/or natural persons, including, but not limited to, a corporation, professional corporation, association, partnership, joint venture, firm, or company.

12. "Quintairos Claims" means all claims and causes of action held by or preserved for the Liquidation Trust under the confirmed Joint Plan [ECF No. 434] against QPWB or any of its current or former attorneys, including the claims defined in the Plan as the Quintairos Claims, the Quintairos Non-Debtor Claims, and the Quintairos PF Claims, and all claims asserted in the Trustee's demand correspondence to QPWB.

13. "QPWB Affiliate" means any entity that, at any time since January 1, 2023, controlled, was controlled by, or was under common control with QPWB, or in which QPWB or any Covered Lawyer (individually or together) held an ownership interest and which transacted business with or received any payment from QPWB, including any entity that leases real property, aircraft, vehicles, or equipment to QPWB or provides management, administrative, staffing, or consulting services to QPWB.

14. "Rael Order" means the Opinion and Order entered in November 2024 in *Rael v. Skies Healthcare and Rehabilitation Center, LLC*, Case No. D-202-CV-2019-07947 (N.M. 2d Jud. Dist.), imposing sanctions on QPWB and/or its attorneys.

15. "Relating" or "Relate To" means concerning, referring to, describing, evidencing, or constituting.

16. "Representation Period" means July 1, 2022 through the date on which QPWB's representation of the last NuMale Defendant in the Sanchez Action terminated, unless a request states a different period.

17. "Sanchez Action" means *Michael E. Sanchez v. NuMale Corporation, et al.*, Case No. D-202-CV-2020-06336, in the Second Judicial District Court, Bernalillo County, New Mexico, including all settlement, mediation, post-verdict, and appellate activity relating to it.

18. "Sanchez Team" means each QPWB attorney, paralegal, or other timekeeper who recorded time to or performed work on the Sanchez Action, including Frank Alvarez, Eric Boyer, John Andrew Robertson, Dominique Barrett, Erin Chavez, and John "Jack" Oliver III.

19. "Transfer" means every mode, direct or indirect, of disposing of or parting with money, property, or an interest in property, including payment of salary, bonus, draw, distribution, dividend, return of capital, redemption or repurchase of stock, loan or advance, loan forgiveness, payment of personal expenses or premiums, retirement or deferred compensation contribution, and the grant of any security interest.

20. "Transfer Period" means January 1, 2024 through the date of Your production, unless a request states a different period. An agreement, plan, or policy that was in effect at any time during the Transfer Period is within the Transfer Period regardless of the date on which it was executed or adopted.

21. As used herein, the terms "You" and "Your" shall refer, collectively, to **Quintairos, Prieto, Wood & Boyer, P.A. or QPWB** and Your agents, employees, attorneys, accountants, advisors, representatives, or any other person over which You have control or have a superior right to compel to do an act or produce an item and any entity You have or had an ownership or beneficial interest (contingent or otherwise) or an entity You were or are an agent, manager, officer, or director or otherwise maintained or maintain a supervisory, advisory, or consulting role.

22. If any document is withheld under a claim of privilege or work product, a list should be furnished identifying each document for which privilege or work product is claimed, together with sufficient basis to assess the validity of the privilege, including but not limited to the following information for each such document: (a) date, sender, recipient, persons to whom copies were furnished, and job titles of each of these persons; (b) subject matter of the document; (c) number of pages in the document; and (d) the basis or bases upon which the privilege is claimed.

23. If any requested document was but no longer is in your possession, subject to your control, or no longer exists, please state whether it (a) is missing or lost; (b) has been destroyed; (c) has been transferred, voluntarily or involuntarily, to others, and state the identity of those persons to whom it has been transferred; or (d) has been otherwise disposed of. In each instance, explain the circumstances surrounding the disposition, state the date or approximate date thereof,

and identify the persons with knowledge of such circumstances.

24. The documents described in the requests below are to be produced as they are kept in the usual course of business. If there are electronic records or e-mails, such documents are to be produced in electronic format.

## INSTRUCTIONS

1. You shall produce all Documents in the manner in which they are maintained in the usual course of business and/or shall organize and label Documents to correspond with the categories of this Request. A Request for Documents shall be deemed to include a Request for any and all file folders within which the document was contained, transmittal sheets, cover letters, exhibits, enclosures, or attachments to the Document in addition to the Document itself.

2. In producing Documents and other materials, You are requested to furnish all Documents or things in Your possession, custody, or control, regardless of whether such Documents or materials are possessed by You directly or Your directors, officers, agents, employees, representatives, subsidiaries, managing agents, affiliates, investigators, or by Your attorneys or their agents, employees, representatives, or investigators.

3. If You cannot answer any portion of the following Requests in full, after exercising due diligence to secure the information, please so state and answer to the extent possible, specifying Your inability to answer the remainder and stating whatever information or knowledge You have concerning the unanswered portion.

4. You are requested to provide all responsive Documents within Your possession, custody, or control. In the event that You provide only a portion of the Documents called for by any particular Request, please state the reason(s) for Your inability to provide the remainder of the Documents requested and the identity of the Document(s).

5. In the event the Documents called for by any particular request are no longer in Your possession, custody or control, please state the reason(s) why those Documents are no longer in Your possession, custody, or control and the identity of the Document(s).

6. In the event that Documents called for by any particular request have been lost or destroyed, please state: (i) the date on which the Document(s) were lost or destroyed; (ii) the manner in which the Document(s) were lost or destroyed; (iii) the identity of the Document(s); (iv)

the information contained within such Document(s) and the nature of the Document(s); and (v) and the identity of any person(s) who has knowledge of the contents of the Document(s) or has received a copy of such Document(s).

7. If You withhold any Document pursuant to a claim of privilege, You shall expressly make the claim of privilege and produce a privilege log in compliance with Fed. R. Civ. P. 26(b)(5), incorporated by Fed. R. Bankr. P. 7026.

8. Documents attached to each other should not be separated.

9. Documents not otherwise responsive to this discovery Request shall be produced if such Documents mention, discuss, refer to, or explain the Documents that are called for in the discovery request.

10. The fact that a Document has been produced by another party in the Debtors' Chapter 11 Cases does not relieve You of Your obligation to produce Your copy of the same Document, even if the two Documents are identical.

11. The terms "each" and "all" shall be construed as "all and each."

12. The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery Request all responses that might otherwise be outside of the scope.

13. The use of the singular form of any word includes the plural and vice versa.

14. The use of the feminine form of any word includes the masculine and vice versa.

15. You are requested and instructed to produce Documents in response to the requests below in accordance with the Federal Rules of Civil Procedure, applicable in the Debtors' bankruptcy cases by way of the Federal Rules of Bankruptcy Procedure.

16. Pursuant to Federal Rule of Civil Procedure 34(b)(1)(C), in response to each of the requests below, electronically stored information is to be produced in a reasonably usable format together with a description of the system from which such information was derived sufficient to permit rendering the records and information intelligible. With the exception of electronically stored information produced in native format, electronically stored information shall be produced as TIFF or PDF images and must be produced with extracted text and metadata reflecting at least the title, author, creation date, modification date, and custodian of such information (and for email

correspondence, also the from, to, cc, bcc, sent date and time, and email subject fields) and also with a load file showing the logical unitization of documents and family member groupings. Excel spreadsheets, multimedia, and other similar files (*e.g.*, .csv files) must be produced in native format.

[*Remainder of page left intentionally blank. See next page.*]

## TOPICS FOR TESTIMONY

1. The documents produced in response to this subpoena, the search for them, and QPWB's document retention and litigation holds relating to the Sanchez Action and the Quintairos Claims.

2. QPWB's ownership structure, classes of shareholders and partners, governance bodies, and the authority and process for approving distributions during the Transfer Period.

3. The mechanics of each compensation component for QPWB's shareholders, practice group leaders, and partners during the Transfer Period.

4. QPWB Affiliates, and transactions between QPWB and any QPWB Affiliate or shareholder-related entity during the Transfer Period.

5. The mechanics of shareholder and partner compensation and distributions, and how those payments were recorded on QPWB's books during the Transfer Period.

6. Transfers to Covered Lawyers during the Transfer Period, including year-end distributions and any change in distribution practices on or after November 1, 2024.

7. QPWB's financial condition during the Transfer Period, including revenue, assets, liabilities, receivables, work in process, cash, debt, encumbrances, contingent liabilities, and projections.

8. QPWB's professional liability insurance, the tender of the Sanchez-related claims, and each insurer's coverage position.

9. QPWB's intake of the Sanchez Action, its conflict analysis, if any, and its relationship with Beazley.

10. QPWB's settlement evaluations and recommendations in the Sanchez Action and their communication to Beazley and the NuMale Defendants during the Sanchez Action.

11. QPWB's response, analysis, and internal application of the Real Order.

## REQUESTS FOR PRODUCTION

Please produce:

1. QPWB's articles of incorporation, bylaws, shareholder agreements, stock purchase, redemption, or buy-sell agreements, and all amendments, in effect at any time during the Transfer Period.

2. Documents sufficient to show the formation, ownership, and function of any entity using the name "Quintairos, Prieto, Wood & Boyer" or any variation (including any professional corporation, P.C., or PLLC) or any Affiliate, and each payment between QPWB and any such entity during the Transfer Period.

3. QPWB's federal income tax returns (Forms 1120-S or 1120), with all schedules and Schedules K-1, for tax years 2023, 2024, and 2025, and any IRS correspondence confirming QPWB's election to be taxed as an S corporation.

4. Documents sufficient to show the composition of QPWB's board of directors and its executive, management, operating, and compensation committees for each year from January 1, 2022 through the present, and the individual or body with authority to approve year-end or residual-profit distributions during that period.

5. QPWB's stock ledger, stock transfer records, shareholder register, capitalization tables, and share certificates (or Documents sufficient to show the information they contain) reflecting (a) each holder of any share or other equity interest in QPWB at any time during the Transfer Period; (b) the number and class of shares, or percentage interest, held by each; and (c) each issuance, redemption, repurchase, transfer, or pledge of any share or equity interest, including its date and the consideration paid.

6. Documents sufficient to show, at any time during the Transfer Period, who served as (a) an officer or director of QPWB; (b) a member of any executive, management, operating, or compensation committee of QPWB; (c) a managing partner or office managing partner of any QPWB office; or (d) a practice group leader, chair, or co-chair at QPWB.

7. All agreements between QPWB and each person identified in response to Request No. 6 that were in effect at any time during the Transfer Period and that govern that person's compensation, bonus, distributions, equity interest, capital account, redemption or buy-out,

deferred compensation, or separation, including employment agreements, shareholder agreements, office managing partner agreements, and practice group leader agreements, with all amendments and side letters.

8. For Partner-Titled Lawyers not identified in response to Request No. 6: (a) each employment, compensation, or shareholder agreement QFWB used for such lawyers at any time during the Transfer Period; and (b) any amendment, side letter, or individually negotiated agreement that modifies the compensation, bonus, or distribution terms of the applicable form for any such lawyer.

9. QFWB's written compensation plans, policies, point systems, formulas, and methodologies in effect at any time during the Transfer Period for Covered Lawyers, including Documents describing (a) each component of shareholder and partner compensation (base, draw, guaranteed payment, bonus, year-end allocation, capital return); (b) whether year-end allocations are based on ownership percentage, origination, collections, hours, or a combination, and the weighting of each; (c) whether allocations are contingent on firm profitability; and (d) the calendar for computing, approving, and paying year-end distributions.

10. Documents sufficient to show each Transfer made by QFWB (or any QFWB Affiliate) to or for the benefit of each Partner-Titled Lawyer or Covered Lawyer during the Transfer Period, stating for each Transfer: (a) payee; (b) payor; (c) date; (d) amount; (e) type (for example, salary, draw, bonus, distribution, dividend, return of capital, redemption payment, loan or advance, loan forgiveness, expense payment, benefit, or retirement or deferred compensation contribution); and (f) the paying account (last four digits). Payroll registers and general ledger exports containing the required information produced in native format are acceptable.

11. For each Covered Lawyer, Documents sufficient to show the calculation, allocation, approval, and payment of each bonus, distribution, dividend, or residual-profit or year-end distribution paid during the Transfer Period, including distribution schedules, worksheets, and approvals.

12. The Forms W-2 and 1099 and Schedules K-1 issued by QFWB to each Covered Lawyer for tax years 2024 and 2025, with social security information redacted.

13. Documents sufficient to show all expenses, perquisites, and personal benefits paid by QPWB for or on behalf of each Covered Lawyer or Family Member of a Covered Lawyer during the Transfer Period that were not billed to and reimbursed by a client, including vehicles, aircraft, travel, club or membership dues, housing, personal credit card charges, life or disability insurance premiums, payments to Family Members, and tax payments or gross-ups, together with QPWB's expense reimbursement policies in effect during the Transfer Period.

14. During the Transfer Period, all minutes, resolutions, written consents, and board or committee materials of QPWB's board of directors, shareholders, and executive, management, operating, or compensation committees relating to: (a) distributions, dividends, bonuses, bonus pools, or compensation of Covered Lawyers; (b) the Sanchez Action, the verdict, or the Quintairos Claims; (c) professional liability insurance; or (d) any merger, restructuring, asset sale, formation of a new entity, dissolution, or bankruptcy.

15. QPWB's annual and interim financial statements (audited, reviewed, compiled, or internal), including balance sheets, income statements, statements of cash flows, notes, auditor or accountant reports, and management letters, for fiscal year 2023 through the most recent period available.

16. All loan, credit facility, and line-of-credit agreements to which QPWB was a party during the Transfer Period, with all compliance certificates, borrowing-base certificates, financial covenant calculations, guaranties (including any personal guaranty by a Covered Lawyer), and notices of default, together with Documents sufficient to show each deposit account held by QPWB during the Transfer Period (institution and last four digits of account number).

17. Documents sufficient to show QPWB's month-end cash and cash-equivalent balances, by account, from January 1, 2024 through the present.

18. For the time period January 1, 2022 through the present, each Sanchez Team lawyers' professional liability insurance policy (primary and excess), if separate or in addition to any policy issued to QPWB and in the possession of QPWB.

19. All notices of claim, notices of circumstances, or tenders to any insurer relating to the Sanchez Action, any NuMale Defendant, or the Quintairos Claims, and all non-privileged Communications with any insurer or insurance broker relating to the tender, notice, or coverage of

those matters.

20. All reservation-of-rights letters, coverage position letters, and denials of coverage issued by any insurer relating to the Sanchez Action, any NuMale Defendant, or the Quintairos Claims, and any coverage litigation or coverage analysis relating to them.

21. Documents sufficient to show the date on which each member of QPWB's executive or management committee, each officer and director, and QPWB's general counsel first learned of (a) the jury verdict in the Sanchez Action; (b) any assertion by or on behalf of a NuMale Defendant that QPWB committed malpractice or breached a duty (including Dr. Asandra's November 20, 2024 e-mail and Arash Homampour's December 10, 2024 correspondence); and (c) the Trustee's assertion of the Quintairos Claims.

22. All Communications among or with QPWB's officers, directors, executive or management committee members relating to the jury verdict in the Sanchez Action, any claim of malpractice by or on behalf of any NuMale Defendant, or the Quintairos Claims.

23. All Documents relating to QPWB's intake and acceptance of the Sanchez Action, including new-matter intake forms, conflict-check requests and results, and Communications with Beazley concerning the July 25, 2022 assignment of the matter to QPWB and Beazley's request that QPWB "check conflicts and advise if you can defend all defendants except Stephen Chapman."

24. All engagement letters, retention agreements, representation agreements, or letters of understanding (including drafts and unsigned versions) between QPWB and any NuMale Defendant or Beazley relating to the Sanchez Action, and all Communications relating to whether any such agreement would be or had been prepared.

25. All conflict waivers, informed-consent Documents, joint-representation disclosures or advisements (including drafts and unsigned versions) provided to, requested from, or executed by any NuMale Defendant, and all Communications relating to whether any such waiver or consent was necessary, requested, or obtained.

26. Documents sufficient to show, for the Representation Period, the QPWB attorney(s) with supervisory responsibility for the Sanchez Action, the QPWB office(s) and practice group(s) to which they were assigned, and the managing partner and practice group leader

of each.

27. QPWB's written policies, procedures, manuals, and guidelines in effect at any time from July 1, 2022 through the present relating to: (a) conflict checks and conflicts of interest in joint representations, including insurer-retained representations; (b) engagement letters; (c) communicating settlement demands, offers, and excess exposure to clients; (d) maintenance, retention, and turnover of client files; (e) use of text messaging, ephemeral messaging, or personal devices for client matters; (f) litigation holds; and (g) supervision or risk-management review of high-exposure matters. For any policy revised during that period, produce each version and Documents sufficient to show the effective date of each revision.

28. All litigation management guidelines, billing guidelines, panel-counsel or preferred-counsel agreements, and reporting requirements issued by Beazley that governed QPWB's work on the Sanchez Action.

29. All conflict-of-interest analyses, memoranda, notes, internal or external ethics consultations, and Communications relating to QPWB's joint representation of the NuMale Defendants, including Documents relating to (a) Dr. Asandra's interests as distinct from those of the other NuMale Defendants; (b) the business litigation between Dr. Asandra and NuMale; (c) any DEA or medical-board matter involving Dr. Asandra; (d) Stephen Chapman, PA-C and the alteration or re-creation of medical records; and (e) the statement in QPWB's statement to James Parrett that QPWB had "verified there is no conflict representing NuMale and Dr. Asandra."

30. All Documents relating to the Joint Defense Agreement between Stephen Chapman, PA-C and the NuMale entities, including all drafts, executed versions, and Communications with Beazley relating to its preparation.

31. For the period November 1, 2024 through the present, all Documents relating to the *Rael* Order that refer to the Sanchez Action or any NuMale Defendant, or that relate to any change in QPWB's policies or practices concerning conflicts of interest in joint representations, together with Documents sufficient to show whether and when QPWB disclosed the Rael Order to any NuMale Defendant or to Beazley.

32. All Documents reflecting any evaluation, valuation, verdict-range analysis, or settlement recommendation by QPWB relating to the Sanchez Action, including Documents

reflecting the basis for any recommendation that the matter be settled for $950,000 or any other amount, and all Documents reflecting any communication of such evaluation or recommendation to Beazley or to any NuMale Defendant.

33. All Documents relating to (a) the Stipulation of the Parties regarding vicarious liability proposed on or about November 8, 2024 and filed November 22, 2024; (b) the stipulated special verdict form; and (c) the stipulated final jury instructions in the Sanchez Action, including all Communications with any NuMale Defendant or Beazley regarding whether to enter into each stipulation.

34. All Documents constituting or relating to the "numerous pieces of evidence which completely absolve QPWB from any liability" referenced in the letter dated September 14, 2026 from Anthony P. Sgro, Esq. of Sgro & Roger, on behalf of QPWB, to Gregory E. Garman, Esq.

# CERTIFICATION OF CUSTODIAN OF RECORDS

STATE OF __________ }
} ss.
COUNTY OF ____________ }

NOW COMES ________________________, who after first being duly sworn deposes and says:

1. That the deponent is an authorized Custodian of Records of *Quintairos, Prieto, Wood & Boyer, P.A.*
2. That on the ________ day of the month of ____________________, of the year 2026, the deponent received a subpoena calling for the production of records pertinent to the financial affairs of the Debtors (NuMale Corporation, Feliciano NuMale Nevada PLLC, NuMedical SC, NuMale Colorado SC, NuMale Florida TB PLLC, NuMale Nebraska LLC, and NuMale New Mexico SC).
3. That the deponent has made or caused to be made a true and exact copy of records responsive to the subpoena, consisting of ____ pages, and that the reproduction of them attached hereto is true and accurate.
4. The original of the attached records was made at or near the time of the act or event, recited therein by or from information transmitted by a person with knowledge, in the course of a regularly conducted activity of the business.

______________________________
CUSTODIAN OF RECORDS

SUBSCRIBED AND SWORN to before me
this _______ day of ______________, 2026.

______________________________
NOTARY PUBLIC in and for said
County and State

GARMAN TURNER GORDON LLP
GREGORY E. GARMAN
Nevada Bar No. 6654
E-mail: ggarman@gtg.legal
TALITHA GRAY KOZLOWSKI, ESQ.
Nevada Bar No. 9040
tgray@gtg.legal
MARY LANGSNER, Ph.D.
Nevada Bar No. 13707
mlangsner@gtg.legal
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
Telephone (725) 777-3000
Facsimile (725) 777-3112
*Attorneys for Michael Carmel,*
*Liquidating Trustee of the NuMale Liquidating Trust*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>NUMALE CORPORATION,<br><br>AFFECTS THIS DEBTOR, ☐<br><br>AFFECTS FELICIANO NUMALE NEVADA PLLC, ☐<br><br>NUMEDICAL SC, ☐<br><br>NUMALE COLORADO SC, ☐<br><br>NUMALE FLORIDA TB PLLC, ☐<br><br>NUMALE NEBRASKA LLC, ☐<br><br>NUMALE NEW MEXICO SC, ☐<br><br>NUMALE ALL DEBTORS, ☒<br><br>Debtors. | Lead Case No.: 25-10341-nmc<br>Chapter 11<br><br>*Jointly administered with:*<br><br>Feliciano NuMale Nevada PLLC<br>Case No. 25-10342-nmc<br><br>NuMedical SC<br>Case No. 25-10343-nmc<br><br>NuMale Colorado SC<br>Case No. 25-10344-nmc<br><br>NuMale Florida TB PLLC<br>Case No. 25-10345-nmc<br><br>NuMale Nebraska LLC<br>Case No. 25-10346-nmc<br><br>NuMale New Mexico SC<br>Case No. 25-10347-nmc |

**EX PARTE APPLICATION FOR EXAMINATION OF THE PERSON MOST KNOWLEDGEABLE FOR QUINTAIROS, PRIETO, WOOD & BOYER, P.A. PURSUANT TO BANKRUPTCY RULE 2004**

Michael Carmel, the former Chapter 11 trustee of the bankruptcy estates of NuMale Corporation, Feliciano NuMale Nevada PLLC, NuMedical SC, NuMale Colorado SC, NuMale Florida TB PLLC, NuMale Nebraska LLC, and NuMale New Mexico SC (collectively, "Debtors"), and the Liquidating Trustee of the NuMale Liquidation Trust (the "Trustee"), by and through his counsel, the law firm of Garman Turner Gordon LLP, hereby respectfully applies for an order pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure directing the person most knowledgeable for Quintairos, Prieto, Wood & Boyer, P.A. to appear for an examination on October 5, 2026, or such other date as mutually agreed by the parties. The Bankruptcy Rule 2004 examination will be conducted in person at the law firm of Berger Singerman, 1450 Brickell Avenue, Suite 1900, Miami, Florida 33131. The Trustee further requests that the examination be continued from day to day until concluded.[1]

Bankruptcy Rule 2004(a) provides that "[o]n a party in interest's motion, the court may order the examination of any entity." Such an examination may relate to the acts, conduct, or property, or to the liabilities and financial condition of the debtors, or to any matter which may affect the administration of the debtors' estate. *See* FED. R. BANKR. P. 2004(b). Here, the requested examination relates to the matters that are within the permitted scope of Bankruptcy Rule 2004, including the Debtors' assets, the Debtors' liabilities, and the Debtors' litigation claims expressly preserved for the NuMale Liquidation Trust under the confirmed *Joint Plan of Reorganization* [ECF No. 434].

Local Rule 2004(b) further provides in pertinent part that "the Clerk may sign orders for examination only if the dates for examination is more than fourteen (14) days from the date the motion is filed...." Therefore, the Clerk may sign an order for the Bankruptcy Rule 2004 examination of the person most knowledgeable for Quintairos, Prieto, Wood & Boyer, P.A.

. . .

. . .

. . .

---

[1] The examination will be recorded via stenographic means and may also be recorded by a videographer.

Garman Turner Gordon LLP
7251 Amigo Street, Ste. 210
Las Vegas, Nevada 89119
(725) 777-3000

WHEREFORE, the Trustee respectfully requests entry of the *Order Granting Ex Parte Application for Examination of the Person Most Knowledgeable for Quintairos, Prieto, Wood & Boyer, P.A. Pursuant to Bankruptcy Rule 2004* submitted herewith as **Exhibit "1"**.

DATED this 10th day of September, 2026.

GARMAN TURNER GORDON LLP

By: /s/ Talitha Gray Kozlowski
GREGORY E. GARMAN, ESQ.
TALITHA GRAY KOZLOWSKI, ESQ.
MARY LANGSNER, Ph.D.
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
*Attorneys for Liquidating Trustee of the NuMale Liquidating Trust*

# EXHIBIT 1

EXHIBIT 1

GARMAN TURNER GORDON LLP
GREGORY E. GARMAN
Nevada Bar No. 6654
E-mail: ggarman@gtg.legal
TALITHA GRAY KOZLOWSKI, ESQ.
Nevada Bar No. 9040
tgray@gtg.legal
MARY LANGSNER, Ph.D.
Nevada Bar No. 13707
mlangsner@gtg.legal
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
Telephone (725) 777-3000
Facsimile (725) 777-3112
*Attorneys for Michael Carmel,*
*Liquidating Trustee of the NuMale Liquidating Trust*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>NUMALE CORPORATION,<br><br>AFFECTS THIS DEBTOR, ☐<br><br>AFFECTS FELICIANO NUMALE NEVADA PLLC, ☐<br><br>NUMEDICAL SC, ☐<br><br>NUMALE COLORADO SC, ☐<br><br>NUMALE FLORIDA TB PLLC, ☐<br><br>NUMALE NEBRASKA LLC, ☐<br><br>NUMALE NEW MEXICO SC, ☐ | Lead Case No.: 25-10341-nmc<br>Chapter 11<br><br>*Jointly administered with:*<br><br>Feliciano NuMale Nevada PLLC<br>Case No. 25-10342-nmc<br><br>NuMedical SC<br>Case No. 25-10343-nmc<br><br>NuMale Colorado SC<br>Case No. 25-10344-nmc<br><br>NuMale Florida TB PLLC<br>Case No. 25-10345-nmc<br><br>NuMale Nebraska LLC<br>Case No. 25-10346-nmc |

| | |
|---|---|
| NUMALE ALL DEBTORS, ☒<br>Debtors. | NuMale New Mexico SC<br>Case No. 25-10347-nmc |

**ORDER GRANTING EX PARTE APPLICATION FOR EXAMINATION OF THE PERSON MOST KNOWLEDGEABLE FOR QUINTAIROS, PRIETO, WOOD & BOYER, P.A. PURSUANT TO BANKRUPTCY RULE 2004**

Upon the *Ex Parte Application for Examination of the Person Most Knowledgeable For Quintairos, Prieto, Wood & Boyer, P.A. Pursuant to Bankruptcy Rule 2004* (the "Ex Parte Application") filed by Michael Carmel, the former Chapter 11 trustee of the bankruptcy estates of NuMale Corporation, Feliciano NuMale Nevada PLLC, NuMedical SC, NuMale Colorado SC, NuMale Florida TB PLLC, NuMale Nebraska LLC, and NuMale New Mexico SC (collectively, "Debtors"), and the Liquidating Trustee of the NuMale Liquidation Trust, and good cause appearing therefor;

**IT IS HEREBY ORDERED** that the person most knowledgeable for *Quintairos, Prieto, Wood & Boyer, P.A.* shall appear for a Rule 2004 examination pursuant to FED. R. BANKR. P. 2004, regarding matters that are within the scope of Rule 2004, including without limitation the acts, assets, conduct, property, liabilities, financial condition, and business dealings of the Debtors, including without limitation the litigation claims expressly preserved for the NuMale Liquidation Trust under the confirmed *Joint Plan of Reorganization* [ECF No. 434]. The Trustee shall issue a separate subpoena pursuant to Fed. R. Bankr. P. 9016 for the production of documents.

. . .

. . .

. . .

. . .

. . .

. . .

. . .

Garman Turner Gordon LLP
7251 Amigo Street, Ste. 210
Las Vegas, Nevada 89119
(725) 777-3000

**IT IS FURTHER ORDERED** that the examination may be continued from day to day until concluded and that the examination will be recorded by a certified court reporter by stenographic means and may also be videographically recorded.

**IT IS SO ORDERED.**

PREPARED AND SUBMITTED BY:

GARMAN TURNER GORDON LLP

By: */s/ Talitha Gray Kozlowski*
GREGORY E. GARMAN, ESQ.
TALITHA GRAY KOZLOWSKI, ESQ.
MARY LANGSNER, Ph.D.
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
*Attorneys for Liquidating Trustee of the NuMale Liquidating Trust*

Honorable Natalie M. Cox
United States Bankruptcy Judge

GARMAN TURNER GORDON LLP
GREGORY E. GARMAN
Nevada Bar No. 6654
E-mail: ggarman@gtg.legal
TALITHA GRAY KOZLOWSKI, ESQ.
Nevada Bar No. 9040
tgray@gtg.legal
MARY LANGSNER, Ph.D.
Nevada Bar No. 13707
mlangsner@gtg.legal
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
Telephone (725) 777-3000
Facsimile (725) 777-3112
*Attorneys for Michael Carmel,*
*Liquidating Trustee of the NuMale Liquidating Trust*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>NUMALE CORPORATION,<br><br>AFFECTS THIS DEBTOR, ☐<br><br>AFFECTS FELICIANO NUMALE NEVADA PLLC, ☐<br><br>NUMEDICAL SC, ☐<br><br>NUMALE COLORADO SC, ☐<br><br>NUMALE FLORIDA TB PLLC, ☐<br><br>NUMALE NEBRASKA LLC, ☐<br><br>NUMALE NEW MEXICO SC, ☐ | Lead Case No.: 25-10341-nmc<br>Chapter 11<br><br>*Jointly administered with:*<br><br>Feliciano NuMale Nevada PLLC<br>Case No. 25-10342-nmc<br><br>NuMedical SC<br>Case No. 25-10343-nmc<br><br>NuMale Colorado SC<br>Case No. 25-10344-nmc<br><br>NuMale Florida TB PLLC<br>Case No. 25-10345-nmc<br><br>NuMale Nebraska LLC<br>Case No. 25-10346-nmc |

| | |
|---|---|
| NUMALE ALL DEBTORS, ☒<br><br>Debtors. | NuMale New Mexico SC<br>Case No. 25-10347-nmc |

**ORDER GRANTING EX PARTE APPLICATION FOR EXAMINATION OF THE PERSON MOST KNOWLEDGEABLE FOR QUINTAIROS, PRIETO, WOOD & BOYER, P.A. PURSUANT TO BANKRUPTCY RULE 2004**

Upon the *Ex Parte Application for Examination of the Person Most Knowledgeable For Quintairos, Prieto, Wood & Boyer, P.A. Pursuant to Bankruptcy Rule 2004* (the "Ex Parte Application") filed by Michael Carmel, the former Chapter 11 trustee of the bankruptcy estates of NuMale Corporation, Feliciano NuMale Nevada PLLC, NuMedical SC, NuMale Colorado SC, NuMale Florida TB PLLC, NuMale Nebraska LLC, and NuMale New Mexico SC (collectively, "Debtors"), and the Liquidating Trustee of the NuMale Liquidation Trust, and good cause appearing therefor;

**IT IS HEREBY ORDERED** that the person most knowledgeable for *Quintairos, Prieto, Wood & Boyer, P.A.* shall appear for a Rule 2004 examination pursuant to FED. R. BANKR. P. 2004, regarding matters that are within the scope of Rule 2004, including without limitation the acts, assets, conduct, property, liabilities, financial condition, and business dealings of the Debtors, including without limitation the litigation claims expressly preserved for the NuMale Liquidation Trust under the confirmed *Joint Plan of Reorganization* [ECF No. 434]. The Trustee shall issue a separate subpoena pursuant to Fed. R. Bankr. P. 9016 for the production of documents.

. . .

. . .

. . .

. . .

. . .

. . .

. . .

Garman Turner Gordon LLP
7251 Amigo Street, Ste. 210
Las Vegas, Nevada 89119
(725) 777-3000

**IT IS FURTHER ORDERED** that the examination may be continued from day to day until concluded and that the examination will be recorded by a certified court reporter by stenographic means and may also be videographically recorded.

**IT IS SO ORDERED.**

PREPARED AND SUBMITTED BY:

GARMAN TURNER GORDON LLP

By: /s/ Talitha Gray Kozlowski
GREGORY E. GARMAN, ESQ.
TALITHA GRAY KOZLOWSKI, ESQ.
MARY LANGSNER, Ph.D.
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
*Attorneys for Liquidating Trustee of the NuMale Liquidating Trust*

# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>NUMALE CORPORATION,<br><br>AFFECTS THIS DEBTOR, ☐<br><br>AFFECTS FELICIANO NUMALE NEVADA PLLC, ☐<br><br>NUMEDICAL SC, ☐<br><br>NUMALE COLORADO SC, ☐<br><br>NUMALE FLORIDA TB PLLC, ☐<br><br>NUMALE NEBRASKA LLC, ☐<br><br>NUMALE NEW MEXICO SC, ☐<br><br>NUMALE ALL DEBTORS, ☒<br><br>Debtors. | Lead Case No.: 25-10341-nmc<br>Chapter 11<br><br>*Jointly administered with:*<br><br>Feliciano NuMale Nevada PLLC<br>Case No. 25-10342-nmc<br><br>NuMedical SC<br>Case No. 25-10343-nmc<br><br>NuMale Colorado SC<br>Case No. 25-10344-nmc<br><br>NuMale Florida TB PLLC<br>Case No. 25-10345-nmc<br><br>NuMale Nebraska LLC<br>Case No. 25-10346-nmc<br><br>NuMale New Mexico SC<br>Case No. 25-10347-nmc<br><br>**SUBPOENA IN A CASE UNDER THE BANKRUPTCY CODE FOR EXAMINATION AND PRODUCTION OF DOCUMENTS PURSUANT TO FED. R. BANKR. P. 2004 AND 9016** |

**TO: ERIC BOYER, ESQ.**
**Quintairos, Prieto, Wood & Boyer, P.A.**
**9300 South Dadeland Blvd., 4th Floor**
**Miami, Florida 33156**

☐ YOU ARE COMMANDED to appear in the United States Bankruptcy Court at the place, date, and time specified below to testify in the above case.

| **PLACE** | **COURTROOM** |
|---|---|
| | **DATE AND TIME** |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify in this bankruptcy case. If you are an organization, you must designate one or more officers directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| PLACE | DATE AND TIME: |
|---|---|
| Berger Singerman<br>1450 Brickell Avenue, Suite 1900<br>Miami, Florida 33131 | October 6, 2026<br>8:30 a.m. (Eastern) |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the documents requested on **Exhibit "A"** hereto.

| PLACE | DATE AND TIME |
|---|---|
| Responsive documents shall be provided in electronic format to tgray@gtg.legal on or before October 1, 2026, at 10:00 a.m. (Eastern). | October 1, 2026<br>10:00 a.m. (Eastern) |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any subpoenaed organization not a party to this proceeding case shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify, Fed. R. Civ. P. 30(b)(6) made applicable to this proceeding by Rule 7030, Fed. R. Bankr. P. See Rules 1018 and 9014, Fed. R. Bankr. P.

| ISSUING OFFICER SIGNATURE AND TITLE | DATE |
|---|---|
| */s/ Talitha Gray Kozlowski* | September 17, 2026 |

| ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER |
|---|
| Gregory E. Garman, Esq.<br>Talitha Gray Kozlowski, Esq.<br>Mary Langsner, Ph.D.<br>Garman Turner Gordon LLP<br>7251 Amigo Street, Suite 210<br>Las Vegas, NV 89119<br>(725) 777-3000 |

**PROOF OF SERVICE**

| SERVED | DATE | PLACE |
|---|---|---|
| | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |
| **SERVED BY (PRINT NAME)** | **TITLE** |
| | |

**DECLARATION OF SERVER**

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.United States of America

Executed on ______________________
(Date)

______________________
SIGNATURE OF SERVER

______________________
ADDRESS OF SERVER

**Federal Rules of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)**
**(made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)**

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person

(i) is a party or a party's officer; or

(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:

(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees —on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*

*(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

*(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises —or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*

*(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

*(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

*(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

*(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

*(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

*(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

*(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*

*(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

*(B) Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

...

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

## EXHIBIT A

These requests are served pursuant to Fed. R. Bankr. P. 2004 and 9016 and the Court's Order Granting Ex Parte Application for Examination of Eric Boyer Pursuant to Bankruptcy Rule 2004 [ECF No. 973], which directs examination regarding matters within the scope of Rule 2004, "including without limitation the litigation claims expressly preserved for the NuMale Liquidation Trust under the confirmed Joint Plan of Reorganization [ECF No. 434]." The Quintairos Claims are assets of the Liquidation Trust. These requests are limited to Your receipt of money and property from QPWB and the subsequent disposition of that money and property, which bear on the collectability of the Quintairos Claims.

## DEFINITIONS

1. "Communications" shall mean, without limitation, any transmittal, conveyance or exchange of a word, statement, fact, thing, idea, Document, instruction, information, demand, question or other information by any medium, whether by written, oral or other means, including but not limited to personal conversations, phone calls, written correspondence, memoranda, letters, reports, publications, electronic communications, instant messaging, messages via e-mail, direct messaging on social media platforms, text messaging (SMS, MMS, iMessage), WhatsApp, Signal, Telegram, Microsoft Teams, Slack, or other messaging or collaboration platforms, voicemail, audio or video recordings, and notes or summaries of telephone calls, video conferences, or meetings, and is to be interpreted broadly.

2. "Date" means the exact day, month, and year, if known, or if not known, Your best approximation thereof. Exact dates shall be given in all answers except where it is explicitly indicated than an approximate date may be given.

3. "Debtors" shall, collectively, mean and refer to NuMale Corporation; Feliciano NuMale Nevada PLLC; NuMedical SC; NuMale Colorado SC; NuMale Florida TB PLLC; NuMale Nebraska LLC; and NuMale New Mexico SC.

4. "Document" is intended to be as broad as it is used in FRCP 26 and 34, and includes, without limitation:

a. the original (or an identical duplicate if the original is not available) and any non-identical copies (whether non-identical because of notes made on copies or attached comments, annotations, marks, transmission notations, or highlighting

of any kind) of writings of every kind and description that are fixed in any kind of physical media;[1]

b. any printed, typewritten, handwritten, electronic, or otherwise recorded matter of whatever character of communications, letters, correspondence, electronic mail, text messages, memoranda, notes, Post-Its, media releases or articles, photographs, tape or sound recordings, contracts, agreements, telephone records, diaries, desk calendars, appointment calendar, group scheduler calendars, statements, reports, journal, minutes, working paper, financial report, accounting report, work papers, facsimile, facsimile transmission, drafts, logs, chart, graph, index, directory, scheduling data, databases, spreadsheets, presentations, word processed Documents, bulletins, design schedules, supplemental instructions, time cards, drawings, shop drawings, progress payments, progress schedules, estimates, equipment time cards, design calculations, design meeting minutes, coordination meeting minutes, and material similar to any of the foregoing, however denominated and to whomever addressed, computer directory, computer disk, computer tape, or any written, printed, typed, punched, taped, filmed, or graphic matter however produced or reproduced. Documents also include the file, folder tabs, and labels appended to or containing any Documents.

c. For the avoidance of doubt, electronically-stored information with all metadata intact shall be produced whenever available in the format described below.

5. "<u>Family Member</u>" means a person's spouse or domestic partner, former spouse, child, stepchild, parent, stepparent, sibling, niece, nephew, cousin, and the spouse of any of the foregoing, and any trust or entity established for the benefit of, or owned or controlled by, any of the foregoing.

6. "<u>Financial Account</u>" means any checking, savings, money market, brokerage, investment, retirement, annuity, trust, digital-asset, or other account at any bank, broker, custodian, exchange, or other financial institution, whether held individually, jointly, or through any trust or entity.

7. "<u>Identify</u>" shall mean to state the nature and subject matter of the Document, the Date, if any, appearing thereon, the identity of each Person who prepared and received the Document, and the present location of the Document. In all cases where identification of a Document is requested, in lieu of such specification, You may supply legible copies of such Documents.

---

[1] Physical media includes, but is not limited to, paper media, photographic media (including pictures, films, slides and microfilm), phonographic media, magnetic media (including, but not limited to hard drives, floppy disks, compact disks, and magnetic tapes of any kind), computer memory, optical media, magneto-optical media, and other physical media on which notations or marking of any kind can be affixed.

8. "Liquidation Trust" and "Trustee" mean the NuMale Liquidation Trust and Michael W. Carmel, in his capacities as former Chapter 11 trustee of the Debtors and as Liquidating Trustee of the Liquidation Trust.

9. "Person" shall mean any natural person, legal entity, or association of legal entities and/or natural persons, including, but not limited to, a corporation, professional corporation, association, partnership, joint venture, firm, or company.

10. "QPWB" means Quintairos, Prieto, Wood & Boyer, P.A., and its predecessors, successors, and offices.

11. "QPWB Affiliate" means any entity that, at any time since January 1, 2023, controlled, was controlled by, or was under common control with QPWB, or in which QPWB or You held an ownership interest and which transacted business with or received any payment from QPWB.

12. "QPWB Payment" means each Transfer made by QPWB or any QPWB Affiliate to You or for Your benefit, or to any Family Member or entity You own or control, during the Transfer Period.

13. "Quintairos Claims" means all claims and causes of action held by or preserved for the Liquidation Trust under the confirmed Joint Plan [ECF No. 434] against QPWB or any of its current or former attorneys, including the claims defined in the Plan as the Quintairos Claims, the Quintairos Non-Debtor Claims, and the Quintairos PF Claims, and all claims asserted in the Trustee's demand correspondence to QPWB.

14. "Relating" or "Relate To" means concerning, referring to, describing, evidencing, or constituting.

15. "Transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with money, property, or an interest in property, including payment of salary, bonus, draw, distribution, dividend, return of capital, redemption or repurchase of stock, loan or advance, loan forgiveness, payment of personal expenses or premiums, retirement or deferred compensation contribution, gift, conveyance, re-titling, and the grant of any security interest.

16. "Transfer Period" means January 1, 2023 through the date of Your production,

unless a request states a different period. An agreement that was in effect at any time during the Transfer Period is within the Transfer Period regardless of the date on which it was executed.

17. As used herein, the terms "You" and "Your" shall refer, collectively, to Eric W. Boyer, individually and in any capacity, and Your agents, employees, attorneys, accountants, advisors, representatives, or any other person over which You have control or have a superior right to compel to do an act or produce an item and any entity You have or had an ownership or beneficial interest (contingent or otherwise) or an entity You were or are an agent, manager, officer, or director or otherwise maintained or maintain a supervisory, advisory, or consulting role.

18. If any document is withheld under a claim of privilege or work product, a list should be furnished identifying each document for which privilege or work product is claimed, together with sufficient basis to assess the validity of the privilege, including but not limited to the following information for each such document: (a) date, sender, recipient, persons to whom copies were furnished, and job titles of each of these persons; (b) subject matter of the document; (c) number of pages in the document; and (d) the basis or bases upon which the privilege is claimed.

19. If any requested document was but no longer is in your possession, subject to your control, or no longer exists, please state whether it (a) is missing or lost; (b) has been destroyed; (c) has been transferred, voluntarily or involuntarily, to others, and state the identity of those persons to whom it has been transferred; or (d) has been otherwise disposed of. In each instance, explain the circumstances surrounding the disposition, state the date or approximate date thereof, and identify the persons with knowledge of such circumstances.

20. The documents described in the requests below are to be produced as they are kept in the usual course of business. If there are electronic records or e-mails, such documents are to be produced in electronic format.

## INSTRUCTIONS

1. You shall produce all Documents in the manner in which they are maintained in the usual course of business and/or shall organize and label Documents to correspond with the categories of this Request. A Request for Documents shall be deemed to include a Request for

any and all file folders within which the document was contained, transmittal sheets, cover letters, exhibits, enclosures, or attachments to the Document in addition to the Document itself.

2. In producing Documents and other materials, You are requested to furnish all Documents or things in Your possession, custody, or control, regardless of whether such Documents or materials are possessed by You directly or Your directors, officers, agents, employees, representatives, subsidiaries, managing agents, affiliates, investigators, or by Your attorneys or their agents, employees, representatives, or investigators.

3. If You cannot answer any portion of the following Requests in full, after exercising due diligence to secure the information, please so state and answer to the extent possible, specifying Your inability to answer the remainder and stating whatever information or knowledge You have concerning the unanswered portion.

4. You are requested to provide all responsive Documents within Your possession, custody, or control. In the event that You provide only a portion of the Documents called for by any particular Request, please state the reason(s) for Your inability to provide the remainder of the Documents requested and the identity of the Document(s).

5. In the event the Documents called for by any particular request are no longer in Your possession, custody or control, please state the reason(s) why those Documents are no longer in Your possession, custody, or control and the identity of the Document(s).

6. In the event that Documents called for by any particular request have been lost or destroyed, please state: (i) the date on which the Document(s) were lost or destroyed; (ii) the manner in which the Document(s) were lost or destroyed; (iii) the identity of the Document(s); (iv) the information contained within such Document(s) and the nature of the Document(s); and (v) and the identity of any person(s) who has knowledge of the contents of the Document(s) or has received a copy of such Document(s).

7. If You withhold any Document pursuant to a claim of privilege, You shall expressly make the claim of privilege and produce a privilege log in compliance with Fed. R. Civ. P. 26(b)(5), incorporated by Fed. R. Bankr. P. 7026.

8. Documents attached to each other should not be separated.

9. A request may be answered, in whole or in part, by identifying by Bates number responsive Documents produced to the Trustee or his counsel by QPWB (including in response to the subpoena served on QPWB in connection with the Rule 2004 examination of its person most knowledgeable), provided the response specifies which Bates-numbered Documents respond to which request.

10. The terms "each" and "all" shall be construed as "all and each."

11. The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery Request all responses that might otherwise be outside of the scope.

12. The use of the singular form of any word includes the plural and vice versa.

13. The use of the feminine form of any word includes the masculine and vice versa.

14. You are requested and instructed to produce Documents in response to the requests below in accordance with the Federal Rules of Civil Procedure, applicable in the Debtors' bankruptcy cases by way of the Federal Rules of Bankruptcy Procedure.

15. Pursuant to Federal Rule of Civil Procedure 34(b)(1)(C), in response to each of the requests below, electronically stored information is to be produced in a reasonably usable format together with a description of the system from which such information was derived sufficient to permit rendering the records and information intelligible. With the exception of electronically stored information produced in native format, electronically stored information shall be produced as TIFF or PDF images and must be produced with extracted text and metadata reflecting at least the title, author, creation date, modification date, and custodian of such information (and for email correspondence, also the from, to, cc, bcc, sent date and time, and email subject fields) and also with a load file showing the logical unitization of documents and family member groupings. Excel spreadsheets, multimedia, and other similar files (*e.g.*, .csv files) must be produced in native format.

[*Remainder of page left intentionally blank. See next page.*]

**REQUESTS FOR PRODUCTION**

Please produce:

1. Documents sufficient to show each QPWB Payment, stating for each: (a) payor; (b) payee; (c) date; (d) amount; (e) type (for example, salary, draw, bonus, year-end or residual-profit distribution, dividend, return of capital, redemption payment, loan or advance, loan forgiveness, expense payment, benefit, or retirement or deferred compensation contribution); and (f) the Financial Account into which it was deposited (institution, last four digits, and titleholder).

2. The Forms W-2 and 1099 and Schedules K-1 You received from QPWB or any QPWB Affiliate for tax years 2023, 2024, and 2025.

3. Documents sufficient to show all expenses, perquisites, and personal benefits paid by QPWB for You or on Your behalf during the Transfer Period that were not billed to and reimbursed by a client, including vehicles, aircraft, travel, club or membership dues, housing, life or disability insurance premiums, payments to Family Members, tax payments or gross-ups, and personal charges on any QPWB-paid credit card, together with the statements for any such card.

4. Monthly statements, for the Transfer Period, for each Financial Account into which any QPWB Payment was deposited.

5. Documents sufficient to show each Transfer of $25,000 or more out of any Financial Account identified in response to Request No. 4 during the Transfer Period, stating for each the date, amount, recipient, and receiving Financial Account (institution, last four digits, and titleholder). This request does not seek payments to unrelated third parties for ordinary household living expenses.

6. Documents sufficient to show each Transfer of money or property having a value of $25,000 or more (individually, or in the aggregate to the same transferee within any 12-month period) made during the Transfer Period by You, or by any entity You own or control, to (a) any Family Member; (b) any trust; (c) any entity in which You or any Family Member holds an interest; or (d) any other person for less than reasonably equivalent value, stating for each the date, amount or description of property, transferee, receiving Financial Account (if any), and consideration received.

7. Your federal gift tax returns (Form 709), with all attachments and appraisals, for tax years 2023, 2024, and 2025.

8. For (a) each trust that received any Transfer identified in response to Request No. 5 or 6, and (b) each trust in existence at any time during the Transfer Period of which You are a settlor or grantor and also a current, discretionary, or contingent beneficiary: the trust agreement or declaration of trust, all amendments, schedules of assets, and all assignment or funding Documents.

9. All premarital, marital, postnuptial, transmutation, or property-characterization agreements executed or amended during the Transfer Period, and all deeds, assignments, and account re-titling Documents by which any property was conveyed to or re-titled in the name of Your spouse or any other Family Member during the Transfer Period.

10. All deeds, closing statements, mortgages, and homestead declarations for any real property acquired, transferred, improved (at a cost of $50,000 or more), or encumbered during the Transfer Period by You, Your spouse, or any trust or entity for the benefit of either of You, together with Documents sufficient to show the source of the funds used.

11. Documents sufficient to show all contributions, premium payments, or deposits of $25,000 or more made by You or on Your behalf during the Transfer Period to annuity contracts, cash-value life insurance policies, retirement accounts (other than ordinary-course payroll deferrals), or education savings accounts, stating for each the date, amount, and account or policy.

12. Documents sufficient to show each entity formed during the Transfer Period in which You, Your spouse, or any trust for the benefit of either of You holds an interest, and each Transfer of money or property to any such entity.

GARMAN TURNER GORDON LLP
GREGORY E. GARMAN
Nevada Bar No. 6654
E-mail: ggarman@gtg.legal
TALITHA GRAY KOZLOWSKI, ESQ.
Nevada Bar No. 9040
tgray@gtg.legal
MARY LANGSNER, Ph.D.
Nevada Bar No. 13707
mlangsner@gtg.legal
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
Telephone (725) 777-3000
Facsimile (725) 777-3112
*Attorneys for Michael Carmel,*
*Liquidating Trustee of the NuMale Liquidating Trust*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>NUMALE CORPORATION,<br><br>AFFECTS THIS DEBTOR, ☐<br><br>AFFECTS FELICIANO NUMALE NEVADA PLLC, ☐<br><br>NUMEDICAL SC, ☐<br><br>NUMALE COLORADO SC, ☐<br><br>NUMALE FLORIDA TB PLLC, ☐<br><br>NUMALE NEBRASKA LLC, ☐<br><br>NUMALE NEW MEXICO SC, ☐<br><br>NUMALE ALL DEBTORS, ☒<br><br>Debtors. | Lead Case No.: 25-10341-nmc<br>Chapter 11<br><br>*Jointly administered with:*<br><br>Feliciano NuMale Nevada PLLC<br>Case No. 25-10342-nmc<br><br>NuMedical SC<br>Case No. 25-10343-nmc<br><br>NuMale Colorado SC<br>Case No. 25-10344-nmc<br><br>NuMale Florida TB PLLC<br>Case No. 25-10345-nmc<br><br>NuMale Nebraska LLC<br>Case No. 25-10346-nmc<br><br>NuMale New Mexico SC<br>Case No. 25-10347-nmc |

**EX PARTE APPLICATION FOR EXAMINATION OF ERIC BOYER**
**<u>PURSUANT TO BANKRUPTCY RULE 2004</u>**

Michael Carmel, the former Chapter 11 trustee of the bankruptcy estates of NuMale Corporation, Feliciano NuMale Nevada PLLC, NuMedical SC, NuMale Colorado SC, NuMale Florida TB PLLC, NuMale Nebraska LLC, and NuMale New Mexico SC (collectively, "Debtors"), and the Liquidating Trustee of the NuMale Liquidation Trust (the "Trustee"), by and through his counsel, the law firm of Garman Turner Gordon LLP, hereby respectfully applies for an order pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure directing Eric Boyer to appear for an examination on October 6, 2026, 8:30 a.m. (Eastern), or such other date as mutually agreed by the parties. The Bankruptcy Rule 2004 examination will be conducted in person at the law firm of Berger Singerman, 1450 Brickell Avenue, Suite 1900, Miami, Florida 33131. The Trustee further requests that the examination be continued from day to day until concluded.[1]

Bankruptcy Rule 2004(a) provides that "[o]n a party in interest's motion, the court may order the examination of any entity." Such an examination may relate to the acts, conduct, or property, or to the liabilities and financial condition of the debtors, or to any matter which may affect the administration of the debtors' estate. *See* FED. R. BANKR. P. 2004(b). Here, the requested examination relates to the matters that are within the permitted scope of Bankruptcy Rule 2004, including the Debtors' assets, the Debtors' liabilities, and the Debtors' litigation claims expressly preserved for the NuMale Liquidation Trust under the confirmed *Joint Plan of Reorganization* [ECF No. 434].

Local Rule 2004(b) further provides in pertinent part that "the Clerk may sign orders for examination only if the dates for examination is more than fourteen (14) days from the date the motion is filed...." Therefore, the Clerk may sign an order for the Bankruptcy Rule 2004 examination of Eric Boyer.

. . .

. . .

[1] The examination will be recorded via stenographic means and may also be recorded by a videographer.

Garman Turner Gordon LLP
7251 Amigo Street, Ste. 210
Las Vegas, Nevada 89119
(725) 777-3000

WHEREFORE, the Trustee respectfully requests entry of the *Order Granting Ex Parte Application for Examination of Eric Boyer Pursuant to Bankruptcy Rule 2004* submitted herewith as **Exhibit "1"**.

DATED this 10th day of September, 2026.

GARMAN TURNER GORDON LLP

By: */s/Talitha Gray Kozlowski*
GREGORY E. GARMAN, ESQ.
TALITHA GRAY KOZLOWSKI, ESQ.
MARY LANGSNER, Ph.D.
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
*Attorneys for Liquidating Trustee of the NuMale Liquidating Trust*

# EXHIBIT 1

EXHIBIT 1

GARMAN TURNER GORDON LLP
GREGORY E. GARMAN
Nevada Bar No. 6654
E-mail: ggarman@gtg.legal
TALITHA GRAY KOZLOWSKI, ESQ.
Nevada Bar No. 9040
tgray@gtg.legal
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
Telephone (725) 777-3000
Facsimile (725) 777-3112
*Attorneys for Michael Carmel,*
*Liquidating Trustee of the NuMale Liquidating Trust*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>NUMALE CORPORATION,<br><br>AFFECTS THIS DEBTOR, ☐<br><br>AFFECTS FELICIANO NUMALE NEVADA PLLC, ☐<br><br>NUMEDICAL SC, ☐<br><br>NUMALE COLORADO SC, ☐<br><br>NUMALE FLORIDA TB PLLC, ☐<br><br>NUMALE NEBRASKA LLC, ☐<br><br>NUMALE NEW MEXICO SC, ☐<br><br>NUMALE ALL DEBTORS, ☒<br><br>Debtors. | Lead Case No.: 25-10341-nmc<br>Chapter 11<br><br>*Jointly administered with:*<br><br>Feliciano NuMale Nevada PLLC<br>Case No. 25-10342-nmc<br><br>NuMedical SC<br>Case No. 25-10343-nmc<br><br>NuMale Colorado SC<br>Case No. 25-10344-nmc<br><br>NuMale Florida TB PLLC<br>Case No. 25-10345-nmc<br><br>NuMale Nebraska LLC<br>Case No. 25-10346-nmc<br><br>NuMale New Mexico SC<br>Case No. 25-10347-nmc |

**ORDER GRANTING EX PARTE APPLICATION FOR EXAMINATION OF ERIC BOYER PURSUANT TO BANKRUPTCY RULE 2004**

Upon the *Ex Parte Application for Examination of Eric Boyer Pursuant to Bankruptcy Rule 2004* (the "Ex Parte Application") filed by Michael Carmel, the former Chapter 11 trustee of the bankruptcy estates of NuMale Corporation, Feliciano NuMale Nevada PLLC, NuMedical SC, NuMale Colorado SC, NuMale Florida TB PLLC, NuMale Nebraska LLC, and NuMale New Mexico SC (collectively, "Debtors"), and the Liquidating Trustee of the NuMale Liquidation Trust, and good cause appearing therefor;

**IT IS HEREBY ORDERED** that *Eric Boyer* shall appear for a Rule 2004 examination pursuant to FED. R. BANKR. P. 2004, regarding matters that are within the scope of Rule 2004, including without limitation the acts, assets, conduct, property, liabilities, financial condition, and business dealings of the Debtors, including without limitation the litigation claims expressly preserved for the NuMale Liquidation Trust under the confirmed *Joint Plan of Reorganization* [ECF No. 434]. The Trustee shall issue a separate subpoena pursuant to Fed. R. Bankr. P. 9016 for the production of documents.

**IT IS FURTHER ORDERED** that the examination may be continued from day to day until concluded and that the examination will be recorded by a certified court reporter by stenographic means and may also be videographically recorded.

**IT IS SO ORDERED.**

PREPARED AND SUBMITTED BY:

GARMAN TURNER GORDON LLP

By: /s/ Talitha Gray Kozlowski
GREGORY E. GARMAN, ESQ.
TALITHA GRAY KOZLOWSKI, ESQ.
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
*Attorneys for Liquidating Trustee of the NuMale Liquidating Trust*

Honorable Natalie M. Cox
United States Bankruptcy Judge

~~GARMAN TURNER GORDON LLP~~
GREGORY E. GARMAN
Nevada Bar No. 6654
E-mail: ggarman@gtg.legal
TALITHA GRAY KOZLOWSKI, ESQ.
Nevada Bar No. 9040
tgray@gtg.legal
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
Telephone (725) 777-3000
Facsimile (725) 777-3112
*Attorneys for Michael Carmel,*
*Liquidating Trustee of the NuMale Liquidating Trust*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>NUMALE CORPORATION,<br><br>AFFECTS THIS DEBTOR, ☐<br><br>AFFECTS FELICIANO NUMALE NEVADA PLLC, ☐<br><br>NUMEDICAL SC, ☐<br><br>NUMALE COLORADO SC, ☐<br><br>NUMALE FLORIDA TB PLLC, ☐<br><br>NUMALE NEBRASKA LLC, ☐<br><br>NUMALE NEW MEXICO SC, ☐<br><br>NUMALE ALL DEBTORS, ☒<br><br>Debtors. | Lead Case No.: 25-10341-nmc<br>Chapter 11<br><br>*Jointly administered with:*<br><br>Feliciano NuMale Nevada PLLC<br>Case No. 25-10342-nmc<br><br>NuMedical SC<br>Case No. 25-10343-nmc<br><br>NuMale Colorado SC<br>Case No. 25-10344-nmc<br><br>NuMale Florida TB PLLC<br>Case No. 25-10345-nmc<br><br>NuMale Nebraska LLC<br>Case No. 25-10346-nmc<br><br>NuMale New Mexico SC<br>Case No. 25-10347-nmc |

**ORDER GRANTING EX PARTE APPLICATION FOR EXAMINATION OF ERIC BOYER PURSUANT TO BANKRUPTCY RULE 2004**

Upon the *Ex Parte Application for Examination of Eric Boyer Pursuant to Bankruptcy Rule 2004* (the "Ex Parte Application") filed by Michael Carmel, the former Chapter 11 trustee of the bankruptcy estates of NuMale Corporation, Feliciano NuMale Nevada PLLC, NuMedical SC, NuMale Colorado SC, NuMale Florida TB PLLC, NuMale Nebraska LLC, and NuMale New Mexico SC (collectively, "Debtors"), and the Liquidating Trustee of the NuMale Liquidation Trust, and good cause appearing therefor;

**IT IS HEREBY ORDERED** that *Eric Boyer* shall appear for a Rule 2004 examination pursuant to FED. R. BANKR. P. 2004, regarding matters that are within the scope of Rule 2004, including without limitation the acts, assets, conduct, property, liabilities, financial condition, and business dealings of the Debtors, including without limitation the litigation claims expressly preserved for the NuMale Liquidation Trust under the confirmed *Joint Plan of Reorganization* [ECF No. 434]. The Trustee shall issue a separate subpoena pursuant to Fed. R. Bankr. P. 9016 for the production of documents.

**IT IS FURTHER ORDERED** that the examination may be continued from day to day until concluded and that the examination will be recorded by a certified court reporter by stenographic means and may also be videographically recorded.

**IT IS SO ORDERED.**

PREPARED AND SUBMITTED BY:

GARMAN TURNER GORDON LLP

By: /s/ Talitha Gray Kozlowski
GREGORY E. GARMAN, ESQ.
TALITHA GRAY KOZLOWSKI, ESQ.
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
*Attorneys for Liquidating Trustee of the NuMale Liquidating Trust*

# EXHIBIT C

GARMAN TURNER GORDON LLP
GREGORY E. GARMAN, ESQ.
Nevada Bar No. 6654
E-mail: ggarman@gtg.legal
TALITHA GRAY KOZLOWSKI, ESQ.
Nevada Bar No. 9040
tgray@gtg.legal
MARY LANGSNER, Ph.D.
Nevada Bar No. 13707
mlangsner@gtg.legal
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
Telephone (725) 777-3000
Facsimile (725) 777-3112
*Attorneys for Michael Carmel,*
*Liquidating Trustee of the NuMale Liquidating Trust*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>NUMALE CORPORATION,<br><br>AFFECTS THIS DEBTOR, ☐<br><br>AFFECTS FELICIANO NUMALE NEVADA PLLC, ☐<br><br>NUMEDICAL SC, ☐<br><br>NUMALE COLORADO SC, ☐<br><br>NUMALE FLORIDA TB PLLC, ☐<br><br>NUMALE NEBRASKA LLC, ☐<br><br>NUMALE NEW MEXICO SC, ☐<br><br>NUMALE ALL DEBTORS, ☒<br><br>Debtors. | Lead Case No.: 25-10341-nmc<br>Chapter 11<br><br>*Jointly administered with:*<br><br>Feliciano NuMale Nevada PLLC<br>Case No. 25-10342-nmc<br><br>NuMedical SC<br>Case No. 25-10343-nmc<br><br>NuMale Colorado SC<br>Case No. 25-10344-nmc<br><br>NuMale Florida TB PLLC<br>Case No. 25-10345-nmc<br><br>NuMale Nebraska LLC<br>Case No. 25-10346-nmc<br><br>NuMale New Mexico SC<br>Case No. 25-10347-nmc |

**NOTICE OF ISSUANCE OF SUBPOENA TO**
**<u>EDWARD PRIETO</u>**

Michael Carmel (the "Trustee"), the former Chapter 11 trustee of the bankruptcy estates of NuMale Corporation, Feliciano NuMale Nevada PLLC, NuMedical SC, NuMale Colorado SC, NuMale Florida TB PLLC, NuMale Nebraska LLC, and NuMale New Mexico SC (collectively, the "Debtors"), and the Liquidating Trustee of the NuMale Liquidation Trust, by and through his counsel, Garman Turner Gordon LLP, hereby provides notice of the issuance of a subpoena for the production of documents and examination of Edward Prieto. A copy of the subpoena is attached hereto as **Exhibit 1**.

Dated this 23rd day of September, 2026.

BANKRUPTCY RECOVERY GROUP, LLC

By: */s/ Talitha Gray Kozlowski*
GREGORY E. GARMAN, ESQ.
TALITHA GRAY KOZLOWSKI, ESQ.
MARY LANGSNER, Ph.D.
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
*Attorneys for Michael Carmel, Liquidating Trustee of the NuMale Liquidating Trust*

# EXHIBIT 1

EXHIBIT 1

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>NUMALE CORPORATION,<br><br>AFFECTS THIS DEBTOR, ☐<br><br>AFFECTS FELICIANO NUMALE NEVADA PLLC, ☐<br><br>NUMEDICAL SC, ☐<br><br>NUMALE COLORADO SC, ☐<br><br>NUMALE FLORIDA TB PLLC, ☐<br><br>NUMALE NEBRASKA LLC, ☐<br><br>NUMALE NEW MEXICO SC, ☐<br><br>NUMALE ALL DEBTORS, ☒<br><br>Debtors. | Lead Case No.: 25-10341-nmc<br>Chapter 11<br><br>*Jointly administered with:*<br><br>Feliciano NuMale Nevada PLLC<br>Case No. 25-10342-nmc<br><br>NuMedical SC<br>Case No. 25-10343-nmc<br><br>NuMale Colorado SC<br>Case No. 25-10344-nmc<br><br>NuMale Florida TB PLLC<br>Case No. 25-10345-nmc<br><br>NuMale Nebraska LLC<br>Case No. 25-10346-nmc<br><br>NuMale New Mexico SC<br>Case No. 25-10347-nmc<br><br>**SUBPOENA IN A CASE UNDER THE BANKRUPTCY CODE FOR EXAMINATION AND PRODUCTION OF DOCUMENTS PURSUANT TO FED. R. BANKR. P. 2004 AND 9016** |

**TO: EDWARD PRIETO, ESQ.**
**Quintairos, Prieto, Wood & Boyer, P.A.**
**1475 Centrepark Blvd., Suite 130**
**West Palm Beach, Florida 33401**

☐ YOU ARE COMMANDED to appear in the United States Bankruptcy Court at the place, date, and time specified below to testify in the above case.

| **PLACE** | **COURTROOM** |
|---|---|
| | **DATE AND TIME** |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify in this bankruptcy case. If you are an organization, you must designate one or more officers directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| PLACE | DATE AND TIME: |
|---|---|
| Berger Singerman<br>1450 Brickell Avenue, Suite 1900<br>Miami, Florida 33131 | October 6, 2026<br>1:00 p.m. (Eastern) |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the documents requested on **Exhibit "A"** hereto.

| PLACE | DATE AND TIME |
|---|---|
| Responsive documents shall be provided in electronic format to tgray@gtg.legal on or before October 1, 2026, at 10:00 a.m. (Eastern). | October 1, 2026<br>10:00 a.m. (Eastern) |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any subpoenaed organization not a party to this proceeding case shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify, Fed. R. Civ. P. 30(b)(6) made applicable to this proceeding by Rule 7030, Fed. R. Bankr. P. See Rules 1018 and 9014, Fed. R. Bankr. P.

| ISSUING OFFICER SIGNATURE AND TITLE | DATE |
|---|---|
| */s/ Talitha Gray Kozlowski* | September 22, 2026 |

| ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER |
|---|
| Gregory E. Garman, Esq.<br>Talitha Gray Kozlowski, Esq.<br>Mary Langsner, Ph.D.<br>Garman Turner Gordon LLP<br>7251 Amigo Street, Suite 210<br>Las Vegas, NV 89119<br>(725) 777-3000 |

| PROOF OF SERVICE | | |
|---|---|---|
| **SERVED** | **DATE** | **PLACE** |
| **SERVED ON (PRINT NAME)** | **MANNER OF SERVICE** | |
| **SERVED BY (PRINT NAME)** | **TITLE** | |
| **DECLARATION OF SERVER** | | |

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.United States of America

Executed on ____________________
(Date)

____________________
SIGNATURE OF SERVER

____________________
ADDRESS OF SERVER

**Federal Rules of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)**
**(made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)**

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person

(i) is a party or a party's officer; or

(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:

(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees —on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*

*(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

*(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises —or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*

*(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

*(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

*(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

*(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

*(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

*(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

*(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*

*(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

*(B) Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

...

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

**EXHIBIT A**

These requests are served pursuant to Fed. R. Bankr. P. 2004 and 9016 and the Court's Order Granting Ex Parte Application for Examination of Edward Prieto Pursuant to Bankruptcy Rule 2004 [ECF No. ___], which directs examination regarding matters within the scope of Rule 2004, "including without limitation the litigation claims expressly preserved for the NuMale Liquidation Trust under the confirmed Joint Plan of Reorganization [ECF No. 434]." The Quintairos Claims are assets of the Liquidation Trust. These requests are limited to Your receipt of money and property from QPWB and the subsequent disposition of that money and property, which bear on the collectability of the Quintairos Claims.

**DEFINITIONS**

1. "Communications" shall mean, without limitation, any transmittal, conveyance or exchange of a word, statement, fact, thing, idea, Document, instruction, information, demand, question or other information by any medium, whether by written, oral or other means, including but not limited to personal conversations, phone calls, written correspondence, memoranda, letters, reports, publications, electronic communications, instant messaging, messages via e-mail, direct messaging on social media platforms, text messaging (SMS, MMS, iMessage), WhatsApp, Signal, Telegram, Microsoft Teams, Slack, or other messaging or collaboration platforms, voicemail, audio or video recordings, and notes or summaries of telephone calls, video conferences, or meetings, and is to be interpreted broadly.

2. "Date" means the exact day, month, and year, if known, or if not known, Your best approximation thereof. Exact dates shall be given in all answers except where it is explicitly indicated than an approximate date may be given.

3. "Debtors" shall, collectively, mean and refer to NuMale Corporation; Feliciano NuMale Nevada PLLC; NuMedical SC; NuMale Colorado SC; NuMale Florida TB PLLC; NuMale Nebraska LLC; and NuMale New Mexico SC.

4. "Document" is intended to be as broad as it is used in FRCP 26 and 34, and includes, without limitation:

a. the original (or an identical duplicate if the original is not available) and any non-identical copies (whether non-identical because of notes made on copies or attached comments, annotations, marks, transmission notations, or highlighting

of any kind) of writings of every kind and description that are fixed in any kind of physical media;[1]

b. any printed, typewritten, handwritten, electronic, or otherwise recorded matter of whatever character of communications, letters, correspondence, electronic mail, text messages, memoranda, notes, Post-Its, media releases or articles, photographs, tape or sound recordings, contracts, agreements, telephone records, diaries, desk calendars, appointment calendar, group scheduler calendars, statements, reports, journal, minutes, working paper, financial report, accounting report, work papers, facsimile, facsimile transmission, drafts, logs, chart, graph, index, directory, scheduling data, databases, spreadsheets, presentations, word processed Documents, bulletins, design schedules, supplemental instructions, time cards, drawings, shop drawings, progress payments, progress schedules, estimates, equipment time cards, design calculations, design meeting minutes, coordination meeting minutes, and material similar to any of the foregoing, however denominated and to whomever addressed, computer directory, computer disk, computer tape, or any written, printed, typed, punched, taped, filmed, or graphic matter however produced or reproduced. Documents also include the file, folder tabs, and labels appended to or containing any Documents.

c. For the avoidance of doubt, electronically-stored information with all metadata intact shall be produced whenever available in the format described below.

5. "Family Member" means a person's spouse or domestic partner, former spouse, child, stepchild, parent, stepparent, sibling, niece, nephew, cousin, and the spouse of any of the foregoing, and any trust or entity established for the benefit of, or owned or controlled by, any of the foregoing.

6. "Financial Account" means any checking, savings, money market, brokerage, investment, retirement, annuity, trust, digital-asset, or other account at any bank, broker, custodian, exchange, or other financial institution, whether held individually, jointly, or through any trust or entity.

7. "Identify" shall mean to state the nature and subject matter of the Document, the Date, if any, appearing thereon, the identity of each Person who prepared and received the Document, and the present location of the Document. In all cases where identification of a Document is requested, in lieu of such specification, You may supply legible copies of such

[1] Physical media includes, but is not limited to, paper media, photographic media (including pictures, films, slides and microfilm), phonographic media, magnetic media (including, but not limited to hard drives, floppy disks, compact disks, and magnetic tapes of any kind), computer memory, optical media, magneto-optical media, and other physical media on which notations or marking of any kind can be affixed.

Documents.

8. "Liquidation Trust" and "Trustee" mean the NuMale Liquidation Trust and Michael W. Carmel, in his capacities as former Chapter 11 trustee of the Debtors and as Liquidating Trustee of the Liquidation Trust.

9. "Person" shall mean any natural person, legal entity, or association of legal entities and/or natural persons, including, but not limited to, a corporation, professional corporation, association, partnership, joint venture, firm, or company.

10. "QPWB" means Quintairos, Prieto, Wood & Boyer, P.A., and its predecessors, successors, and offices.

11. "QPWB Affiliate" means any entity that, at any time since January 1, 2023, controlled, was controlled by, or was under common control with QPWB, or in which QPWB or You held an ownership interest and which transacted business with or received any payment from QPWB.

12. "QPWB Payment" means each Transfer made by QPWB or any QPWB Affiliate to You or for Your benefit, or to any Family Member or entity You own or control, during the Transfer Period.

13. "Quintairos Claims" means all claims and causes of action held by or preserved for the Liquidation Trust under the confirmed Joint Plan [ECF No. 434] against QPWB or any of its current or former attorneys, including the claims defined in the Plan as the Quintairos Claims, the Quintairos Non-Debtor Claims, and the Quintairos PF Claims, and all claims asserted in the Trustee's demand correspondence to QPWB.

14. "Relating" or "Relate To" means concerning, referring to, describing, evidencing, or constituting.

15. "Transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with money, property, or an interest in property, including payment of salary, bonus, draw, distribution, dividend, return of capital, redemption or repurchase of stock, loan or advance, loan forgiveness, payment of personal expenses or premiums, retirement or deferred compensation contribution, gift, conveyance, re-titling, and the grant of any security interest.

16. "Transfer Period" means January 1, 2023 through the date of Your production, unless a request states a different period. An agreement that was in effect at any time during the Transfer Period is within the Transfer Period regardless of the date on which it was executed.

17. As used herein, the terms "You" and "Your" shall refer, collectively, to **Edward C. Prieto**, individually and in any capacity, and Your agents, employees, attorneys, accountants, advisors, representatives, or any other person over which You have control or have a superior right to compel to do an act or produce an item and any entity You have or had an ownership or beneficial interest (contingent or otherwise) or an entity You were or are an agent, manager, officer, or director or otherwise maintained or maintain a supervisory, advisory, or consulting role.

18. If any document is withheld under a claim of privilege or work product, a list should be furnished identifying each document for which privilege or work product is claimed, together with sufficient basis to assess the validity of the privilege, including but not limited to the following information for each such document: (a) date, sender, recipient, persons to whom copies were furnished, and job titles of each of these persons; (b) subject matter of the document; (c) number of pages in the document; and (d) the basis or bases upon which the privilege is claimed.

19. If any requested document was but no longer is in your possession, subject to your control, or no longer exists, please state whether it (a) is missing or lost; (b) has been destroyed; (c) has been transferred, voluntarily or involuntarily, to others, and state the identity of those persons to whom it has been transferred; or (d) has been otherwise disposed of. In each instance, explain the circumstances surrounding the disposition, state the date or approximate date thereof, and identify the persons with knowledge of such circumstances.

20. The documents described in the requests below are to be produced as they are kept in the usual course of business. If there are electronic records or e-mails, such documents are to be produced in electronic format.

## INSTRUCTIONS

1. You shall produce all Documents in the manner in which they are maintained in the usual course of business and/or shall organize and label Documents to correspond with the categories of this Request. A Request for Documents shall be deemed to include a Request for

any and all file folders within which the document was contained, transmittal sheets, cover letters, exhibits, enclosures, or attachments to the Document in addition to the Document itself.

2. In producing Documents and other materials, You are requested to furnish all Documents or things in Your possession, custody, or control, regardless of whether such Documents or materials are possessed by You directly or Your directors, officers, agents, employees, representatives, subsidiaries, managing agents, affiliates, investigators, or by Your attorneys or their agents, employees, representatives, or investigators.

3. If You cannot answer any portion of the following Requests in full, after exercising due diligence to secure the information, please so state and answer to the extent possible, specifying Your inability to answer the remainder and stating whatever information or knowledge You have concerning the unanswered portion.

4. You are requested to provide all responsive Documents within Your possession, custody, or control. In the event that You provide only a portion of the Documents called for by any particular Request, please state the reason(s) for Your inability to provide the remainder of the Documents requested and the identity of the Document(s).

5. In the event the Documents called for by any particular request are no longer in Your possession, custody or control, please state the reason(s) why those Documents are no longer in Your possession, custody, or control and the identity of the Document(s).

6. In the event that Documents called for by any particular request have been lost or destroyed, please state: (i) the date on which the Document(s) were lost or destroyed; (ii) the manner in which the Document(s) were lost or destroyed; (iii) the identity of the Document(s); (iv) the information contained within such Document(s) and the nature of the Document(s); and (v) and the identity of any person(s) who has knowledge of the contents of the Document(s) or has received a copy of such Document(s).

7. If You withhold any Document pursuant to a claim of privilege, You shall expressly make the claim of privilege and produce a privilege log in compliance with Fed. R. Civ. P. 26(b)(5), incorporated by Fed. R. Bankr. P. 7026.

8. Documents attached to each other should not be separated.

9. A request may be answered, in whole or in part, by identifying by Bates number responsive Documents produced to the Trustee or his counsel by QPWB (including in response to the subpoena served on QPWB in connection with the Rule 2004 examination of its person most knowledgeable), provided the response specifies which Bates-numbered Documents respond to which request.

10. The terms "each" and "all" shall be construed as "all and each."

11. The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery Request all responses that might otherwise be outside of the scope.

12. The use of the singular form of any word includes the plural and vice versa.

13. The use of the feminine form of any word includes the masculine and vice versa.

14. You are requested and instructed to produce Documents in response to the requests below in accordance with the Federal Rules of Civil Procedure, applicable in the Debtors' bankruptcy cases by way of the Federal Rules of Bankruptcy Procedure.

15. Pursuant to Federal Rule of Civil Procedure 34(b)(1)(C), in response to each of the requests below, electronically stored information is to be produced in a reasonably usable format together with a description of the system from which such information was derived sufficient to permit rendering the records and information intelligible. With the exception of electronically stored information produced in native format, electronically stored information shall be produced as TIFF or PDF images and must be produced with extracted text and metadata reflecting at least the title, author, creation date, modification date, and custodian of such information (and for email correspondence, also the from, to, cc, bcc, sent date and time, and email subject fields) and also with a load file showing the logical unitization of documents and family member groupings. Excel spreadsheets, multimedia, and other similar files (*e.g.*, .csv files) must be produced in native format.

[*Remainder of page left intentionally blank. See next page.*]

**REQUESTS FOR PRODUCTION**

Please produce:

1. Documents sufficient to show each QPWB Payment, stating for each: (a) payor; (b) payee; (c) date; (d) amount; (e) type (for example, salary, draw, bonus, year-end or residual-profit distribution, dividend, return of capital, redemption payment, loan or advance, loan forgiveness, expense payment, benefit, or retirement or deferred compensation contribution); and (f) the Financial Account into which it was deposited (institution, last four digits, and titleholder).

2. The Forms W-2 and 1099 and Schedules K-1 You received from QPWB or any QPWB Affiliate for tax years 2023, 2024, and 2025.

3. Documents sufficient to show all expenses, perquisites, and personal benefits paid by QPWB for You or on Your behalf during the Transfer Period that were not billed to and reimbursed by a client, including vehicles, aircraft, travel, club or membership dues, housing, life or disability insurance premiums, payments to Family Members, tax payments or gross-ups, and personal charges on any QPWB-paid credit card, together with the statements for any such card.

4. Monthly statements, for the Transfer Period, for each Financial Account into which any QPWB Payment was deposited.

5. Documents sufficient to show each Transfer of $25,000 or more out of any Financial Account identified in response to Request No. 4 during the Transfer Period, stating for each the date, amount, recipient, and receiving Financial Account (institution, last four digits, and titleholder). This request does not seek payments to unrelated third parties for ordinary household living expenses.

6. Documents sufficient to show each Transfer of money or property having a value of $25,000 or more (individually, or in the aggregate to the same transferee within any 12-month period) made during the Transfer Period by You, or by any entity You own or control, to (a) any Family Member; (b) any trust; (c) any entity in which You or any Family Member holds an interest; or (d) any other person for less than reasonably equivalent value, stating for each the date, amount or description of property, transferee, receiving Financial Account (if any), and consideration received.

7. Your federal gift tax returns (Form 709), with all attachments and appraisals, for

tax years 2023, 2024, and 2025.

8. For (a) each trust that received any Transfer identified in response to Request No. 5 or 6, and (b) each trust in existence at any time during the Transfer Period of which You are a settlor or grantor and also a current, discretionary, or contingent beneficiary: the trust agreement or declaration of trust, all amendments, schedules of assets, and all assignment or funding Documents.

9. All premarital, marital, postnuptial, transmutation, or property-characterization agreements executed or amended during the Transfer Period, and all deeds, assignments, and account re-titling Documents by which any property was conveyed to or re-titled in the name of Your spouse or any other Family Member during the Transfer Period.

10. All deeds, closing statements, mortgages, and homestead declarations for any real property acquired, transferred, improved (at a cost of $50,000 or more), or encumbered during the Transfer Period by You, Your spouse, or any trust or entity for the benefit of either of You, together with Documents sufficient to show the source of the funds used.

11. Documents sufficient to show all contributions, premium payments, or deposits of $25,000 or more made by You or on Your behalf during the Transfer Period to annuity contracts, cash-value life insurance policies, retirement accounts (other than ordinary-course payroll deferrals), or education savings accounts, stating for each the date, amount, and account or policy.

12. Documents sufficient to show each entity formed during the Transfer Period in which You, Your spouse, or any trust for the benefit of either of You holds an interest, and each Transfer of money or property to any such entity.

# EXHIBIT D

GARMAN
TURNER
GORDON

7251 AMIGO STREET
SUITE 210
LAS VEGAS, NV 89119
WWW.GTG.LEGAL
PHONE: 725 777 3000
FAX: 725 777 3112

May 18, 2026

Gregory Garman, Esq.
Email: ggarman@gtg.legal

**SENT VIA EMAIL AND FEDERAL EXPRESS**

Quintairos, Prieto, Wood & Boyer, P.A.
Attn: Eric W. Boyer, Esq.,
Managing Partner
9300 South Dadeland Blvd., 4th Floor
Miami, Florida 33156
eboyer@qpwblaw.com

Quintairos, Prieto, Wood & Boyer, P.A.
Attn: Dominique Barrett, Esq.
14350 N. 87th St., Suite 265
Scottsdale, Arizona 85260
dominique.barrett@qpwblaw.com

Quintairos, Prieto, Wood & Boyer, P.A.
Attn: Donna L. Chapman, Esq.,
Managing Partner 6565 Americas Parkway
NE, Suite 200
Albuquerque, New Mexico 87110
donna.chapman@qpwblaw.com

Atwood, Malone, Turner, & Sabin, P.A.
Attn: Erin Chavez, Esq.
400 N. Pennsylvania Ave., Suite 1100
P.O. Drawer 700
Roswell, New Mexico 88201
echavez@atwoodmalone.com

Quintairos, Prieto, Wood & Boyer, P.A
Attn: Frank Alvarez, Esq.,
Managing Partner
J. Andrew Robertson, Esq.
1700 Pacific Ave., Suite 4545
Dallas, Texas 75201
frank.alvarez@qpwblaw.com
andrew.robertson@qpwblaw.com

Re: *In re NuMale Medical, Inc., et al.*, Case No. 25-10341-nmc (Bankr. D. Nev). Pre-Litigation Demand for Resolution of Breach of Fiduciary Duty, Legal Malpractice, Fraud, and Related Claims Arising from *Michael E. Sanchez v. NuMale Corporation, et al.*, Case No. D-202-CV-2020-06336

Dear Counsel:

Quintairos, Prieto, Wood & Boyer, P.A. ("QPWB" or the "firm") is responsible for the largest medical malpractice judgment in New Mexico history. The firm, among other misconduct, concealed a disqualifying conflict of interest from its nine clients for three years; privately told the carrier to pay $950,000 to settle the case while concealing that same information from its own

clients; stipulated to joint and several liability across defendants with fundamentally divergent interests without client consent; and willfully violated court orders in the presence of the jury to the point the trial court publicly branded defense counsel's conduct "willful" violations of the court's orders multiple times in open court thereby poisoning the jury.

This letter provides notice to QPWB via the firm's management, with separate service on the individual attorneys who handled the *Sanchez* matter. The claims set forth herein are asserted jointly and severally against the firm and against each of the individually named attorneys.

Michael W. Carmel, Esq., as the Liquidating Trustee (the "Trustee") of the NuMale Liquidating Trust (the "Trust"). The Trust, through the Trustee is the lead plaintiff in the consolidated and joint prosecution of the collective claim against you by your former clients the NuMale Debtors and the individual insured plaintiffs, Dr. Christopher Asandra, Dr. Carlos Feliciano, Brad Palubicki, and Justin Pulliam. After notice and a hearing, this joint and consolidated prosecution was approved by order of the United States Bankruptcy Court for the District of Nevada. *See* 25-1034-nmc, ECF No. 0727, Order Confirming Joint Chapter 11 Plan (Bankr. D. Nev 2025).; 25-10341, ECF No. 0582, Order Approving Global Settlement, at 12 ("All claims against Quintairos, Prieto, Wood & Boyer, P.A. are not being released and are expressly preserved."). *See* ECF 434, Joint Plan of Reorganization ("...which claims shall be jointly prosecuted under the sole direction and control of the Liquidation Trustee"). For ease of reference in this letter, the Trustee and the individual insureds are collectively the "Plaintiffs."

This letter constitutes a formal pre-litigation demand for resolution of the following claims against QPWB and each individual attorney: breach of fiduciary duty, legal malpractice, fraud and constructive fraud, fraudulent concealment, civil conspiracy, post-verdict abandonment, breach of the implied covenant of good faith and fair dealing, negligent misrepresentation, disgorgement of fees, and punitive damages. The claims arise from QPWB's catastrophically inept defense of the NuMale defendants in *Sanchez v. NuMale Corporation, et al.*, which produced a jury verdict of $412,500,149 on November 25, 2024 and the subsequent destruction of the NuMale enterprise and its bankruptcy.

## I. SUMMARY

QPWB is responsible for the $412,500,149 Sanchez judgment and the collapse of the NuMale enterprise. The claims against the firm and each of you individually are supported by the firm's own file. That record, summarized below and established in the thirty-nine exemplary exhibits, is devastating.

The misconduct (both intentional and negligent) is so pervasive there are multiple paths to liability and judgment, but four facts are dispositive. Among the most damaging is the fact that QPWB never obtained a written engagement agreement with any of the nine defendants it represented, **nor did it obtain a written conflict waiver from any of them, at any point during**

**the three-year engagement**. Both are mandatory under the New Mexico Rules of Professional Conduct, and both were material at the very moment QPWB was retained.

Beazley hired QPWB specifically to replace prior counsel who had been disqualified for a conflict of interest in representing all the defendants arising from the Chapman-records-alteration issue. Beazley's July 25, 2022 engagement email expressly asked QPWB to "**advise if you can defend all defendants except Stephen Chapman — PA**." (Exhibit 4). QPWB's files, including its client communications and billing records show no such analysis was conducted. The firm's billing ledger contains no time entry for conflict analysis at any point during the first twenty-eight months from retention through verdict, and the file contains no conflict memorandum, no waiver, and no analysis. None.

Second, the QPWB managing partner admitted in writing, three weeks before jury selection, that the case should have been settled at $950,000 by accepting an outstanding offer of judgment. Frank Alvarez texted on October 24, 2024: "They f'ed this up. **We told them to pay 950**. NuMale has a claim against them, unfortunately for them." (Exhibit 1). That message tells the Plaintiffs three things. QPWB itself valued the case at $950,000 three weeks before trial, a figure that is one-sixth of the policy limits and four-thousandths of the eventual verdict. QPWB knew the individual insureds had a claim against the carrier. <u>And QPWB never told its own clients or encouraged its clients to accept the Offer of Judgment</u>. No written recommendation or policy-limits demand from QPWB to Beazley exists anywhere in the twenty-eight-month file. No written communication exists in which any QPWB attorney advised any individual defendant that the managing partner privately believed the carrier was improperly refusing the firm's settlement recommendation.

Third, QPWB trial counsel, Mr. Robertson, **admitted the disqualifying conflict** of interest in open court on November 20, 2024, the fifth day of trial: "*I'm cut in half between NuMale and Asandra.*" (Exhibit 2). That admission, made sixteen days after writing to Mr. Parrett, Dr. Asandra's separately retained counsel, that "*there is no conflict representing NuMale and Dr. Asandra,*" resolves the conflict question as a matter of fact. It also supplies the Plaintiffs' fraud and fraudulent concealment claims. This was not a conflict that arose on day five of the trial; instead, it was a conflict that existed from the very first day of the engagement because the QPWB clients were never aligned.

The same day, November 20, 2024, Dr. Asandra wrote QPWB stating: "I believe this course of action constitutes **ongoing malpractice** by defense counsel. … you hired attorneys who had a conflict of interest all along and I've never had my interests protected appropriately." (Exhibit 3). Dr. Asandra's counsel, Mr. Parrett sent three escalating emails the same day, accusing the firm by name of "essentially extortion" and "**continuing blatant failures to carry out your sworn duty to your client**." (Exhibits 9, 10, 11).

Fourth, and perhaps most damaging, three days before jury selection began in *Sanchez*, the very same judge who would preside over the *Sanchez* trial sanctioned QPWB for the identical

pattern of conflict concealment. On November 11, 2024, the Hon. Beatrice J. Brickhouse signed an Opinion and Order in *Rael v. Skies Healthcare and Rehabilitation Center, LLC*, Case No. D-202-CV-2019-07947, sanctioning QPWB (same firm, same Mr. Alvarez) for the same disqualifying conflict and same multi-year concealment pattern. The *Rael* court expressly found that QPWB's conduct was "intentional and designed to obtain strategic litigation advantage for their clients at the expense of this Court, Plaintiffs, and the judicial system as a whole," and further found that the sanctioned defendants "have a remedy against Movants for legal malpractice." (Exhibit 32, FOF ¶¶ 43, 52). Three days later, QPWB walked into Judge Brickhouse's courtroom and repeated the same conduct while concealing the *Rael* order from its own clients.

Fifth, and compounding these failures, QPWB stipulated on the record — without consulting its clients and without obtaining any client consent — to joint and several liability across the defendants with fundamentally divergent interests. Dr. Feliciano had already obtained a summary judgment ruling that he owed no duty to the plaintiff. Mr. Palubicki and Mr. Pulliam were non-physician corporate officers with individualized defenses. NuMale New Mexico S.C. Corp. had been placed on written notice, three years earlier, that it was entirely uninsured. And Dr. Asandra was simultaneously a plaintiff suing NuMale in Nevada state court. The November 22, 2024 Stipulation of Vicarious Liability collapsed these structurally divergent positions into a single unified verdict form and enabled the jury's "acting in concert" finding. That stipulation, made without client input or consent, is *per se* malpractice.

These facts, and the additional facts set out in the remainder of this letter, easily satisfy the willful, reckless, and wanton standard under New Mexico law for punitive damages at or above a three-to-one ratio. Applied to the compensatory base described in Part X below, total exposure exceeds $2 *billion*. The Plaintiffs are not making a monetary demand at this stage. The Plaintiffs first demand full disclosure of QPWB's professional liability coverage and a written commitment to engage in timely good faith settlement discussions.

After several demands for production, the Plaintiffs have now reviewed the entire QPWB file.[1] The relevant documents include the Alvarez text admissions, the Beazley-Robertson adjuster

---

[1] QPWB's production of the *Sanchez* file was itself marked by reckless disregard for the firm's confidentiality obligations to other clients. QPWB transferred to the undersigned not only the *Sanchez* matter file but also what appeared to be more than 255 additional client matter files having no relationship to the *Sanchez* matter. The Plaintiffs, through undersigned counsel, made multiple attempts to have the firm remedy the over-production. QPWB never sought return or destruction of the non-*Sanchez* files. We have acted in a good faith effort to segregate, not review, and destroy all non-*Sanchez* files in our possession in order to limit the attendant harm to the firm's unaffected clients and to the firm itself, including by mitigating (to the extent possible) waiver of attorney-client privilege, breach of the duty of confidentiality under Rule 16-106(A) NM R RPC, spoliation-of-evidence exposure in other client matters, and the State Bar reporting obligations that may be triggered by a large-scale inadvertent disclosure that QPWB did not even attempt to mitigate. The

communications, the Beazley-Alvarez engagement emails, QPWB's complete billing ledger ($502,682 over three years), Mr. Robertson's 16-page "Personal Recollection of Facts Surrounding the Motion for Mistrial and Relevant Pre-Trial Facts" (Exhibit 6), the *Rael* sanctions order, and direct evidence of the written-record void described throughout this letter.

This letter is organized as our complaint will be (if necessary). Part II addresses the concealed conflict of interest. Part III addresses the catastrophic settlement failures. Part IV addresses the Rael sanctions order. Part V addresses trial and post-trial performance. Part VI addresses the willful conduct supporting punitive damages. Part VII addresses causation. Part VIII addresses individual attorney exposure. Part IX lists the claims. Part X sets out damages. Part XI sets out the Plaintiffs' demands. Part XII reserves rights. Part XIII concludes.

## II. THE KNOWN, CONCEALED, AND LIED-ABOUT CONFLICT OF INTEREST

Under New Mexico law, a lawyer may not represent two or more clients concurrently if the representation involves a concurrent conflict, unless each affected client gives informed consent, confirmed in writing. *See* Rule 16-107(A), (B) NM R RPC. The duty is fiduciary: it belongs to each client; it is non-waivable except by the client affirmatively, in writing, after full disclosure. Breach is actionable as breach of fiduciary duty under UJI 13-2410 and UJI 13-2414 NMRA, and, where causally connected to loss, as legal malpractice. *See Richter v. Van Amberg*, 97 F. Supp. 2d 1255, 1261 (D.N.M. 2000); *Spencer v. Barber*, 2013-NMSC-010, ¶ 17, 299 P.3d 388; *Encinias v. Whitener Law Firm, P.A.*, 2013-NMSC-045, ¶ 8, 310 P.3d 611; *Andrews v. Saylor*, 2003-NMCA-132, ¶ 15, 134 N.M. 545.

### A. The Conflict Was Present at Inception and Was Deliberately Ignored and Hidden

QPWB walked into the *Sanchez* engagement with its eyes wide open. Predecessor counsel Butt Thornton & Baehr PC had been disqualified for a conflict arising from Stephen Chapman's admitted alteration of medical records. That disqualification is the entire reason QPWB was retained in July 2022. Any reasonable attorney stepping into a case from which predecessor counsel has just been disqualified due to a conflict would (a) immediately analyze whether all disqualifying facts had been cured or merely inherited; (b) obtain written informed consent from every remaining defendant before accepting joint representation; and (c) document the conflict analysis contemporaneously in the file. QPWB did none of these things.

Beazley Insurance's direction was explicit. On July 25, 2022, Joe Cianflone (Beazley) wrote to Frank Alvarez: "Frank — you've come recommended by outgoing counsel and agreed to by our Insured to take over the handling of this matter going forward. Please check conflicts and advise if you can defend all defendants except Stephen Chapman — PA." (Exhibit 4). The

---

firm's conduct in the production of the file is itself evidence of the institutional disregard for client interests that pervaded its handling of the *Sanchez* matter.

direction was explicit. QPWB was on express written notice, at the inception of the engagement, that a conflict analysis was required.

**QPWB failed to perform the conflict analysis.** The firm's complete billing ledger contains no time entry for conflict analysis at inception or at any point during the first twenty-eight months of the representation. The firm's only ethical analysis appears on a billing entry dated on November 12, 2024 (Mr. Robertson, 1.80 hours), and it is an analysis of *opposing* counsel's ethics. In a sad bit of irony, November 12 was the date the Court entered the *Rael* sanctions order against QPWB. This failure, standing alone, is dispositive.

The evidence absence is not limited to the billing ledger. It extends to the file itself. The complete client file contains no conflict memorandum, no conflict-waiver template, no conflict-disclosure letter, no conflict-analysis email, and no internal correspondence discussing the firm's joint representation of nine clients with divergent interests. Because the firm generated no analysis, the firm communicated none to its clients. The written consent that Rule[2] 16-107(B)(4) requires could never have been obtained and was never obtained.

Three additional structural conflicts existed at the inception of the engagement and continued throughout. NuMale New Mexico S.C. Corp. was uninsured per Beazley's January 13, 2021 Reservation of Rights letter, which stated unequivocally: "Underwriters will not indemnify NuMale New Mexico S.C. Corp. for any settlement or judgment entered against it." (Exhibit 7). The individual defendants Palubicki, Pulliam, and Feliciano had fundamentally different exposure profiles than the corporate defendants, with potentially dispositive individualized defenses that were never pursued. And the nine defendants were competing for a single $6,000,000 aggregate policy under a self-eroding structure that consumed the fund dollar-for-dollar with every fee QPWB billed.

Between August 2022 and the November 25, 2024 verdict, QPWB obtained disqualifying information about Dr. Asandra: three separate state medical-board reprimands in Colorado, California, and New York, all based on improper supervision of a physician's assistant—precisely the conduct at issue in *Sanchez*. Dr. Asandra also had an active lawsuit pending against NuMale in Nevada state court, directly adverse to the very NuMale corporate entities QPWB was simultaneously representing in New Mexico. Dr. Asandra separately retained Mr. Parrett as personal counsel and on October 23, 2024 Mr. Parrett catalogued fourteen specific conflict-and-loyalty failures in writing, which were sent to QPWB. Rather than recognize and address these clear conflicts, QPWB ignored and concealed them.

## B. The Complete Absence of an Engagement Agreement and Conflict Waivers

The firm has now admitted that it had no engagement agreement with anyone. Mr. Alvarez wrote to me on February 5, 2026: "Please note we did not have an engagement agreement or

[2] Unless otherwise noted, "Rules" refer to the New Mexico Rules of Professional Conduct.

retainer agreement. We received the file from the carrier, Beazley, and we did not have a specific retainer agreement with them." (Exhibit 5). Across a three-year, $502,682 insurance-defense engagement involving nine defendants, three mediations, a nine-figure verdict, and a post-verdict bankruptcy, QPWB operated without any written engagement agreement defining the scope of the representation, the allocation of authority between insurer and insured, or the handling of conflicts. These facts, particularly in light of Mr. Alvarez's admission, clearly amount to malpractice.

Worse, the firm never even sought a conflict waiver from any of the nine jointly represented defendants (nor discussed with them the impact of the obvious conflicts). A written conflict waiver is not a best practice; it is a requirement of law. New Mexico Rule 16-107(B)(4) requires that, in any concurrent conflict of interest, "each affected client gives informed consent, confirmed in writing." The requirement is mandatory. It is non-waivable. It is not satisfied by oral discussions (which never occurred), by post-hoc rationalizations, or by the firm's own internal assessment (without even a memo to the file) that *"no conflict"* exists. No waiver exists in this case. That absence was not a technicality. It was and is material.

As of the July 25, 2022 engagement, four facts made the conflict question decisive. Prior counsel had just been disqualified on conflict grounds. The carrier had expressly asked QPWB to analyze conflicts. PA Chapman's record-alteration conduct was imputable to the other jointly represented defendants by virtue of the joint representation. And NuMale New Mexico S.C. Corp. had been placed on written notice of non-indemnity, making its exposure structurally different from that of every other entity. Any one of those facts required a written waiver under Rule 16-107. All four together made the absence of written waivers a *per se* breach of the duty of loyalty from day one.

The firm itself has admitted the absence. Through Ms. Chavez's November 4, 2024 email to Mr. Parrett, the firm wrote: "we have verified there is no conflict representing NuMale and Dr. Asandra. … Our analysis of the New Mexico ethical rules is there is no actual or apparent conflict." (Exhibit 8). The firm's position is that because (in its own, unwritten assessment) no conflict existed, no written waiver was required. That position is both absurd and incorrect as a matter of New Mexico law and is incompatible with the firm's admission in open court sixteen days later that the conflict existed and was disqualifying.

**C. The Mid-Trial Admission**

Yet only two weeks later, on November 20, 2024, Mr. Robertson admitted the conflict to Judge Brickhouse:

> "Now I'm cut in half between NuMale and Asandra. I owe a duty to Dr. Asandra to get him out. But the problem I'm facing is Dr. Asandra is our star witness. He's our key witness. … So NuMale requires — needs Dr. Asandra to defend them. So now I'm split in half and we were never split in half before." (Exhibit 2).

Plaintiff's counsel identified the problem. Judge Brickhouse stated what was already obvious — that a conflict had existed from the outset: "I'm trying to understand now why there's a conflict because now opposing counsel has said hey that stuff that's gonna come out is gonna be damaging. Well, this whole time shouldn't there have been an evaluation regarding the case and the witness testimony and the weaknesses and the strengths of the case?"

The answer is obviously yes. It was preposterous on its face for QPWB to assert, and to continue asserting through November 4, 2024, that no conflict existed. The conflict had been structural from the moment QPWB accepted the engagement. Any reasonably competent lawyer exercising ordinary care would have identified it at inception, when Dr. Asandra's DEA investigation surfaced, when Dr. Asandra retained personal counsel, and when Mr. Parrett's October 23, 2024 letter catalogued fourteen specific failures turning on the conflict. Mr. Robertson's mid-trial admission was not a sudden discovery. It was a willful disregard, finally forced to the surface by the trial record, of a disqualifying conflict that had been in plain view since July 25, 2022.

On day 7 of the trial, Mr. Robertson stipulated on the record that the "NuMale defendants" designation on the special verdict form "refers to all remaining defendants in the case." (Exhibit -14). On November 22, 2024 at 9:02 a.m., QPWB (Mr. Robertson, Mr. Alvarez, Ms. Barrett, Ms. Chavez) signed a court-filed Stipulation of Vicarious Liability on behalf of all remaining defendants — including Asandra, Feliciano, Palubicki, and Pulliam — establishing that every NuMale corporate entity was vicariously liable for the acts of its agents and employees as a matter of law. (Exhibit 15). QPWB conceded this contested point without any client consultation and without consent. That single stipulation enabled the jury's "acting in concert" finding, which imposed joint and several liability for the full $412 million on every defendant. No competent lawyer representing a non-physician corporate officer (Palubicki, Pulliam) or a doctor with a no-duty ruling (Feliciano) would have stipulated to a unified verdict form without informed written consent. That no consent was sought is itself attributable to the concurrent conflict QPWB acknowledged on Day 5.

Stipulating, without client input or consent, to joint and several liability across nine defendants whose factual circumstances and legal exposure differed profoundly is outrageous. It is an extraordinary lapse in judgment. It is, on its face, *per se* malpractice.

**D. Client Confirmation of the Conflict**

Dr. Asandra's personal counsel, Mr. Parrett, sent three escalating emails on November 20, 2024:

- 7:45 a.m.: "I just got off the phone with Dr. Asandra and was even more shocked to learn the events that transpired later last night and this morning. You need to settle him out right now, immediately. Not later this morning, not this afternoon, not tomorrow. RIGHT NOW. What is the matter with you all?" (Exhibit 9).

- 8:17 a.m.: "your actions to keep him in the lawsuit when Plaintiff will dismiss him is essentially extortion to force him to testify. … your continuing actions are continuing blatant failures to carry out your sworn duty to your client. … you are in breach of your responsibilities toward your insured." (Exhibit 10).

- 7:13 p.m.: "astounded to learn he is still not dismissed and the window of opportunity has been lost due to your failure (including you Beazley) to carry out your obligations to protect him." (Exhibit 11).

Dr. Asandra himself, at 9:09 a.m. the same day, sent QPWB and Beazley a five-point letter using the word "malpractice". Among the points: his right to protect himself from liability via settlement; "you owe me a duty of good faith — this is bad faith"; that forcing testimony created a conflict harming his career; that cooperation did not benefit the defense; and the malpractice charge: "I believe this course of action constitutes ongoing malpractice by defense counsel . . . they have failed to advocate for a resolution … they are not fulfilling their professional obligations … you hired attorneys who had a conflict of interest all along and I've never had my interests protected appropriately." (Exhibit 3).

## III. THE CATASTROPHIC SETTLEMENT FAILURES

An attorney retained by an insurer to defend an insured owes the insured a duty of full settlement communication, full excess-exposure advisory, and full candor regarding the lawyer's own assessment. Rule 16-104(A)(3) NM R RPC; Rule 16-102(A) NM R RPC; NM Rule 16-107 cmt.; Rest. (3d) L. Gov. Law. §§ 20, 134; *Lysick v. Walcom*, 258 Cal. App. 2d 136, 65 Cal. Rptr. 406 (1968). The duty is not satisfied by reports to the carrier. It is satisfied only by written communication to the insured-client identifying the settlement posture, the excess-exposure risk, and the lawyer's recommendation.

The central and unanswerable fact about QPWB's handling of Sanchez: the firm's complete client file contains not a single policy-limits demand from QPWB to Beazley at any point during the three-year engagement. It contains no communication in which QPWB advised any individual defendant of the firm's own settlement assessment, of the carrier's divergence from that assessment, or of the insureds' right to demand that the carrier tender policy limits. That void is the breach. The breach caused the verdict. The breach caused the bankruptcy.

### A. Nine Missed Within-Limits Settlement Opportunities, Including a Mid-Trial $0 Dismissal

The *Sanchez* case presented eight discrete opportunities to resolve within or below policy limits, plus a ninth opportunity for an Asandra-and-Feliciano $0 dismissal mid-trial. QPWB mishandled each — without the written client advisory the fiduciary duty required.

1. **December 31, 2021** — the inherited demand. Plaintiff served the first $6M policy-limits demand on prior counsel. QPWB took over in July 2022 and never converted the inherited demand into a written QPWB demand on Beazley.

2. **October 12, 2022** — the renewed $6M demand. Plaintiff renewed the $6M demand and attached Mr. Rowley's $131M, $74.6M, and $46.7M verdict history. QPWB billed nominal time ($194) in response. Nó individual defendant received a communication (written or otherwise) advising of the demand or its excess-exposure implications.

   February 9, 2023 — first comprehensive evaluation. Mr. Robertson recommended a settlement starting figure of "$25K and $50K" against an acknowledged risk profile that included Chapman's record alteration, NM Unfair Practices Act treble damages, punitive-damages exposure, and "sizable" plaintiff attorney fees. (Exhibit 17). The potential for excess exposure was not disclosed to any client.

3. **October 4, 2023** — the first mediation. QPWB entered with Mr. Robertson's low valuation as the anchor. The mediation failed.

   May 28, 2024 — witness assessment to the carrier. Six months before trial, Mr. Robertson's written status report to Mr. Cianflone (Exhibit 20) graded Mr. Palubicki — the corporate face of the defense — as a "below average" defense witness. The same report graded the case at "$0 or $5M," hedging that "we do not necessarily think that this case is worth seven figure."

4. **June 18, 2024** — the second mediation. On the day of the second mediation, Mediator Denise Torres transmitted to defense counsel a twenty-three-bullet written summary titled "Testimony of Defendant Christopher Asandra, M.D." (Exhibit 21). The summary catalogued case-ending sworn admissions: that Dr. Asandra had "no training or experience in men's sexual health before starting the first NuMale clinic in 2013"; that "a consulting group, not consisting of any physicians, gave Dr. Asandra and Dr. Feliciano the medications and protocols"; that the Colorado Medical Board had issued a letter of admonition for improper supervision; that sending the plaintiff home with an erection was "inappropriate"; that "neither Chapman nor Asandra was able to manage the complications"; and that no consent form was signed on November 17, 2017.

5. **June 25, 2024** — the $950,000 Rule 68 Offer of Judgment. Plaintiff served a $950,000 Offer of Judgment offer with a statutory July 4 deadline. Beazley directed that the offer be allowed to expire ("Joe is not paying $950k"). The offer was the exact figure Mr. Alvarez later told Beazley it should have paid. (Exhibit 1). No advice was given to the clients about the implications of the rejecting the Offer of Judgment, and no demand to Beazley to accept the offer exists. In fact, in a simply outrageous lapse of professional judgment and in express violations of its express ethical obligations, the insureds were never even told of the offer's existence, let alone the firm's view that it should be accepted, thus

denying the insureds the ability to exercise their judgment and discretion to pay the OOJ. At trial you will hear testimony that decision would have been made

6. **October 8, 2024** — the final policy-limits demand. Plaintiff served the final policy-limits demand with a 10-day deadline; Mr. Rowley's transmittal warned: "This is going to be a record setting verdict in New Mexico." QPWB's "best and final" of $1,500,000 followed on October 29 and was rejected on October 31. No individual defendant was advised in writing — before, during, or after — that the policy-limits window was closing.

November 1, 2024 — the mock trial. The QPWB-commissioned mock trial returned a $1,500,000 verdict in under sixty minutes, including $1,000,000 in punitive damages not covered under the policy. Counsel's contemporaneous internal text thread documented what the result meant. Mr. Robertson: "Excess still possible." Ms. Barrett: "And are punitives covered?" Mr. Robertson: "Don't think so." Ms. Barrett's contemporaneous internal characterization of her client Mr. Palubicki was that he was a "dumbass" who needed reminding "not to take a shot in his dick before he testifies" and would "look shady" on the stand. The mock jury's reaction to the underlying business: "No one liked the business model especially after we showed the training materials. Unprofessional." (Exhibit 22). Yet no written escalation, no written policy-limits demand, and no written request for additional settlement authority issued. The firm's written advocacy to the carrier downplayed every fact its lawyers — and a neutral mediator — had put in writing.

On November 4, 2024, QPWB sent case evaluations to Mr. Rivera and to Mr. Parrett (for Dr. Asandra) writing for the first time that "an excess verdict is still possible and punitive damages are not covered under the policy" — **twenty days before verdict**, after the final policy-limits demand had already expired.

7. **November 19, 2024** — the Asandra dismissal stipulation. Plaintiff offered to dismiss Dr. Asandra by stipulation. Dr. Asandra emailed QPWB and Beazley directly: "I've reviewed the document and would like to accept the plaintiff's offer for dismissal. Please sign the dismissal proposal today." (Exhibit 26). Mr. Parrett wrote at 7:53 p.m.: "Please immediately sign and approve the dismissal in order to protect your client and your insured." QPWB willfully and intentionally ignored the instructions by their Client and refused to sign the stipulation dismissing Dr. Assandra.

8. **November 22, 2024** — the $0 dismissal offer for Asandra and Feliciano. Plaintiff offered to dismiss both physicians for nothing in exchange for the corporate-defendant stipulations QPWB ultimately signed anyway. (Exhibit 16). Dr. Feliciano was never told the offer existed. Dr. Asandra had been demanding dismissal at every turn. QPWB again refused. Both physicians were included in the $412,500,149 verdict.

9. **November 22, 2024** (mid-closing) — the hallway tender. Mr. Robertson tendered the policy limits in a hallway conversation immediately before plaintiff's rebuttal closing, then

emailed to confirm. (Exhibit 23). Mr. Homampour later called the timing what it was: "too little and too late." (Exhibit 12). Three days later the jury returned $412,500,149.

Nine settlement opportunities, including one $0 dismissal opportunity, missed. At each, the carrier set the posture, QPWB executed the carrier's instruction, and the insureds were not told. At no inflection point did any individual defendant receive a written advisory from QPWB explaining the firm's actual settlement assessment, the gap between the firm's internal view and the carrier's posture, or the magnitude of excess exposure.

**B. The Alvarez Text is Direct Proof of Causation**

Mr. Alvarez's October 24, 2024 text proves three facts each fatal to any QPWB defense. The full message reads: "They f'ed this up. **We told them to pay 950**. NuMale has a claim against them, unfortunately for them." (Exhibit 1). It was sent within a three-person text thread (Alvarez, Robertson, Barrett) in direct response to Ms. Barrett's message of the same day: "Did you guys see my email from Jack that Adam [Moser, the Beazley adjuster] has 1.5 million? He wants input on how to approach ptf (essentially putting it in our lap)."

First, the text establishes that QPWB privately valued the case at $950,000 three weeks before trial. Mr. Alvarez was the managing partner over the Albuquerque office and, as the November 4, 2024 letter to Mr. Parrett confirms, was the final-authority attorney on conflict and settlement issues. When the managing partner writes that the case "should have been paid" at $950,000, that is the firm's contemporaneous assessment. $950,000 is not a nine-figure case. It is below one-sixth of policy limits. Everything above $950,000 on the $412,500,149 verdict, and every dollar of the downstream bankruptcy damages, flows from QPWB's misconduct.

Second, the text establishes what QPWB never told its clients. No letter, memo, email, or meeting note in the QPWB file contains a written communication from QPWB to any NuMale defendant stating the firm's view that the case should have been paid at $950,000. That communication never happened. The individual defendants were never told their own lawyers believed the Offer of Judgment should have been accepted. Mr. Parrett's October 23, 2024 letter expressly documented, as one of fourteen failures: "$500k offer / $950k demand from July exchange Asandra did not know about." (Exhibit 31). The insureds could not have acted on QPWB's private "pay 950" assessment because they were not told \.

The only plausible defense — that QPWB "pushed" and the carrier "refused" — fails for multiple reasons. Under Rule 16-107 and the Restatement, the insured is the client; "we were told to" by the carrier is a breach, not a defense. The written-record void proves the "pushing" narrative false; a firm that pushes and is refused leaves a paper trail that demonstrates it advised its clients. Joe Cianflone had already left Beazley when the text was sent; a competent firm would have re-pitched the policy-limits recommendation in writing to the new adjuster (Adam Moser). QPWB did not.. And QPWB never withdrew, despite Rule 16-116(A)(1)'s mandate that withdrawal is

required when the insurer's direction places counsel in an impossible ethical position. The firm instead billed another $300,000-plus and took the case to verdict.

## C. The Clients Were Screaming for Settlement and QPWB Said Nothing

On December 21, 2023, Dr. Asandra forwarded to Mr. Robertson a warning: "$6 million in insurance coverage and I can see Plaintiff obtaining a judgment that exceeds this amount, which is why you should pressure your carrier to settle this case. … Nick is considered one of the best trial attorneys in the Country and he can easily get a large verdict on these facts. … You should put pressure on your insurance carrier to settle this case as you have serious financial, career and license exposure." Dr. Asandra wrote directly: "PLEASE review so we have strategy." (Exhibit 24). Mr. Robertson's didn't even bother to respond to the email.

On November 18, 2024, Mr. Parrett wrote: "This sounds like a disaster. This is another demand for the matter to be settled as to Dr. Asandra for whatever is necessary to achieve a settlement and dismissal as to him. This needs to be done now before it gets any worse." (Exhibit 25). No written client advisory generated. On November 19, 2024, Dr. Asandra wrote QPWB and Beazley accepting plaintiff's dismissal offer. (Exhibit 26). QPWB refused to sign. No explanation was ever sent to Mr. Parrett or Dr. Assandra. On November 20, 2024, the Parrett three-email escalation and the Dr. Asandra five-point letter followed (Exhibits 9, 10, 11, 3). Again, no written response. On November 19, 2024, Mr. Palubicki's own settlement analysis was forwarded to Mr. Cianflone the same day. The insured was already routing around his own defense firm.

After verdict, QPWB's silence continued. Mr. Palubicki wrote on December 30, 2024: "Your firm's continued silence raises serious questions about your commitment to fulfilling your professional obligations as our defense counsel. The pattern of non-engagement leads to an unavoidable question: have you withdrawn from representing us?" (Exhibit 27). His March 6, 2025 letter asked: "was Beazley aware that, since July 8, 2024, QPWB had not engaged in any settlement discussions on its behalf or NuMale's behalf?" (Exhibit 28).

## D. The Self-Eroding Policy Issue Was Never Communicated to the Clients

Compounding every one of the above failures is the self-eroding policy issue. On October 2, 2023, plaintiff's counsel wrote to QPWB demanding that Beazley conform the policy to comply with New Mexico law, citing NMAC 13.11.2.8 and 13.11.2.9, which prohibit defense-within-limits provisions in New Mexico medical malpractice liability policies. (Exhibit 29). The letter was not frivolous; it identified a serious regulatory problem with the coverage structure: every dollar QPWB billed Beazley reduced the funds available to settle. Mr. Robertson billed 0.80 hours researching the issue (Exhibit 13), forwarded plaintiff's letter to Beazley, and characterized plaintiff as "just whining to the judge" (Exhibit 29). There is no evidence QPWB ever advised its own clients that their insurance policy might be illegal under New Mexico law, that defense costs

were eroding settlement limits, that the clients should demand conformity, or that the $502,682 QPWB eventually billed was, dollar for dollar, reducing the $6,000,000 aggregate fund.

**E. Excess-Exposure Communications Were Limited, Belated, and Inadequate**

The earliest written coverage-issue advisory from QPWB to any individual defendant is Mr. Robertson's October 25, 2023 email to Dr. Asandra — fifteen months after engagement and, after the first mediation had already failed — recommending Asandra "retain your own counsel to look at the insurance coverage issues in this case" but not advising as to the specific magnitude of excess risk. The firm's first written statement that an "excess verdict is still possible" came on November 4, 2024, twenty days before verdict, in Ms. Chavez's case evaluations to Mr. Rivera (directly) and to Mr. Parrett (for Dr. Asandra). Dr. Feliciano, Mr. Palubicki, and Mr. Pulliam received no written excess-exposure advisory from QPWB. No individual defendant received a written advisory at the strategic inflection points where it mattered: at engagement in July 2022; at the October 12, 2022 $6M policy-limits demand; at the October 4, 2023 mediation; at the June 25, 2024 Rule 68 offer; or at the October 8, 2024 final policy-limits demand.

**F. Individualized Derelictions**

The joint representation produced client-specific failures that compounded the systemic ones.

**Dr. Feliciano**. The trial court granted partial summary judgment finding "Dr. Feliciano owed no duty to Plaintiff." A competent lawyer would have converted that finding into full dismissal via renewed motion, trial motion for directed verdict, or settlement. QPWB did none. Dr. Feliciano was also never informed of the $0 dismissal offer of November 22, 2024. (Exhibit 16). He was included in the $412M verdict.

**Dr. Asandra**. No Reservation of Rights letter from Beazley was ever relayed to Dr. Asandra personally by QPWB. His December 21, 2023 warning (Exhibit 24) was ignored. His mid-trial "ongoing malpractice" letter (Exhibit 3) was ignored.

**Mr. Palubicki and Mr. Pulliam**. Non-physician corporate officers with viable individual defenses to medical-negligence claims. No separate settlement strategy was pursued. No individual engagement letters were generated. No motion practice to limit exposure.

**NuMale New Mexico S.C. Corp.** Uninsured. Jointly represented without written warning to its principals that the entity faced the full verdict personally. No individual counsel, no individual settlement advocacy, and no written excess advisory.

The written-record void is uniform. Every individual defendant was exposed to a catastrophic excess verdict without a single written client communication from QPWB addressing

the excess exposure, the settlement posture, the coverage structure, or the defendant's individual options.

## IV. THE *RAEL* SANCTIONS ORDER: SAME JUDGE, SAME FIRM, SAME CONDUCT, DAYS EARLIER

The *Rael* sanctions order is devastating. The same court, presided over by the same judge who would preside over *Sanchez*, sanctioned the same firm and same partner for the same disqualifying conflict and the same concealment methodology, and expressly told the sanctioned defendants they had a remedy against QPWB for *legal malpractice*. Three days later, the same firm walked into the same judge's courtroom and did the same thing again, while concealing the sanctions order from its clients.

### A. Identity of Parties, Attorneys, Forum, and Conduct

*Rael v. Skies Healthcare and Rehabilitation Center, LLC*, Case No. D-202-CV-2019-07947, was pending before the same Judge Brickhouse. Judge Brickhouse signed her Opinion and Order November 11, 2024, and it was e-filed November 12, 2024. The order sanctioned QPWB — same firm, same Mr. Alvarez — for an identical conflict-concealment pattern: concurrent representation of an employee-witness and a corporate defendant without informed written consent. The same structural conflict between Dr. Asandra (employee-witness) and NuMale (corporate defendant); the same concealment duration (over three years, FOF ¶ 38); and the same strategic justification ("more strategic than anything else," FOF ¶ 36) all tainted QPWB's representations of the Plaintiffs.

### B. The Rael Findings, Verbatim

The *Rael* findings, quoted verbatim, make this action's outcome inevitable:

- FOF ¶ 35: QPWB made "knowing misrepresentation of fact to this Court" regarding when the conflict arose.
- FOF ¶ 36: QPWB conceded its decision not to correct adverse testimony "was more strategic than anything else."
- FOF ¶ 43: "The record and facts of this case demonstrate no other reasonable finding but that Movants' conduct was intentional and designed to obtain strategic litigation advantage for their clients at the expense of this Court, Plaintiffs, and the judicial system as a whole."
- FOF ¶ 52: "To the extent Defendants themselves were not complicit in the conduct of their counsel, Defendants have a remedy against Movants for legal malpractice."
- COL ¶ 14 (citing *United Nuclear Corp. v. Gen. Atomic Co.*, 1980-NMSC-094): QPWB and defendants "followed a conscious, willful and deliberate policy throughout this litigation, which continues to the present time, in cynical disregard and disdain of the Rules

of Procedure relating to discovery [and of our Rules of Professional Conduct], of concealing rather than in good faith revealing the true facts."

**C. The Candor Breach Three Days Later**

QPWB walked into Judge Brickhouse's courtroom on November 14, 2024 having been sanctioned by that very judge for the identical pattern three days earlier. QPWB told no one. The firm did not disclose the *Rael* order to its clients and did not raise the issue with the court. The firm did not analyze whether the *Rael* findings impacted its Sanchez representation. The only ethics-analysis billing entry on the *Rael* e-filing date, November 12, 2024, is Mr. Robertson's 1.80-hour analysis of opposing counsel's ethical obligations in Sanchez. (Exhibit 13). The duty of candor under Rule 16-303(a) NM R RPC, standing alone, compels full disgorgement of all fees and an award of damages against QPWB.

**D. Evidentiary Use**

The Rael decision will be admissible: the *Rael* court's finding that QPWB's conflict-concealment methodology is "intentional and designed to obtain strategic litigation advantage" is preclusive against QPWB. Rule 11-404(B)(2) NMRA will admit the order to prove motive, opportunity, intent, preparation, plan, knowledge, and absence of mistake. The order is admissible as *res gestae* because it was entered contemporaneously with the same conduct in Sanchez. And the order is a sufficient alone for an award of punitive damages under New Mexico law.

## V. TRIAL AND POST-TRIAL PERFORMANCE

Even setting aside the conflict and settlement failures, QPWB's trial and post-trial performance, standing alone, fell far below the standard of care.

**A. Pre-Trial**

Plaintiff filed seven motions in limine; QPWB filed none and failed to join Defendant Chapman's motions. The court remarked on the imbalance. Plaintiff prevailed on all nine discovery motions to compel. (Exhibit 36). The expert mismatch was stark: plaintiff's Dr. Irwin Goldstein, a world-renowned sexual-medicine specialist, provided a 7-page opinion identifying 15+ standard-of-care breaches; QPWB's Dr. Dudley Danoff was 87 years old, was not designated on the New Mexico standard of care, and had his testimony largely excluded. Trial counsel called the defense expert by the wrong name ("Dr. Goldstein" instead of "Dr. Danoff"). The six defense MSJs were denied without oral argument; the seventh was granted in part on Dr. Feliciano's no-duty finding, yet QPWB failed to leverage that ruling for directed verdict or excess-liability protection for Dr. Feliciano.

**B. In-Trial**

Day 2: Ms. Barrett's *voir dire* implied that physicians, not insurers, choose not to settle, inviting plaintiff's bad-faith argument; the court issued a curative instruction. (Exhibit 37).

Day 3: Ms. Barrett willfully violated the *in limine* order regarding the plaintiff's deceased wife and depression; the court read a curative instruction finding "counsel for NuMale defendants willfully violated this Court's order." (Exhibit 33).

Day 4: defense expert Dr. Barisa, the mental-health mitigation expert, was abandoned as a direct consequence of the Day 3 violation. (Exhibit 34).

Day 5: Ms. Barrett coached the sequestered witness PA Chapman in violation of the sequestration order. That same day: Mr. Robertson's "cut in half" speech admits the conflict for the first time. (Exhibit 2).

Day 6: further *in limine* violation by Ms. Barrett, prompting the court's warning: "We're at the end of the road, Ms. Barrett, with regards to these types of things that just keep happening over and over and over." (Exhibit 35).

Day 7: Mr. Robertson's "NuMale defendants = all remaining defendants" stipulation (Exhibit 14); the Stipulation of Vicarious Liability stipulated by QPWB on behalf of all defendants without their consent (Exhibit 15); Barrett-Chavez internal text thread the same day: "They dumped this bench brief on us. We barely survived the directed verdict. … They got our expert to admit fraud." (Exhibit 38). Closing: Ms. Barrett suggested damages of $1,000,000; the jury returned $412,500,149.

**C. Post-Trial**

Zero post-trial motions. No JNOV, no motion for new trial, no motion for remittitur. (Exhibit 39). $132,171.78 billed in January 2025 alone, yet no post-trial motions were filed. (Exhibit 13). Beazley replaced QPWB with the Rodey firm and Paul Weiss on January 2, 2025. The insurer's immediate decision to replace QPWB with competent appellate and post-trial counsel is itself an admission that the firm's performance was inadequate. Mr. Palubicki's post-verdict letters document the abandonment. (Exhibits 27, 28).

## VI. THE WILLFUL-CONDUCT RECORD: PUNITIVE DAMAGES

New Mexico law authorizes punitive damages where the defendant's conduct was malicious, willful, reckless, wanton, fraudulent, or in bad faith. UJI 13-1827 NMRA. Breach of fiduciary duty committed with a culpable mental state supports punitive damages as a matter of law.

Legal malpractice rising to willful misconduct supports punitive damages. *Paiz v. State Farm Fire & Cas. Co.*, 1994-NMSC-079, 118 N.M. 203, 880 P.2d 300; *Clay v. Ferrellgas, Inc.*, 1994-NMSC-080, 118 N.M. 266, 881 P.2d 11; *Aken v. Plains Elec. Generation & Transmission Coop.*, 2002-NMSC-021, 132 N.M. 401, 49 P.3d 662; *Chavarria v. Fleetwood Retail Corp.*, 2006-NMSC-046, 140 N.M. 478, 143 P.3d 717. A jury may award punitive damages to express its condemnation of the defendant's conduct and to deter the defendant and others from engaging in similar conduct.

The Plaintiffs do not need to reach for willfulness. The record supplies it on at least ten independent grounds:

1. The *Rael* judicial finding. The same judge determined that the same firm, using the same methodology, engaged in conduct "intentional and designed to obtain strategic litigation advantage." (Exhibit 32, FOF ¶ 43). That finding is preclusive. Standing alone, it is sufficient to establish the willful-conduct predicate.

2. QPWB's own concession in *Rael* that its decision not to correct adverse deposition testimony "was more strategic than anything else." (FOF ¶ 36). The same firm repeated the same strategic concealment three days later in Sanchez.

3. The Alvarez text admission. Three weeks before trial, the managing partner knew the case should have been paid at $950,000. (Exhibit 1). Possession of that knowledge triggered every fiduciary-duty-to-inform obligation QPWB owed the insureds. None was satisfied.

4. The November 4, 2024 written denial of the conflict (Exhibit 8), made when Mr. Robertson already knew the Asandra testimony would be devastating, and contradicted in open court sixteen days later. That letter is either knowingly false (fraud) or recklessly false (constructive fraud). Either supports punitive damages.

5. The mid-trial "ongoing malpractice" letter from Dr. Asandra (Exhibit 3), and the contemporaneous Parrett escalations (Exhibits 9, 10, 11). The client told QPWB, in writing, during trial, that it was committing ongoing malpractice. QPWB continued the same conduct through verdict.

6. The concealment of the $0 dismissal offer from Dr. Feliciano (Exhibit 16) and the failure to convey settlement positions to all individual insureds at multiple inflection points.

7. The failure to advise clients of the potentially illegal self-eroding policy structure under NMAC 13.11.2.8 / 13.11.2.9 (Exhibits 29, 13), where every QPWB billing dollar reduced the settlement fund.

8. Three in-trial "willful violation" findings against Ms. Barrett, with the court reading curative instructions to the jury that "counsel for NuMale defendants willfully violated this Court's order" (Exhibits 33, 34, 35), plus Ms. Barrett's coaching of the sequestered witness PA Chapman (Exhibit 2).

9. The November 12, 2024 opposing-counsel-ethics billing entry (Exhibit 13) — the same day the Rael sanctions order was e-filed against QPWB — demonstrating that the firm used billing time to attack opposing counsel's ethics on the very day the court was sanctioning QPWB for its own.

10. The $132,171.78 January 2025 invoice for zero post-verdict motions. Billing six figures for doing nothing after a nine-figure verdict is wanton profiteering on abandonment.

Any one of these grounds, standing alone, supports a punitive-damages finding under New Mexico law. Collectively, they establish a course of conduct of exceptional reprehensibility. Every aggravator recognized by New Mexico and federal punitive-damages doctrine is present: repetition of the same conduct after prior judicial notice (*Rael*); concealment from the client; profit motive (every unpaid-out settlement dollar extended the firm's billing runway, $502,682 over three years); vulnerability of the victims (nine insured defendants dependent on the firm for candor); duration (twenty-eight months of continuous misconduct); and institutional scale (managing partner admission in writing; *Rael* respondent partners; multiple trial-counsel attorneys each committing independent acts).

The due-process ceiling on punitive damages is established by *BMW of N. Am. v. Gore*, 517 U.S. 559 (1996). *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003); *Aken v. Plains Elec. Generation & Transmission Coop.*, 2002-NMSC-021, 132 N.M. 401, 49 P.3d 662 (applying *BMW* guideposts and approving a 3.5:1 ratio); *Chavarria v. Fleetwood Retail Corp.*, 2006-NMSC-046, 140 N.M. 478, 143 P.3d 717 (applying *BMW* guideposts). On this reprehensibility record, a punitive-to-compensatory ratio of up to three to one is easily foreseeable and would be appropriate. Applied to the compensatory base in Part X, three-to-one yields punitive exposure approaching $1.5 billion alone. The *Rael* court's express "intentional and designed to obtain strategic litigation advantage" finding, binding on QPWB and Mr. Alvarez personally, establishes the reprehensibility predicate as a matter of issue preclusion.

## VII. CAUSATION

Every claim depends on proof that QPWB's conduct proximately caused the Plaintiffs' damages. The "case within a case" analysis is straightforward, and the causal chain from breach to verdict to bankruptcy to creditor deficiency is airtight.

### A. The Case Was Always Settleable on QPWB's Own Assessment

Mr. Alvarez's October 24, 2024 text is the strongest causation exhibit in the file. (Exhibit 1). The managing partner of the defending firm privately valued the case at $950,000 three weeks before trial. That assessment is external to any post-hoc reconstruction by the Plaintiffs. The case was a within-policy-limits seven-figure case on QPWB's own analysis. Everything above $950,000 in the eventual verdict and resulting damages flows from QPWB's failures.

### B. Beazley's Post-Verdict Conduct Confirms the Assessment

The Plaintiffs have resolved their claims against Beazley. The carrier paid $108,500,000 in bankruptcy to resolve the Sanchez-driven claims. (Exhibit 30). That settlement is one hundred nine times QPWB's own "pay 950" assessment. The insurer's post-verdict willingness to pay a nine-figure sum is external, market-tested confirmation that the case was always settleable for a fraction of the verdict. Had QPWB issued a written policy-limits demand on Beazley at any point between the October 12, 2022 demand and the October 8, 2024 final demand, and had QPWB delivered a written excess-exposure advisory to each individual defendant, the insureds would have been positioned to demand that Beazley tender. Beazley would have tendered. The case would have resolved within limits. The $412M verdict would not have occurred. The bankruptcy would not have occurred.

### C. Specific Causal Links

Joint representation led to the stipulated verdict form, which led to joint and several liability for $412M. (Exhibit 14). Joint representation caused the refusal of plaintiff's November 22, 2024 $0 dismissal offer for Dr. Asandra and Dr. Feliciano. (Exhibit 16). The conflict-driven representation and refusal to dismiss Dr. Asandra caused the firm's "cut in half" predicament. (Exhibit 2). Imputed character evidence bled across all jointly represented defendants. Three willful-violation findings destroyed defense credibility before closing. (Exhibits 33, 34, 35). And the zero written policy-limits demand, zero written excess-exposure advisory, and zero written client advisory of the firm's own "pay 950" within-policy-limits assessment left the insureds powerless to override the carrier, because they were never told. Again, you will hear testimony at trial that decision would have been made.

### D. The Bankruptcy as Consequential Damages

The $412,500,149 verdict was fatal to NuMale, from both a monetary and a reputational perspective. The NuMale bankruptcy was filed because of the $412,500,149 verdict. Every administrative cost, professional fee, and creditor deficiency of that bankruptcy is a consequential damage of QPWB's malpractice.

## VIII. INDIVIDUAL ATTORNEY EXPOSURE

The claims in this letter are asserted against QPWB as a firm and, jointly and severally, against each individually named attorney: Mr. Boyer, Ms. Chapman, Mr. Alvarez, Mr. Robertson, Ms. Barrett, and Ms. Chavez. New Mexico law imposes personal responsibility on attorneys for misconduct they committed, ratified, or failed to remediate. Rule 16-501(C) NM R RPC; *see also* Rule 16-502 NM R RPC. Joint and several liability among attorneys and their firms for breach of fiduciary duty is well-established. *See* Rest. (3d) L. Gov. Law. § 58. The record summarized throughout this letter establishes personal culpability as to each named attorney. Each is encouraged to place his or her individual professional liability insurer on notice of these claims, retain independent coverage counsel, and produce the insurance information demanded in Part XI below. The Plaintiffs expressly preserve claims against each of the above-named attorneys in their individual capacity, in addition to claims against the firm, and the pre-litigation engagement and mediation demand in Part XI is addressed to the firm and to each of you jointly.

## IX. CLAIMS

Based on the foregoing, the Plaintiffs intend to assert the following claims against QPWB and against each of you individually:

1. Breach of Fiduciary Duty: Conflict of Interest. Concurrent representation of nine defendants with divergent interests, without informed written consent, in violation of Rules 16-107(A) & 16-107(B)(4).

2. Legal Malpractice: Settlement Failure. Failure to advise the insured-clients regarding settlement, failure to convey written policy-limits demands, failure to issue written excess-exposure advisories, failure to recommend acceptance of multiple within-limits settlement opportunities, and failure to exercise independent professional judgment free from Beazley's control.

3. Legal Malpractice: Negligence. Representation fell below the standard of care, including failure to file motions in limine, failure to pursue individual defenses, failure to retain a qualified New Mexico defense expert, failure to object to the stipulated verdict form, willful violations of court orders, failure to file post-verdict motions, and failure to advise clients regarding the potentially illegal self-eroding insurance policy.

4. Fraud and Constructive Fraud. The November 4, 2024 representation that there was "no conflict" was either a knowing misrepresentation (fraud) or a statement made with reckless disregard for the truth (constructive fraud). *See Williams v. Stewart*, 2005-NMCA-061, ¶ 34, 137 N.M. 420; *Duncan v. Campbell*, 1997-NMCA-28, ¶¶ 9-10.

5. Fraudulent Concealment. Concealment of the conflict, of the Rael sanctions order, and of the self-eroding policy issue. *See Duncan*, 1997-NMCA-28, ¶¶ 9-10.

6. Civil Conspiracy. *See Seeds v. Lucero*, 2005-NMCA-67, ¶ 12, 137 N.M. 589.

7. Post-Verdict Abandonment. An independent negligence claim arising from QPWB's failure to file any post-verdict motions on a $412M verdict.

8. Breach of the Implied Covenant of Good Faith and Fair Dealing in the attorney-client relationship.

9. Negligent Misrepresentation (alternative to fraud and constructive fraud).

10. Disgorgement of All Fees. Where an attorney breaches the fiduciary duty of loyalty, disgorgement of all fees paid is an available remedy regardless of work quality. *See Burrow v. Arce*, 997 S.W.2d 229, 240 (Tex. 1999); Restatement (Third) of the Law Governing Lawyers § 37 (2000). Full disgorgement of $502,682.

11. Punitive Damages.

All claims are asserted jointly and severally against the firm and against each individually named attorney.

## X. DAMAGES

The Plaintiffs' damages, as supported by the judicially determined record and by independently calculable consequential damages, are as follows.

### A. Base Compensatory Damages

1. The Allowed Sanchez Claim: $410,000,000. The original *Sanchez* verdict was $412,500,149 plus interest, which had grown to more than $500,000,000. The corresponding claim, as ultimately allowed through the bankruptcy claims-reconciliation process, was reduced to $410,000,000. The reduction occurred entirely through bankruptcy proceedings, and the resulting benefit to QPWB (a lower measured compensatory base) is itself a consequence of the bankruptcy QPWB caused. The judicially allowed figure of $410,000,000 is the current measure of harm to the NuMale Debtor Estates. The entire amount was avoidable through competent representation.

2. Bankruptcy Administration Costs: approximately $13,000,000. The NuMale enterprise was forced into bankruptcy as a result of the $412M verdict. All administrative costs, professional fees, and expenses of the bankruptcy are consequential damages of QPWB's malpractice.

3. Prejudgment Interest. Under applicable New Mexico law, the Plaintiffs are entitled to prejudgment interest on all compensatory damages from the date of accrual. The Plaintiffs' claims accrued on the verdict date (November 25, 2024) or, at the latest, on the bankruptcy filing date.

At New Mexico's statutory rate of 15% interest on the Allowed Sanchez Claim from November 25, 2024 through the date of this letter (approximately seventeen months) computes to approximately $87,000,000. *See* NMSA § 56-8-4. The Plaintiffs reserve the right to claim post-judgment interest at the applicable rate.

4. Fee Disgorgement: $502,682. Disgorgement of QPWB's full $502,682 in fees is an available remedy regardless of work quality. *Burrow v. Arce*, 997 S.W.2d 229, 240 (Tex. 1999); Rest. (3d) L. Gov. Law. § 37.

**B. Base Total**

Using the net Sanchez figure (after the Beazley setoff): $301,500,000 + $13,000,000 + $87,000,000 + $502,682 ≈ $402,000,000.

Using the gross Sanchez figure (before the Beazley setoff, which the Plaintiffs contend is the correct measure of the harm QPWB caused): $410,000,000 + $13,000,000 + $87,000,000 + $502,682 ≈ $510,500,000.

The individual defendants have suffered, and assert, additional damages resulting from the entirely avoidable jury verdict, which materially increase QPWB's exposure.

**C. Punitive Damages and Total Exposure**

The record summarized in Part VI establishes willful, reckless, and wanton conduct on at least ten independent grounds. A three-to-one ratio is constitutionally defensible on this reprehensibility record. Applied to a compensatory-and-consequential base of approximately $500,000,000, three-to-one yields approximately $1,500,000,000 in punitive damages alone. Total exposure to QPWB and to each individually named attorney, taking compensatory and punitive damages together, exceeds $2 billion.

The Rael court's express finding of "intentional and designed to obtain strategic litigation advantage" conduct, binding on QPWB and on Mr. Alvarez personally, establishes the reprehensibility predicate as a matter of issue preclusion.

## XI. DEMANDS

Based on the foregoing, the Plaintiffs make the following demands. The Plaintiffs are not making a final monetary demand at this time. The monetary demand will follow promptly after QPWB's and each individually named attorney's professional liability coverage is fully disclosed.

**A. Demand for Immediate Disclosure of Insurance Coverage**

Within ten (10) calendar days of the date of this letter, QPWB and each individually named attorney shall provide to the undersigned complete copies of all professional liability, errors and omissions, and malpractice insurance policies currently in effect or in effect at any time during QPWB's representation of the NuMale defendants (July 2022 through the present), including:

1. All primary policies, including all declarations pages, endorsements, and amendments;
2. All excess and umbrella policies, including all declarations pages, endorsements, and amendments;
3. The identity of each insurer, policy number, policy period, and per-claim and aggregate limits of liability;
4. Any notice of claim or potential claim previously submitted by QPWB or any individually named attorney to any insurer in connection with the Sanchez matter, the Rael matter, or any other matter involving allegations of conflict of interest or malpractice;
5. Contact information for the claims adjuster or coverage counsel assigned to any such notice; and
6. Any communications between QPWB and its insurers regarding the Rael sanctions order.

**B. Demand for Engagement and Mediation**

The Plaintiffs are prepared to file suit immediately. In the interest of efficiency, the Plaintiffs are willing to stay the filing of suit for a period not to exceed sixty (60) calendar days from the date of this letter, provided that:

1. QPWB and each individually named attorney confirms in writing, within fourteen (14) calendar days, willingness to engage in pre-litigation resolution discussions, including the involvement of each professional liability insurer;
2. The parties agree, within thirty (30) calendar days, to an in-person mediation before a mutually acceptable mediator, to be conducted within the sixty (60) day stay period; and
3. QPWB and each individually named attorney provide the insurance coverage information demanded above within the fourteen-day deadline.

If QPWB or any individually named attorney fails to comply with any of these conditions, the Plaintiffs will file suit without further notice. The sixty-day stay is not subject to extension absent the agreement of the Plaintiffs.

**C. Continued Compliance with Litigation Hold and Client File Demands**

This demand supplements but does not supersede the Litigation Hold Notice and Demand for Immediate Transfer of Client File issued on October 6, 2025, and all subsequent demand letters and notices. QPWB's compliance obligations under those demands remain in full force and effect. Any spoliation of evidence or continued failure to produce the complete client file, including text

messages, adjuster communications, internal ethics analyses, and *Rael*-related communications, will be cited as evidence of consciousness of guilt in any subsequent litigation and will support adverse-inference instructions.

**D. Preservation Demand**

QPWB and each individually named attorney is on written notice to preserve, without alteration or deletion, all communications (including text messages, emails, internal messaging-application records, and voicemails) from July 25, 2022 through the present relating to the Sanchez matter, the Rael matter, or the claims asserted in this letter. Failure to preserve any of the foregoing will be argued as spoliation, as support for adverse-inference instructions, and as an independent aggravator of the punitive-damages claim.

## XII. RESERVATION OF RIGHTS

This letter is provided for settlement discussion purposes pursuant to Federal Rule of Evidence 408, New Mexico Rule 11-408, and applicable state equivalents. Nothing herein should be construed as an admission, waiver, agreement to any forum or procedure, limitation of any kind, or acceptance of any liability limitation or damage cap.

The Plaintiffs expressly reserve all rights, claims, remedies, and defenses, whether at law or in equity, including but not limited to claims for legal malpractice, breach of fiduciary duty, fraud, constructive fraud, fraudulent concealment, civil conspiracy, breach of contract, negligent misrepresentation, unjust enrichment, disgorgement of fees, and any other applicable causes of action, whether arising under New Mexico law, Nevada law, federal law, or the law of any other jurisdiction. The Plaintiffs further reserve the right to seek punitive and exemplary damages to the fullest extent permitted by law.

Nothing in this letter shall be deemed to limit or waive any statute of limitations, statute of repose, or other limitations defense. The Plaintiffs' claims accrued no earlier than the date of the verdict (November 25, 2024) and are extended by the doctrine of continuous representation. The claims asserted against individually named attorneys are distinct from the claims asserted against the firm, and the Plaintiffs reserve the right to pursue joint and several liability against each.

## XIII. CONCLUSION

The claims against QPWB and against each of you individually are substantial, exceptionally well-documented, and supported by an extensive evidentiary record that includes judicial findings of identical misconduct by the same firm and same named partner in a case before the same judge. The written-record void within QPWB's own file is, if anything, more damning than the documents that do exist.

The Plaintiffs are prepared to prosecute these claims to verdict and through appeal, and will seek the full measure of damages described herein plus costs, plus fees incurred in prosecuting the claims, plus post-judgment interest at the maximum applicable rate, and will vigorously oppose any attempt by the firm or by any individual attorney to limit damages.

The Plaintiffs' willingness to discuss resolution through the sixty (60) day mediation window reflects a judgment that even catastrophic claims are sometimes more efficiently resolved than litigated, if the opposing party engages in prompt, substantive, good-faith engagement backed by full coverage disclosure. That engagement is the condition precedent to any accommodation. Absent timely compliance with the ten (10) day disclosure demand, the fourteen (14) day engagement confirmation, and the thirty (30) day mediation agreement, the Plaintiffs will file suit against the firm and against each of you personally, in each instance joined as individual defendants, without further notice.

I await your response within ten calendar days.

Sincerely,

GARMAN TURNER GORDON

GREGORY E. GARMAN, ESQ.

Enclosures: Exhibits per attached list

cc:
Clients
Talitha Gray Kozlowski, Esq.
Teresa Pilatowicz, Esq.
Jamie Garman, Esq.

## EXHIBIT LIST

1. Frank Alvarez text message, October 24, 2024 ("They f'ed this up. We told them to pay 950")
2. Trial Tr. Day V (November 20, 2024): Robertson "cut in half" admission; Barrett-Chapman sequestration violation
3. Dr. Christopher Asandra's November 20, 2024 five-point "ongoing malpractice" letter
4. Cianflone-Alvarez / Boyer engagement email, July 25, 2022
5. Alvarez February 5, 2026 admission: no engagement agreement, no retainer
6. Robertson's 16-page "Personal Recollection of Facts Surrounding the Motion for Mistrial and Relevant Pre-Trial Facts"
7. Beazley January 13, 2021 Reservation of Rights letter (NuMale NM S.C. uninsured)
8. J. Andrew Robertson November 4, 2024 "no conflict" letter to Jim Parrett
9. Parrett November 20, 2024 email, 7:45 AM
10. Parrett November 20, 2024 email, 8:17 AM ("extortion")
11. Parrett November 20, 2024 email, 7:13 PM ("window of opportunity has been lost")
12. Arash Homampour December 10, 2024 entry of appearance / settlement letter
13. QPWB billing records (Bills for matter # 173226), including Robertson Nov. 12, 2024 opposing-counsel ethics-analysis billing entry; Robertson Feb. 5, 2024 JDA "per authority of adjuster" entry; Robertson 0.80-hour self-eroding-policy entry; and QPWB January 2025 invoice ($132,171.78)
14. Trial Tr. Day 7 (November 22, 2024) at 99-101: Robertson verdict-form stipulation
15. Signed Stipulation of the Parties: Vicarious Liability, November 22, 2024
16. Stipulation to Dismiss Asandra and Feliciano, November 19, 2024
17. Robertson February 9, 2023 status / recommendations to Beazley ("$25K and $50K to start")
18. Plaintiff's December 2021 $6,000,000 policy-limits demand
19. September 27, 2022 status report to Beazley
20. QPWB May 28, 2024 updated settlement evaluation to Beazley
21. Mediator Denise Torres June 18, 2024 Asandra 23-bullet summary
22. Barrett / Chavez / Robertson mock-trial text thread, November 1, 2024 ("They are going to give this guy punitives")
23. Robertson-Moser TENDER chain, November 22-23, 2024 ("I tendered in the middle of closing arguments")
24. Dr. Asandra December 21, 2023 attorney-friend warning forwarded to Robertson

25. Parrett November 18, 2024 "disaster" letter
26. Dr. Asandra November 19, 2024 dismissal-acceptance email
27. Palubicki December 30, 2024 letter to QPWB ("continued silence")
28. Palubicki March 6, 2025 letter ("since July 8, 2024 … no settlement discussions")
29. Plaintiff October 2, 2023 NMAC 13.11.2.8/9 self-eroding-policy letter with QPWB and Beazley discussion "just whining to the judge"
30. Beazley $108,500,000 bankruptcy settlement order
31. Parrett October 23, 2024 seventeen-item formal demand letter
32. Rael v. Skies Healthcare Sanctions Order, November 11-12, 2024
33. Trial Tr. Day III (November 18, 2024): Day 3 limine violation re deceased wife
34. Trial Tr. Day IV (November 19, 2024): willful-violation curative instruction
35. Trial Tr. Day VI (November 21, 2024): "end of the road" warning
36. Nine Stipulated Motions-to-Compel Orders, February 6, 2024
37. Trial Tr. Day II (November 15, 2024): Rowley sidebar re insurance / bad faith; Barrett voir dire / insurance-related curative instruction
38. Barrett-Chavez November 22, 2024 text thread ("barely survived the directed verdict" / "got our expert to admit fraud")
39. Trial Tr. Day VIII: post-verdict colloquy; zero preservation motions

# EXHIBIT E

GARMAN
TURNER
GORDON

7251 AMIGO STREET
SUITE 210
LAS VEGAS, NV 89119
WWW.GTG.LEGAL
PHONE: 725 777 3000
FAX: 725 777 3112

September 10, 2026

Gregory Garman, Esq.
Email:ggarman@gtg.legal

**SENT VIA HAND DELIVERY AND EMAIL**

Eric W. Boyer
c/o Alex Fugazzi, Esq.
Snell & Wilmer
1700 S. Pavilion Center Dr., Suite 700
Las Vegas, NV 89135
afuggazi@swlaw.com

Re: **NOTICE OF: (1) FRAUDULENT TRANSFER LIABILITY; (2) LIABILITY FOR IMPROPER DISTRIBUTIONS UNDER FLORIDA STATUTES §§ 607.06401 AND 607.0834; AND DEMAND TO PRESERVE PARTNER PROFIT DISTRIBUTIONS AND RELATED RECORDS:** ***Michael E. Sanchez v. NuMale Corporation, et al.***, No. D-202-CV-2020-06336 (N.M. 2d Jud. Dist.); ***In re NuMale Corporation, et al.***, Case No. 25-10341-nmc (Bankr. D. Nev.)

Dear Mr. Boyer,

We represent Michael W. Carmel, Esq., as Liquidating Trustee (the "Trustee") of the NuMale Liquidating Trust (the "Trust"), Christopher Asandra, M.D., Carlos Feliciano, M.D., Brad Palubicki, and Justin Pulliam (collectively with the Trustee, the "Plaintiffs").

On May 18, 2026, Plaintiffs sent a demand letter (the "QPWB Demand Letter") to Quintairos, Prieto, Wood & Boyer, P.A. ("QPWB" or the "Firm"), a copy of which is attached hereto (excluding exhibits) as **Exhibit A** for reference. The QPWB Demand Letter sets forth in detail the Plaintiffs' claims against QPWB for breach of fiduciary duty, legal malpractice, fraud and constructive fraud, fraudulent concealment, civil conspiracy, post-verdict abandonment, breach of the implied covenant of good faith and fair dealing, negligent misrepresentation, disgorgement, and punitive damages (collectively, the "Malpractice Claims"). The QPWB Demand Letter is explicit about QPWB's exposure: approximately $510,500,000 in compensatory damages, plus punitive damages at a 3:1 ratio, with total exposure exceeding $2 billion.

We have attempted, unsuccessfully, to resolve this dispute with QPWB management.

For the avoidance of doubt, this letter is neither a demand on you nor other communication with respect to the Malpractice Claims set forth in the QPWB Demand Letter. Rather, this letter identifies *separate claims* directed to you *individually* as a shareholder of QPWB on account of the profit distributions or other distributions of firm earnings since November 2024. The purpose

of this letter is to put each of you on notice, to the extent necessary, that those distributions are subject to avoidance and recovery as fraudulent transfers, and to demand that you preserve those funds and all related records pending resolution of the Plaintiffs' claims.

## I. The Plaintiffs Are Creditors of QPWB With Matured, Catastrophic Claims

The Plaintiffs are creditors holding claims against QPWB under the applicable fraudulent transfer statutes. A "claim" is a right to payment "whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured."[1] The Plaintiffs' claims against QPWB, which accrued no later than November 25, 2024, squarely satisfy that definition. The Plaintiffs therefore have present standing to pursue recovery of the transfers QPWB made to its equity shareholders — and need not obtain a malpractice judgment first.

## II. You Were on Notice No Later than November 2024

As set forth in the QPWB Demand Letter, the record is overwhelming, and it predates November 2024. By the fall of 2024 at the latest, QPWB was on notice that it faced a malpractice claim of catastrophic magnitude. Any distribution of firm profits to you on or after the dates discussed in the QPWB Demand Letter was made by a firm that knew it faced a contingent liability dwarfing its net worth — and knew it was woefully underinsured.

## III. The Profit Distributions Are Avoidable Transfers

QPWB compensates you through salaries supplemented by profit distributions of firm earnings. Those distributions are transfers of firm assets within the meaning of each applicable act, and they are avoidable.[2]

Under each applicable state's version of the Uniform Fraudulent Transfer Act, the Plaintiffs may avoid the transfers and recover a money judgment against each Transferee up to the value of the property each received. *See* Fla. Stat. § 726.108, § 726.109; NMSA § 56-10-21, § 56-10-22; NRS 112.210, 112.220. The Plaintiffs may pursue these claims now.

## IV. The Distributions Were Also Unlawful When Made Under The Florida Business Corporation Act

QPWB is a Florida professional association. Its internal affairs, including the lawfulness of any distribution[3] of firm earnings to its shareholder/partners, are governed by Florida law, and

---

[1] *See* Florida Uniform Voidable Transactions Act, Fla. Stat. § 726.102; New Mexico Uniform Voidable Transfer Act, NM Stat. § 56-10-15; Nevada Uniform Fraudulent Transfer Act, NRS 112.150.

[2] *See* Fla. Stat. § 726.105(1)(a)-(b); NM Stat. § 56-10-18(A)-(B); NRS 112.180(1)(a)-(b) & NRS 112.190.

[3] A "distribution" is not limited to a formally declared dividend. Section 607.01401 defines a distribution to include any *direct or indirect* transfer of money or other property, or incurrence of indebtedness, by a corporation to or for the

Chapter 621 makes the Florida Business Corporation Act applicable to professional service corporations and associations. Nothing in Chapter 621 permits a professional association to distribute its earnings to its shareholders inconsistent with Chapter 607.

Accordingly, section 607.06401 governs every payment QPWB has made to you and other partners, even if they were also W-2 employees and without regard to where any individual partner resides or practices. Section 607.06401(3) prohibits a distribution if either: (a) the corporation would not be able to pay its debts as they become due in the usual course of business, or (b) the corporation's total assets would be less than the sum of its total liabilities. Every distribution QPWB made beginning as early as 2024 fails both tests independently.

As of no later than the November 25, 2024 verdict (and in fact much earlier), QPWB carried a liability to its own former clients that had compensatory exposure of approximately $510.5 million, and with punitive damages at a 3:1 ratio total. Against that asserted liability, QPWB's available coverage is materially less than the asserted exposure and, by its terms, excludes punitive amounts. A firm carrying a nine-figure matured claim, ten-figure total exposure, with insufficient insurance, cannot pay its debts as they become due, and its total assets do not approach its total liabilities. Section 607.06401(4) permits firm management to base its determination on financial statements prepared on a reasonable basis or on a fair valuation reasonable in the circumstances. It does not permit management to assign a value of zero to a liability its own lawyers had measured and its own clients had asserted. No valuation that omits the Malpractice Claims' exposure is "reasonable in the circumstances."

The firm cannot insulate individual payments by pointing to a favorable measurement date: under section 607.06401(6)(c), the effect of a distribution is measured as of the date of authorization if payment follows within 120 days and as of the date of payment if it follows later. Either date yields the same answer because QPWB has been balance-sheet and cash-flow insolvent, measured against the Sanchez liability, continuously since no later than November 25, 2024. And to the extent you hold a deferred-compensation obligation, bonus, true-up or capital-account credit arising from a distribution, section 607.06401(7) places that indebtedness at parity with QPWB's general unsecured creditors, which is to say, at parity with the Plaintiffs, not ahead of them.

Section 607.0834 supplies the consequences, and it reaches you, the recipient of this letter, in two distinct capacities. First, under section 607.0834(1), any director, shareholder, or member of QPWB's governing or management committee member who voted for, assented to, caused or permitted a distribution made in violation of section 607.06401 is **personally liable** for the amount by which the distribution exceeded what could lawfully have been distributed, where the claimant

---

benefit of its shareholders in whatever form and by whatever label. QPWB's compensation structure, salaries supplemented by year-end allocations of firm profit to its shareholder body is a distribution to shareholders regardless of how the firm's books characterize it. The records demanded below, partnership and shareholder agreements, capital accounts, distribution schedules, K-1s, and general ledgers will establish that characterization out of QPWB's own files.

establishes that the shareholder failed to comply with the standards of conduct in § 607.0830. We will establish that you cannot satisfy section 607.0830 on this record. That section permits good-faith reliance on financial data and on officers, accountants, and counsel, but not where the firm possessed knowledge making reliance unwarranted. You undeniably possessed such knowledge. Second, under section 607.0834(2), a shareholder who accepted a distribution in violation of section 607.06401 is answerable for the amount accepted. If you intend to plead ignorance, this letter forecloses that position.

**This letter provides express written notice of the magnitude of the asserted claims, the inadequacy of the firm's coverage, and the statutory prohibition. Any distribution accepted from this date forward is accepted knowingly.**

Claims to recover unlawful distributions are collected from the partners who received them and the managers who approved them, and they are precisely the asset that a receiver, an assignee for the benefit of creditors, or a bankruptcy trustee exists to liquidate. The Plaintiffs' claims under the fraudulent transfer statutes cited above are independent of, and unaffected by, Chapter 607 and section 607.06401's prohibition disposes of the defenses the Transferees would otherwise assert to those claims. A distribution the Firm was legally forbidden to make is not a transfer for which the Firm received reasonably equivalent value, and a Shareholder who accepts a distribution after written notice that it is unlawful does not take it in good faith. Fla. Stat. § 726.109.

## V. Demand to Preserve Assets and Records

The Plaintiffs demand, effective immediately, that you, as Transferees:

1. Preserve and segregate all profit distributions, partner draws, bonuses, year-end allocations, and other distributions of firm earnings received from QPWB from **January 1, 2024** to the present, and refrain from dissipating, transferring, encumbering, gifting, or placing beyond the Plaintiffs' reach any such funds or property traceable to them; and

2. Preserve all documents and electronically stored information relating to QPWB's partner-compensation and distribution structure, including partnership and shareholder agreements, capital accounts, distribution schedules, K-1s, ledgers, bank records, and any communications concerning distributions made on or after **January 1, 2024.**[4]

Any dissipation, transfer, or concealment of distributions after receipt of this letter — and any failure to preserve the records identified above — will be cited as evidence of actual intent, and will support the Plaintiffs' pursuit of avoidance, recovery, prejudgment remedies (including a prejudgment writ of attachment or injunctive relief), and all other available remedies.

---

[4] For the avoidance of doubt, nothing in this letter requests that you (or any other recipient) disclose information protected by their professional obligations to QPWB's clients.

**VI. Communication to You Individually**

Again, for the avoidance of doubt, this letter is not asserting, or seeking resolution of, the Malpractice Claims set forth in the May 18, 2026 QPWB Demand Letter. Rather, this letter is solely provided with respect to the fraudulent transfer and unlawful distribution claims against you individually.

Sincerely,

GARMAN TURNER GORDON

GREGORY E. GARMAN, ESQ.

Enclosures:
Exhibit A: QPWB Demand Letter

cc:

Clients
Talitha Gray Kozlowski, Esq.
Jamie Garman, Esq.

**Exhibit A**
(QPWB Demand Letter)

GARMAN
TURNER
GORDON

7251 AMIGO STREET
SUITE 210
LAS VEGAS, NV 89119
WWW.GTG.LEGAL
PHONE: 725 777 3000
FAX: 725 777 3112

May 18, 2026

Gregory Garman, Esq.
Email: ggarman@gtg.legal

**SENT VIA EMAIL AND FEDERAL EXPRESS**

Quintairos, Prieto, Wood & Boyer, P.A.
Attn: Eric W. Boyer, Esq.,
Managing Partner
9300 South Dadeland Blvd., 4th Floor
Miami, Florida 33156
eboyer@qpwblaw.com

Quintairos, Prieto, Wood & Boyer, P.A.
Attn: Donna L. Chapman, Esq.,
Managing Partner 6565 Americas Parkway
NE, Suite 200
Albuquerque, New Mexico 87110
donna.chapman@qpwblaw.com

Quintairos, Prieto, Wood & Boyer, P.A
Attn: Frank Alvarez, Esq.,
Managing Partner
J. Andrew Robertson, Esq.
1700 Pacific Ave., Suite 4545
Dallas, Texas 75201
frank.alvarez@qpwblaw.com
andrew.robertson@qpwblaw.com

Quintairos, Prieto, Wood & Boyer, P.A.
Attn: Dominique Barrett, Esq.
14350 N. 87th St., Suite 265
Scottsdale, Arizona 85260
dominique.barrett@qpwblaw.com

Atwood, Malone, Turner, & Sabin, P.A.
Attn: Erin Chavez, Esq.
400 N. Pennsylvania Ave., Suite 1100
P.O. Drawer 700
Roswell, New Mexico 88201
echavez@atwoodmalone.com

Re: *In re NuMale Medical, Inc., et al.*, Case No. 25-10341-nmc (Bankr. D. Nev). Pre-Litigation Demand for Resolution of Breach of Fiduciary Duty, Legal Malpractice, Fraud, and Related Claims Arising from *Michael E. Sanchez v. NuMale Corporation, et al.*, Case No. D-202-CV-2020-06336

Dear Counsel:

Quintairos, Prieto, Wood & Boyer, P.A. ("QPWB" or the "firm") is responsible for the largest medical malpractice judgment in New Mexico history. The firm, among other misconduct, concealed a disqualifying conflict of interest from its nine clients for three years; privately told the carrier to pay $950,000 to settle the case while concealing that same information from its own

clients; stipulated to joint and several liability across defendants with fundamentally divergent interests without client consent; and willfully violated court orders in the presence of the jury to the point the trial court publicly branded defense counsel's conduct "willful" violations of the court's orders multiple times in open court thereby poisoning the jury.

This letter provides notice to QPWB via the firm's management, with separate service on the individual attorneys who handled the *Sanchez* matter. The claims set forth herein are asserted jointly and severally against the firm and against each of the individually named attorneys.

Michael W. Carmel, Esq., as the Liquidating Trustee (the "Trustee") of the NuMale Liquidating Trust (the "Trust"). The Trust, through the Trustee is the lead plaintiff in the consolidated and joint prosecution of the collective claim against you by your former clients the NuMale Debtors and the individual insured plaintiffs, Dr. Christopher Asandra, Dr. Carlos Feliciano, Brad Palubicki, and Justin Pulliam. After notice and a hearing, this joint and consolidated prosecution was approved by order of the United States Bankruptcy Court for the District of Nevada. *See* 25-1034-nmc, ECF No. 0727, Order Confirming Joint Chapter 11 Plan (Bankr. D. Nev 2025).; 25-10341, ECF No. 0582, Order Approving Global Settlement, at 12 ("All claims against Quintairos, Prieto, Wood & Boyer, P.A. are not being released and are expressly preserved."). *See* ECF 434, Joint Plan of Reorganization ("...which claims shall be jointly prosecuted under the sole direction and control of the Liquidation Trustee"). For ease of reference in this letter, the Trustee and the individual insureds are collectively the "Plaintiffs."

This letter constitutes a formal pre-litigation demand for resolution of the following claims against QPWB and each individual attorney: breach of fiduciary duty, legal malpractice, fraud and constructive fraud, fraudulent concealment, civil conspiracy, post-verdict abandonment, breach of the implied covenant of good faith and fair dealing, negligent misrepresentation, disgorgement of fees, and punitive damages. The claims arise from QPWB's catastrophically inept defense of the NuMale defendants in *Sanchez v. NuMale Corporation, et al.*, which produced a jury verdict of $412,500,149 on November 25, 2024 and the subsequent destruction of the NuMale enterprise and its bankruptcy.

## I. SUMMARY

QPWB is responsible for the $412,500,149 Sanchez judgment and the collapse of the NuMale enterprise. The claims against the firm and each of you individually are supported by the firm's own file. That record, summarized below and established in the thirty-nine exemplary exhibits, is devastating.

The misconduct (both intentional and negligent) is so pervasive there are multiple paths to liability and judgment, but four facts are dispositive. Among the most damaging is the fact that QPWB never obtained a written engagement agreement with any of the nine defendants it represented, **nor did it obtain a written conflict waiver from any of them, at any point during**

**the three-year engagement.** Both are mandatory under the New Mexico Rules of Professional Conduct, and both were material at the very moment QPWB was retained.

Beazley hired QPWB specifically to replace prior counsel who had been disqualified for a conflict of interest in representing all the defendants arising from the Chapman-records-alteration issue. Beazley's July 25, 2022 engagement email expressly asked QPWB to "**advise if you can defend all defendants except Stephen Chapman — PA.**" (Exhibit 4). QPWB's files, including its client communications and billing records show no such analysis was conducted. The firm's billing ledger contains no time entry for conflict analysis at any point during the first twenty-eight months from retention through verdict, and the file contains no conflict memorandum, no waiver, and no analysis. None.

Second, the QPWB managing partner admitted in writing, three weeks before jury selection, that the case should have been settled at $950,000 by accepting an outstanding offer of judgment. Frank Alvarez texted on October 24, 2024: "They f'ed this up. **We told them to pay 950.** NuMale has a claim against them, unfortunately for them." (Exhibit 1). That message tells the Plaintiffs three things. QPWB itself valued the case at $950,000 three weeks before trial, a figure that is one-sixth of the policy limits and four-thousandths of the eventual verdict. QPWB knew the individual insureds had a claim against the carrier. <u>And QPWB never told its own clients or encouraged its clients to accept the Offer of Judgment</u>. No written recommendation or policy-limits demand from QPWB to Beazley exists anywhere in the twenty-eight-month file. No written communication exists in which any QPWB attorney advised any individual defendant that the managing partner privately believed the carrier was improperly refusing the firm's settlement recommendation.

Third, QPWB trial counsel, Mr. Robertson, **admitted the disqualifying conflict** of interest in open court on November 20, 2024, the fifth day of trial: "*I'm cut in half between NuMale and Asandra.*" (Exhibit 2). That admission, made sixteen days after writing to Mr. Parrett, Dr. Asandra's separately retained counsel, that "*there is no conflict representing NuMale and Dr. Asandra,*" resolves the conflict question as a matter of fact. It also supplies the Plaintiffs' fraud and fraudulent concealment claims. This was not a conflict that arose on day five of the trial; instead, it was a conflict that existed from the very first day of the engagement because the QPWB clients were never aligned.

The same day, November 20, 2024, Dr. Asandra wrote QPWB stating: "I believe this course of action constitutes **ongoing malpractice** by defense counsel. … you hired attorneys who had a conflict of interest all along and I've never had my interests protected appropriately." (Exhibit 3). Dr. Asandra's counsel, Mr. Parrett sent three escalating emails the same day, accusing the firm by name of "essentially extortion" and "**continuing blatant failures to carry out your sworn duty to your client.**" (Exhibits 9, 10, 11).

Fourth, and perhaps most damaging, three days before jury selection began in *Sanchez*, the very same judge who would preside over the *Sanchez* trial sanctioned QPWB for the identical

pattern of conflict concealment. On November 11, 2024, the Hon. Beatrice J. Brickhouse signed an Opinion and Order in *Rael v. Skies Healthcare and Rehabilitation Center, LLC*, Case No. D-202-CV-2019-07947, sanctioning QPWB (same firm, same Mr. Alvarez) for the same disqualifying conflict and same multi-year concealment pattern. The *Rael* court expressly found that QPWB's conduct was "intentional and designed to obtain strategic litigation advantage for their clients at the expense of this Court, Plaintiffs, and the judicial system as a whole," and further found that the sanctioned defendants "have a remedy against Movants for legal malpractice." (Exhibit 32, FOF ¶¶ 43, 52). Three days later, QPWB walked into Judge Brickhouse's courtroom and repeated the same conduct while concealing the *Rael* order from its own clients.

Fifth, and compounding these failures, QPWB stipulated on the record — without consulting its clients and without obtaining any client consent — to joint and several liability across the defendants with fundamentally divergent interests. Dr. Feliciano had already obtained a summary judgment ruling that he owed no duty to the plaintiff. Mr. Palubicki and Mr. Pulliam were non-physician corporate officers with individualized defenses. NuMale New Mexico S.C. Corp. had been placed on written notice, three years earlier, that it was entirely uninsured. And Dr. Asandra was simultaneously a plaintiff suing NuMale in Nevada state court. The November 22, 2024 Stipulation of Vicarious Liability collapsed these structurally divergent positions into a single unified verdict form and enabled the jury's "acting in concert" finding. That stipulation, made without client input or consent, is *per se* malpractice.

These facts, and the additional facts set out in the remainder of this letter, easily satisfy the willful, reckless, and wanton standard under New Mexico law for punitive damages at or above a three-to-one ratio. Applied to the compensatory base described in Part X below, total exposure exceeds $2 *billion*. The Plaintiffs are not making a monetary demand at this stage. The Plaintiffs first demand full disclosure of QPWB's professional liability coverage and a written commitment to engage in timely good faith settlement discussions.

After several demands for production, the Plaintiffs have now reviewed the entire QPWB file.[1] The relevant documents include the Alvarez text admissions, the Beazley-Robertson adjuster

---

[1] QPWB's production of the *Sanchez* file was itself marked by reckless disregard for the firm's confidentiality obligations to other clients. QPWB transferred to the undersigned not only the *Sanchez* matter file but also what appeared to be more than 255 additional client matter files having no relationship to the *Sanchez* matter. The Plaintiffs, through undersigned counsel, made multiple attempts to have the firm remedy the over-production. QPWB never sought return or destruction of the non-*Sanchez* files. We have acted in a good faith effort to segregate, not review, and destroy all non-*Sanchez* files in our possession in order to limit the attendant harm to the firm's unaffected clients and to the firm itself, including by mitigating (to the extent possible) waiver of attorney-client privilege, breach of the duty of confidentiality under Rule 16-106(A) NM R RPC, spoliation-of-evidence exposure in other client matters, and the State Bar reporting obligations that may be triggered by a large-scale inadvertent disclosure that QPWB did not even attempt to mitigate. The

communications, the Beazley-Alvarez engagement emails, QPWB's complete billing ledger ($502,682 over three years), Mr. Robertson's 16-page "Personal Recollection of Facts Surrounding the Motion for Mistrial and Relevant Pre-Trial Facts" (Exhibit 6), the *Rael* sanctions order, and direct evidence of the written-record void described throughout this letter.

This letter is organized as our complaint will be (if necessary). Part II addresses the concealed conflict of interest. Part III addresses the catastrophic settlement failures. Part IV addresses the Rael sanctions order. Part V addresses trial and post-trial performance. Part VI addresses the willful conduct supporting punitive damages. Part VII addresses causation. Part VIII addresses individual attorney exposure. Part IX lists the claims. Part X sets out damages. Part XI sets out the Plaintiffs' demands. Part XII reserves rights. Part XIII concludes.

## II. THE KNOWN, CONCEALED, AND LIED-ABOUT CONFLICT OF INTEREST

Under New Mexico law, a lawyer may not represent two or more clients concurrently if the representation involves a concurrent conflict, unless each affected client gives informed consent, confirmed in writing. *See* Rule 16-107(A), (B) NM R RPC. The duty is fiduciary: it belongs to each client; it is non-waivable except by the client affirmatively, in writing, after full disclosure. Breach is actionable as breach of fiduciary duty under UJI 13-2410 and UJI 13-2414 NMRA, and, where causally connected to loss, as legal malpractice. *See Richter v. Van Amberg*, 97 F. Supp. 2d 1255, 1261 (D.N.M. 2000); *Spencer v. Barber*, 2013-NMSC-010, ¶ 17, 299 P.3d 388; *Encinias v. Whitener Law Firm, P.A.*, 2013-NMSC-045, ¶ 8, 310 P.3d 611; *Andrews v. Saylor*, 2003-NMCA-132, ¶ 15, 134 N.M. 545.

### A. The Conflict Was Present at Inception and Was Deliberately Ignored and Hidden

QPWB walked into the *Sanchez* engagement with its eyes wide open. Predecessor counsel Butt Thornton & Baehr PC had been disqualified for a conflict arising from Stephen Chapman's admitted alteration of medical records. That disqualification is the entire reason QPWB was retained in July 2022. Any reasonable attorney stepping into a case from which predecessor counsel has just been disqualified due to a conflict would (a) immediately analyze whether all disqualifying facts had been cured or merely inherited; (b) obtain written informed consent from every remaining defendant before accepting joint representation; and (c) document the conflict analysis contemporaneously in the file. QPWB did none of these things.

Beazley Insurance's direction was explicit. On July 25, 2022, Joe Cianflone (Beazley) wrote to Frank Alvarez: "Frank — you've come recommended by outgoing counsel and agreed to by our Insured to take over the handling of this matter going forward. Please check conflicts and advise if you can defend all defendants except Stephen Chapman — PA." (Exhibit 4). The

---

firm's conduct in the production of the file is itself evidence of the institutional disregard for client interests that pervaded its handling of the *Sanchez* matter.

direction was explicit. QPWB was on express written notice, at the inception of the engagement, that a conflict analysis was required.

**QPWB failed to perform the conflict analysis.** The firm's complete billing ledger contains no time entry for conflict analysis at inception or at any point during the first twenty-eight months of the representation. The firm's only ethical analysis appears on a billing entry dated on November 12, 2024 (Mr. Robertson, 1.80 hours), and it is an analysis of *opposing* counsel's ethics. In a sad bit of irony, November 12 was the date the Court entered the *Rael* sanctions order against QPWB. This failure, standing alone, is dispositive.

The evidence absence is not limited to the billing ledger. It extends to the file itself. The complete client file contains no conflict memorandum, no conflict-waiver template, no conflict-disclosure letter, no conflict-analysis email, and no internal correspondence discussing the firm's joint representation of nine clients with divergent interests. Because the firm generated no analysis, the firm communicated none to its clients. The written consent that Rule[2] 16-107(B)(4) requires could never have been obtained and was never obtained.

Three additional structural conflicts existed at the inception of the engagement and continued throughout. NuMale New Mexico S.C. Corp. was uninsured per Beazley's January 13, 2021 Reservation of Rights letter, which stated unequivocally: "Underwriters will not indemnify NuMale New Mexico S.C. Corp. for any settlement or judgment entered against it." (Exhibit 7). The individual defendants Palubicki, Pulliam, and Feliciano had fundamentally different exposure profiles than the corporate defendants, with potentially dispositive individualized defenses that were never pursued. And the nine defendants were competing for a single $6,000,000 aggregate policy under a self-eroding structure that consumed the fund dollar-for-dollar with every fee QPWB billed.

Between August 2022 and the November 25, 2024 verdict, QPWB obtained disqualifying information about Dr. Asandra: three separate state medical-board reprimands in Colorado, California, and New York, all based on improper supervision of a physician's assistant—precisely the conduct at issue in *Sanchez*. Dr. Asandra also had an active lawsuit pending against NuMale in Nevada state court, directly adverse to the very NuMale corporate entities QPWB was simultaneously representing in New Mexico. Dr. Asandra separately retained Mr. Parrett as personal counsel and on October 23, 2024 Mr. Parrett catalogued fourteen specific conflict-and-loyalty failures in writing, which were sent to QPWB. Rather than recognize and address these clear conflicts, QPWB ignored and concealed them.

**B. The Complete Absence of an Engagement Agreement and Conflict Waivers**

The firm has now admitted that it had no engagement agreement with anyone. Mr. Alvarez wrote to me on February 5, 2026: "Please note we did not have an engagement agreement or

---

[2] Unless otherwise noted, "Rules" refer to the New Mexico Rules of Professional Conduct.

retainer agreement. We received the file from the carrier, Beazley, and we did not have a specific retainer agreement with them." (Exhibit 5). Across a three-year, $502,682 insurance-defense engagement involving nine defendants, three mediations, a nine-figure verdict, and a post-verdict bankruptcy, QPWB operated without any written engagement agreement defining the scope of the representation, the allocation of authority between insurer and insured, or the handling of conflicts. These facts, particularly in light of Mr. Alvarez's admission, clearly amount to malpractice.

Worse, the firm never even sought a conflict waiver from any of the nine jointly represented defendants (nor discussed with them the impact of the obvious conflicts). A written conflict waiver is not a best practice; it is a requirement of law. New Mexico Rule 16-107(B)(4) requires that, in any concurrent conflict of interest, "each affected client gives informed consent, confirmed in writing." The requirement is mandatory. It is non-waivable. It is not satisfied by oral discussions (which never occurred), by post-hoc rationalizations, or by the firm's own internal assessment (without even a memo to the file) that *"no conflict"* exists. No waiver exists in this case. That absence was not a technicality. It was and is material.

As of the July 25, 2022 engagement, four facts made the conflict question decisive. Prior counsel had just been disqualified on conflict grounds. The carrier had expressly asked QPWB to analyze conflicts. PA Chapman's record-alteration conduct was imputable to the other jointly represented defendants by virtue of the joint representation. And NuMale New Mexico S.C. Corp. had been placed on written notice of non-indemnity, making its exposure structurally different from that of every other entity. Any one of those facts required a written waiver under Rule 16-107. All four together made the absence of written waivers a *per se* breach of the duty of loyalty from day one.

The firm itself has admitted the absence. Through Ms. Chavez's November 4, 2024 email to Mr. Parrett, the firm wrote: "we have verified there is no conflict representing NuMale and Dr. Asandra. … Our analysis of the New Mexico ethical rules is there is no actual or apparent conflict." (Exhibit 8). The firm's position is that because (in its own, unwritten assessment) no conflict existed, no written waiver was required. That position is both absurd and incorrect as a matter of New Mexico law and is incompatible with the firm's admission in open court sixteen days later that the conflict existed and was disqualifying.

## C. The Mid-Trial Admission

Yet only two weeks later, on November 20, 2024, Mr. Robertson admitted the conflict to Judge Brickhouse:

> "Now I'm cut in half between NuMale and Asandra. I owe a duty to Dr. Asandra to get him out. But the problem I'm facing is Dr. Asandra is our star witness. He's our key witness. … So NuMale requires — needs Dr. Asandra to defend them. So now I'm split in half and we were never split in half before." (Exhibit 2).

Plaintiff's counsel identified the problem. Judge Brickhouse stated what was already obvious — that a conflict had existed from the outset: "I'm trying to understand now why there's a conflict because now opposing counsel has said hey that stuff that's gonna come out is gonna be damaging. Well, this whole time shouldn't there have been an evaluation regarding the case and the witness testimony and the weaknesses and the strengths of the case?"

The answer is obviously yes. It was preposterous on its face for QPWB to assert, and to continue asserting through November 4, 2024, that no conflict existed. The conflict had been structural from the moment QPWB accepted the engagement. Any reasonably competent lawyer exercising ordinary care would have identified it at inception, when Dr. Asandra's DEA investigation surfaced, when Dr. Asandra retained personal counsel, and when Mr. Parrett's October 23, 2024 letter catalogued fourteen specific failures turning on the conflict. Mr. Robertson's mid-trial admission was not a sudden discovery. It was a willful disregard, finally forced to the surface by the trial record, of a disqualifying conflict that had been in plain view since July 25, 2022.

On day 7 of the trial, Mr. Robertson stipulated on the record that the "NuMale defendants" designation on the special verdict form "refers to all remaining defendants in the case." (Exhibit -14). On November 22, 2024 at 9:02 a.m., QPWB (Mr. Robertson, Mr. Alvarez, Ms. Barrett, Ms. Chavez) signed a court-filed Stipulation of Vicarious Liability on behalf of all remaining defendants — including Asandra, Feliciano, Palubicki, and Pulliam — establishing that every NuMale corporate entity was vicariously liable for the acts of its agents and employees as a matter of law. (Exhibit 15). QPWB conceded this contested point without any client consultation and without consent. That single stipulation enabled the jury's "acting in concert" finding, which imposed joint and several liability for the full $412 million on every defendant. No competent lawyer representing a non-physician corporate officer (Palubicki, Pulliam) or a doctor with a no-duty ruling (Feliciano) would have stipulated to a unified verdict form without informed written consent. That no consent was sought is itself attributable to the concurrent conflict QPWB acknowledged on Day 5.

Stipulating, without client input or consent, to joint and several liability across nine defendants whose factual circumstances and legal exposure differed profoundly is outrageous. It is an extraordinary lapse in judgment. It is, on its face, *per se* malpractice.

## D. Client Confirmation of the Conflict

Dr. Asandra's personal counsel, Mr. Parrett, sent three escalating emails on November 20, 2024:

- 7:45 a.m.: "I just got off the phone with Dr. Asandra and was even more shocked to learn the events that transpired later last night and this morning. You need to settle him out right now, immediately. Not later this morning, not this afternoon, not tomorrow. RIGHT NOW. What is the matter with you all?" (Exhibit 9).

- 8:17 a.m.: "your actions to keep him in the lawsuit when Plaintiff will dismiss him is essentially extortion to force him to testify. … your continuing actions are continuing blatant failures to carry out your sworn duty to your client. … you are in breach of your responsibilities toward your insured." (Exhibit 10).
- 7:13 p.m.: "astounded to learn he is still not dismissed and the window of opportunity has been lost due to your failure (including you Beazley) to carry out your obligations to protect him." (Exhibit 11).

Dr. Asandra himself, at 9:09 a.m. the same day, sent QPWB and Beazley a five-point letter using the word "malpractice". Among the points: his right to protect himself from liability via settlement; "you owe me a duty of good faith — this is bad faith"; that forcing testimony created a conflict harming his career; that cooperation did not benefit the defense; and the malpractice charge: "I believe this course of action constitutes ongoing malpractice by defense counsel . . . they have failed to advocate for a resolution … they are not fulfilling their professional obligations … you hired attorneys who had a conflict of interest all along and I've never had my interests protected appropriately." (Exhibit 3).

## III. THE CATASTROPHIC SETTLEMENT FAILURES

An attorney retained by an insurer to defend an insured owes the insured a duty of full settlement communication, full excess-exposure advisory, and full candor regarding the lawyer's own assessment. Rule 16-104(A)(3) NM R RPC; Rule 16-102(A) NM R RPC; NM Rule 16-107 cmt.; Rest. (3d) L. Gov. Law. §§ 20, 134; *Lysick v. Walcom*, 258 Cal. App. 2d 136, 65 Cal. Rptr. 406 (1968). The duty is not satisfied by reports to the carrier. It is satisfied only by written communication to the insured-client identifying the settlement posture, the excess-exposure risk, and the lawyer's recommendation.

The central and unanswerable fact about QPWB's handling of Sanchez: the firm's complete client file contains not a single policy-limits demand from QPWB to Beazley at any point during the three-year engagement. It contains no communication in which QPWB advised any individual defendant of the firm's own settlement assessment, of the carrier's divergence from that assessment, or of the insureds' right to demand that the carrier tender policy limits. That void is the breach. The breach caused the verdict. The breach caused the bankruptcy.

### A. Nine Missed Within-Limits Settlement Opportunities, Including a Mid-Trial $0 Dismissal

The *Sanchez* case presented eight discrete opportunities to resolve within or below policy limits, plus a ninth opportunity for an Asandra-and-Feliciano $0 dismissal mid-trial. QPWB mishandled each — without the written client advisory the fiduciary duty required.

1. **December 31, 2021** — the inherited demand. Plaintiff served the first $6M policy-limits demand on prior counsel. QPWB took over in July 2022 and never converted the inherited demand into a written QPWB demand on Beazley.

2. **October 12, 2022** — the renewed $6M demand. Plaintiff renewed the $6M demand and attached Mr. Rowley's $131M, $74.6M, and $46.7M verdict history. QPWB billed nominal time ($194) in response. No individual defendant received a communication (written or otherwise) advising of the demand or its excess-exposure implications.

   February 9, 2023 — first comprehensive evaluation. Mr. Robertson recommended a settlement starting figure of "$25K and $50K" against an acknowledged risk profile that included Chapman's record alteration, NM Unfair Practices Act treble damages, punitive-damages exposure, and "sizable" plaintiff attorney fees. (Exhibit 17). The potential for excess exposure was not disclosed to any client.

3. **October 4, 2023** — the first mediation. QPWB entered with Mr. Robertson's low valuation as the anchor. The mediation failed.

   May 28, 2024 — witness assessment to the carrier. Six months before trial, Mr. Robertson's written status report to Mr. Cianflone (Exhibit 20) graded Mr. Palubicki — the corporate face of the defense — as a "below average" defense witness. The same report graded the case at "$0 or $5M," hedging that "we do not necessarily think that this case is worth seven figure."

4. **June 18, 2024** — the second mediation. On the day of the second mediation, Mediator Denise Torres transmitted to defense counsel a twenty-three-bullet written summary titled "Testimony of Defendant Christopher Asandra, M.D." (Exhibit 21). The summary catalogued case-ending sworn admissions: that Dr. Asandra had "no training or experience in men's sexual health before starting the first NuMale clinic in 2013"; that "a consulting group, not consisting of any physicians, gave Dr. Asandra and Dr. Feliciano the medications and protocols"; that the Colorado Medical Board had issued a letter of admonition for improper supervision; that sending the plaintiff home with an erection was "inappropriate"; that "neither Chapman nor Asandra was able to manage the complications"; and that no consent form was signed on November 17, 2017.

5. **June 25, 2024** — the $950,000 Rule 68 Offer of Judgment. Plaintiff served a $950,000 Offer of Judgment offer with a statutory July 4 deadline. Beazley directed that the offer be allowed to expire ("Joe is not paying $950k"). The offer was the exact figure Mr. Alvarez later told Beazley it should have paid. (Exhibit 1). No advice was given to the clients about the implications of the rejecting the Offer of Judgment, and no demand to Beazley to accept the offer exists. In fact, in a simply outrageous lapse of professional judgment and in express violations of its express ethical obligations, the insureds were never even told of the offer's existence, let alone the firm's view that it should be accepted, thus

denying the insureds the ability to exercise their judgment and discretion to pay the OOJ. At trial you will hear testimony that decision would have been made

6. **October 8, 2024** — the final policy-limits demand. Plaintiff served the final policy-limits demand with a 10-day deadline; Mr. Rowley's transmittal warned: "This is going to be a record setting verdict in New Mexico." QPWB's "best and final" of $1,500,000 followed on October 29 and was rejected on October 31. No individual defendant was advised in writing — before, during, or after — that the policy-limits window was closing.

November 1, 2024 — the mock trial. The QPWB-commissioned mock trial returned a $1,500,000 verdict in under sixty minutes, including $1,000,000 in punitive damages not covered under the policy. Counsel's contemporaneous internal text thread documented what the result meant. Mr. Robertson: "Excess still possible." Ms. Barrett: "And are punitives covered?" Mr. Robertson: "Don't think so." Ms. Barrett's contemporaneous internal characterization of her client Mr. Palubicki was that he was a "dumbass" who needed reminding "not to take a shot in his dick before he testifies" and would "look shady" on the stand. The mock jury's reaction to the underlying business: "No one liked the business model especially after we showed the training materials. Unprofessional." (Exhibit 22). Yet no written escalation, no written policy-limits demand, and no written request for additional settlement authority issued. The firm's written advocacy to the carrier downplayed every fact its lawyers — and a neutral mediator — had put in writing.

On November 4, 2024, QPWB sent case evaluations to Mr. Rivera and to Mr. Parrett (for Dr. Asandra) writing for the first time that "an excess verdict is still possible and punitive damages are not covered under the policy" — **twenty days before verdict**, after the final policy-limits demand had already expired.

7. **November 19, 2024** — the Asandra dismissal stipulation. Plaintiff offered to dismiss Dr. Asandra by stipulation. Dr. Asandra emailed QPWB and Beazley directly: "I've reviewed the document and would like to accept the plaintiff's offer for dismissal. Please sign the dismissal proposal today." (Exhibit 26). Mr. Parrett wrote at 7:53 p.m.: "Please immediately sign and approve the dismissal in order to protect your client and your insured." QPWB willfully and intentionally ignored the instructions by their Client and refused to sign the stipulation dismissing Dr. Assandra.

8. **November 22, 2024** — the $0 dismissal offer for Asandra and Feliciano. Plaintiff offered to dismiss both physicians for nothing in exchange for the corporate-defendant stipulations QPWB ultimately signed anyway. (Exhibit 16). Dr. Feliciano was never told the offer existed. Dr. Asandra had been demanding dismissal at every turn. QPWB again refused. Both physicians were included in the $412,500,149 verdict.

9. **November 22, 2024** (mid-closing) — the hallway tender. Mr. Robertson tendered the policy limits in a hallway conversation immediately before plaintiff's rebuttal closing, then

emailed to confirm. (Exhibit 23). Mr. Homampour later called the timing what it was: "too little and too late." (Exhibit 12). Three days later the jury returned $412,500,149.

Nine settlement opportunities, including one $0 dismissal opportunity, missed. At each, the carrier set the posture, QPWB executed the carrier's instruction, and the insureds were not told. At no inflection point did any individual defendant receive a written advisory from QPWB explaining the firm's actual settlement assessment, the gap between the firm's internal view and the carrier's posture, or the magnitude of excess exposure.

**B. The Alvarez Text is Direct Proof of Causation**

Mr. Alvarez's October 24, 2024 text proves three facts each fatal to any QPWB defense. The full message reads: "They f'ed this up. **We told them to pay 950.** NuMale has a claim against them, unfortunately for them." (Exhibit 1). It was sent within a three-person text thread (Alvarez, Robertson, Barrett) in direct response to Ms. Barrett's message of the same day: "Did you guys see my email from Jack that Adam [Moser, the Beazley adjuster] has 1.5 million? He wants input on how to approach ptf (essentially putting it in our lap)."

First, the text establishes that QPWB privately valued the case at $950,000 three weeks before trial. Mr. Alvarez was the managing partner over the Albuquerque office and, as the November 4, 2024 letter to Mr. Parrett confirms, was the final-authority attorney on conflict and settlement issues. When the managing partner writes that the case "should have been paid" at $950,000, that is the firm's contemporaneous assessment. $950,000 is not a nine-figure case. It is below one-sixth of policy limits. Everything above $950,000 on the $412,500,149 verdict, and every dollar of the downstream bankruptcy damages, flows from QPWB's misconduct.

Second, the text establishes what QPWB never told its clients. No letter, memo, email, or meeting note in the QPWB file contains a written communication from QPWB to any NuMale defendant stating the firm's view that the case should have been paid at $950,000. That communication never happened. The individual defendants were never told their own lawyers believed the Offer of Judgment should have been accepted. Mr. Parrett's October 23, 2024 letter expressly documented, as one of fourteen failures: "$500k offer / $950k demand from July exchange Asandra did not know about." (Exhibit 31). The insureds could not have acted on QPWB's private "pay 950" assessment because they were not told \.

The only plausible defense — that QPWB "pushed" and the carrier "refused" — fails for multiple reasons. Under Rule 16-107 and the Restatement, the insured is the client; "we were told to" by the carrier is a breach, not a defense. The written-record void proves the "pushing" narrative false; a firm that pushes and is refused leaves a paper trail that demonstrates it advised its clients. Joe Cianflone had already left Beazley when the text was sent; a competent firm would have re-pitched the policy-limits recommendation in writing to the new adjuster (Adam Moser). QPWB did not. And QPWB never withdrew, despite Rule 16-116(A)(1)'s mandate that withdrawal is

required when the insurer's direction places counsel in an impossible ethical position. The firm instead billed another $300,000-plus and took the case to verdict.

### C. The Clients Were Screaming for Settlement and QPWB Said Nothing

On December 21, 2023, Dr. Asandra forwarded to Mr. Robertson a warning: "$6 million in insurance coverage and I can see Plaintiff obtaining a judgment that exceeds this amount, which is why you should pressure your carrier to settle this case. … Nick is considered one of the best trial attorneys in the Country and he can easily get a large verdict on these facts. … You should put pressure on your insurance carrier to settle this case as you have serious financial, career and license exposure." Dr. Asandra wrote directly: "PLEASE review so we have strategy." (Exhibit 24). Mr. Robertson's didn't even bother to respond to the email.

On November 18, 2024, Mr. Parrett wrote: "This sounds like a disaster. This is another demand for the matter to be settled as to Dr. Asandra for whatever is necessary to achieve a settlement and dismissal as to him. This needs to be done now before it gets any worse." (Exhibit 25). No written client advisory generated. On November 19, 2024, Dr. Asandra wrote QPWB and Beazley accepting plaintiff's dismissal offer. (Exhibit 26). QPWB refused to sign. No explanation was ever sent to Mr. Parrett or Dr. Assandra. On November 20, 2024, the Parrett three-email escalation and the Dr. Asandra five-point letter followed (Exhibits 9, 10, 11, 3). Again, no written response. On November 19, 2024, Mr. Palubicki's own settlement analysis was forwarded to Mr. Cianflone the same day. The insured was already routing around his own defense firm.

After verdict, QPWB's silence continued. Mr. Palubicki wrote on December 30, 2024: "Your firm's continued silence raises serious questions about your commitment to fulfilling your professional obligations as our defense counsel. The pattern of non-engagement leads to an unavoidable question: have you withdrawn from representing us?" (Exhibit 27). His March 6, 2025 letter asked: "was Beazley aware that, since July 8, 2024, QPWB had not engaged in any settlement discussions on its behalf or NuMale's behalf?" (Exhibit 28).

### D. The Self-Eroding Policy Issue Was Never Communicated to the Clients

Compounding every one of the above failures is the self-eroding policy issue. On October 2, 2023, plaintiff's counsel wrote to QPWB demanding that Beazley conform the policy to comply with New Mexico law, citing NMAC 13.11.2.8 and 13.11.2.9, which prohibit defense-within-limits provisions in New Mexico medical malpractice liability policies. (Exhibit 29). The letter was not frivolous; it identified a serious regulatory problem with the coverage structure: every dollar QPWB billed Beazley reduced the funds available to settle. Mr. Robertson billed 0.80 hours researching the issue (Exhibit 13), forwarded plaintiff's letter to Beazley, and characterized plaintiff as "just whining to the judge" (Exhibit 29). There is no evidence QPWB ever advised its own clients that their insurance policy might be illegal under New Mexico law, that defense costs

were eroding settlement limits, that the clients should demand conformity, or that the $502,682 QPWB eventually billed was, dollar for dollar, reducing the $6,000,000 aggregate fund.

**E. Excess-Exposure Communications Were Limited, Belated, and Inadequate**

The earliest written coverage-issue advisory from QPWB to any individual defendant is Mr. Robertson's October 25, 2023 email to Dr. Asandra — fifteen months after engagement and, after the first mediation had already failed — recommending Asandra "retain your own counsel to look at the insurance coverage issues in this case" but not advising as to the specific magnitude of excess risk. The firm's first written statement that an "excess verdict is still possible" came on November 4, 2024, twenty days before verdict, in Ms. Chavez's case evaluations to Mr. Rivera (directly) and to Mr. Parrett (for Dr. Asandra). Dr. Feliciano, Mr. Palubicki, and Mr. Pulliam received no written excess-exposure advisory from QPWB. No individual defendant received a written advisory at the strategic inflection points where it mattered: at engagement in July 2022; at the October 12, 2022 $6M policy-limits demand; at the October 4, 2023 mediation; at the June 25, 2024 Rule 68 offer; or at the October 8, 2024 final policy-limits demand.

**F. Individualized Derelictions**

The joint representation produced client-specific failures that compounded the systemic ones.

**Dr. Feliciano.** The trial court granted partial summary judgment finding "Dr. Feliciano owed no duty to Plaintiff." A competent lawyer would have converted that finding into full dismissal via renewed motion, trial motion for directed verdict, or settlement. QPWB did none. Dr. Feliciano was also never informed of the $0 dismissal offer of November 22, 2024. (Exhibit 16). He was included in the $412M verdict.

**Dr. Asandra.** No Reservation of Rights letter from Beazley was ever relayed to Dr. Asandra personally by QPWB. His December 21, 2023 warning (Exhibit 24) was ignored. His mid-trial "ongoing malpractice" letter (Exhibit 3) was ignored.

**Mr. Palubicki and Mr. Pulliam.** Non-physician corporate officers with viable individual defenses to medical-negligence claims. No separate settlement strategy was pursued. No individual engagement letters were generated. No motion practice to limit exposure.

**NuMale New Mexico S.C. Corp.** Uninsured. Jointly represented without written warning to its principals that the entity faced the full verdict personally. No individual counsel, no individual settlement advocacy, and no written excess advisory.

The written-record void is uniform. Every individual defendant was exposed to a catastrophic excess verdict without a single written client communication from QPWB addressing

the excess exposure, the settlement posture, the coverage structure, or the defendant's individual options.

## IV. THE *RAEL* SANCTIONS ORDER: SAME JUDGE, SAME FIRM, SAME CONDUCT, DAYS EARLIER

The *Rael* sanctions order is devastating. The same court, presided over by the same judge who would preside over *Sanchez*, sanctioned the same firm and same partner for the same disqualifying conflict and the same concealment methodology, and expressly told the sanctioned defendants they had a remedy against QPWB for *legal malpractice*. Three days later, the same firm walked into the same judge's courtroom and did the same thing again, while concealing the sanctions order from its clients.

### A. Identity of Parties, Attorneys, Forum, and Conduct

*Rael v. Skies Healthcare and Rehabilitation Center, LLC*, Case No. D-202-CV-2019-07947, was pending before the same Judge Brickhouse. Judge Brickhouse signed her Opinion and Order November 11, 2024, and it was e-filed November 12, 2024. The order sanctioned QPWB — same firm, same Mr. Alvarez — for an identical conflict-concealment pattern: concurrent representation of an employee-witness and a corporate defendant without informed written consent. The same structural conflict between Dr. Asandra (employee-witness) and NuMale (corporate defendant); the same concealment duration (over three years, FOF ¶ 38); and the same strategic justification ("more strategic than anything else," FOF ¶ 36) all tainted QPWB's representations of the Plaintiffs.

### B. The Rael Findings, Verbatim

The *Rael* findings, quoted verbatim, make this action's outcome inevitable:

- FOF ¶ 35: QPWB made "knowing misrepresentation of fact to this Court" regarding when the conflict arose.
- FOF ¶ 36: QPWB conceded its decision not to correct adverse testimony "was more strategic than anything else."
- FOF ¶ 43: "The record and facts of this case demonstrate no other reasonable finding but that Movants' conduct was intentional and designed to obtain strategic litigation advantage for their clients at the expense of this Court, Plaintiffs, and the judicial system as a whole."
- FOF ¶ 52: "To the extent Defendants themselves were not complicit in the conduct of their counsel, Defendants have a remedy against Movants for legal malpractice."
- COL ¶ 14 (citing *United Nuclear Corp. v. Gen. Atomic Co.*, 1980-NMSC-094): QPWB and defendants "followed a conscious, willful and deliberate policy throughout this litigation, which continues to the present time, in cynical disregard and disdain of the Rules

of Procedure relating to discovery [and of our Rules of Professional Conduct], of concealing rather than in good faith revealing the true facts."

## C. The Candor Breach Three Days Later

QPWB walked into Judge Brickhouse's courtroom on November 14, 2024 having been sanctioned by that very judge for the identical pattern three days earlier. QPWB told no one. The firm did not disclose the *Rael* order to its clients and did not raise the issue with the court. The firm did not analyze whether the *Rael* findings impacted its Sanchez representation. The only ethics-analysis billing entry on the *Rael* e-filing date, November 12, 2024, is Mr. Robertson's 1.80-hour analysis of opposing counsel's ethical obligations in Sanchez. (Exhibit 13). The duty of candor under Rule 16-303(a) NM R RPC, standing alone, compels full disgorgement of all fees and an award of damages against QPWB.

## D. Evidentiary Use

The Rael decision will be admissible: the *Rael* court's finding that QPWB's conflict-concealment methodology is "intentional and designed to obtain strategic litigation advantage" is preclusive against QPWB: Rule 11-404(B)(2) NMRA will admit the order to prove motive, opportunity, intent, preparation, plan, knowledge, and absence of mistake. The order is admissible as *res gestae* because it was entered contemporaneously with the same conduct in Sanchez. And the order is a sufficient alone for an award of punitive damages under New Mexico law.

# V. TRIAL AND POST-TRIAL PERFORMANCE

Even setting aside the conflict and settlement failures, QPWB's trial and post-trial performance, standing alone, fell far below the standard of care.

## A. Pre-Trial

Plaintiff filed seven motions in limine; QPWB filed none and failed to join Defendant Chapman's motions. The court remarked on the imbalance. Plaintiff prevailed on all nine discovery motions to compel. (Exhibit 36). The expert mismatch was stark: plaintiff's Dr. Irwin Goldstein, a world-renowned sexual-medicine specialist, provided a 7-page opinion identifying 15+ standard-of-care breaches; QPWB's Dr. Dudley Danoff was 87 years old, was not designated on the New Mexico standard of care, and had his testimony largely excluded. Trial counsel called the defense expert by the wrong name ("Dr. Goldstein" instead of "Dr. Danoff"). The six defense MSJs were denied without oral argument; the seventh was granted in part on Dr. Feliciano's no-duty finding, yet QPWB failed to leverage that ruling for directed verdict or excess-liability protection for Dr. Feliciano.

**B. In-Trial**

Day 2: Ms. Barrett's *voir dire* implied that physicians, not insurers, choose not to settle, inviting plaintiff's bad-faith argument; the court issued a curative instruction. (Exhibit 37).

Day 3: Ms. Barrett willfully violated the *in limine* order regarding the plaintiff's deceased wife and depression; the court read a curative instruction finding "counsel for NuMale defendants willfully violated this Court's order." (Exhibit 33).

Day 4: defense expert Dr. Barisa, the mental-health mitigation expert, was abandoned as a direct consequence of the Day 3 violation. (Exhibit 34).

Day 5: Ms. Barrett coached the sequestered witness PA Chapman in violation of the sequestration order. That same day: Mr. Robertson's "cut in half" speech admits the conflict for the first time. (Exhibit 2).

Day 6: further *in limine* violation by Ms. Barrett, prompting the court's warning: "We're at the end of the road, Ms. Barrett, with regards to these types of things that just keep happening over and over and over." (Exhibit 35).

Day 7: Mr. Robertson's "NuMale defendants = all remaining defendants" stipulation (Exhibit 14); the Stipulation of Vicarious Liability stipulated by QPWB on behalf of all defendants without their consent (Exhibit 15); Barrett-Chavez internal text thread the same day: "They dumped this bench brief on us. We barely survived the directed verdict. … They got our expert to admit fraud." (Exhibit 38). Closing: Ms. Barrett suggested damages of $1,000,000; the jury returned $412,500,149.

**C. Post-Trial**

Zero post-trial motions. No JNOV, no motion for new trial, no motion for remittitur. (Exhibit 39). $132,171.78 billed in January 2025 alone, yet no post-trial motions were filed. (Exhibit 13). Beazley replaced QPWB with the Rodey firm and Paul Weiss on January 2, 2025. The insurer's immediate decision to replace QPWB with competent appellate and post-trial counsel is itself an admission that the firm's performance was inadequate. Mr. Palubicki's post-verdict letters document the abandonment. (Exhibits 27, 28).

## VI. THE WILLFUL-CONDUCT RECORD: PUNITIVE DAMAGES

New Mexico law authorizes punitive damages where the defendant's conduct was malicious, willful, reckless, wanton, fraudulent, or in bad faith. UJI 13-1827 NMRA. Breach of fiduciary duty committed with a culpable mental state supports punitive damages as a matter of law.

Legal malpractice rising to willful misconduct supports punitive damages. *Paiz v. State Farm Fire & Cas. Co.*, 1994-NMSC-079, 118 N.M. 203, 880 P.2d 300; *Clay v. Ferrellgas, Inc.*, 1994-NMSC-080, 118 N.M. 266, 881 P.2d 11; *Aken v. Plains Elec. Generation & Transmission Coop.*, 2002-NMSC-021, 132 N.M. 401, 49 P.3d 662; *Chavarria v. Fleetwood Retail Corp.*, 2006-NMSC-046, 140 N.M. 478, 143 P.3d 717. A jury may award punitive damages to express its condemnation of the defendant's conduct and to deter the defendant and others from engaging in similar conduct.

The Plaintiffs do not need to reach for willfulness. The record supplies it on at least ten independent grounds:

1. The *Rael* judicial finding. The same judge determined that the same firm, using the same methodology, engaged in conduct "intentional and designed to obtain strategic litigation advantage." (Exhibit 32, FOF ¶ 43). That finding is preclusive. Standing alone, it is sufficient to establish the willful-conduct predicate.

2. QPWB's own concession in *Rael* that its decision not to correct adverse deposition testimony "was more strategic than anything else." (FOF ¶ 36). The same firm repeated the same strategic concealment three days later in Sanchez.

3. The Alvarez text admission. Three weeks before trial, the managing partner knew the case should have been paid at $950,000. (Exhibit 1). Possession of that knowledge triggered every fiduciary-duty-to-inform obligation QPWB owed the insureds. None was satisfied.

4. The November 4, 2024 written denial of the conflict (Exhibit 8), made when Mr. Robertson already knew the Asandra testimony would be devastating, and contradicted in open court sixteen days later. That letter is either knowingly false (fraud) or recklessly false (constructive fraud). Either supports punitive damages.

5. The mid-trial "ongoing malpractice" letter from Dr. Asandra (Exhibit 3), and the contemporaneous Parrett escalations (Exhibits 9, 10, 11). The client told QPWB, in writing, during trial, that it was committing ongoing malpractice. QPWB continued the same conduct through verdict.

6. The concealment of the $0 dismissal offer from Dr. Feliciano (Exhibit 16) and the failure to convey settlement positions to all individual insureds at multiple inflection points.

7. The failure to advise clients of the potentially illegal self-eroding policy structure under NMAC 13.11.2.8 / 13.11.2.9 (Exhibits 29, 13), where every QPWB billing dollar reduced the settlement fund.

8. Three in-trial "willful violation" findings against Ms. Barrett, with the court reading curative instructions to the jury that "counsel for NuMale defendants willfully violated this Court's order" (Exhibits 33, 34, 35), plus Ms. Barrett's coaching of the sequestered witness PA Chapman (Exhibit 2).

9. The November 12, 2024 opposing-counsel-ethics billing entry (Exhibit 13) — the same day the Rael sanctions order was e-filed against QPWB — demonstrating that the firm used billing time to attack opposing counsel's ethics on the very day the court was sanctioning QPWB for its own.

10. The $132,171.78 January 2025 invoice for zero post-verdict motions. Billing six figures for doing nothing after a nine-figure verdict is wanton profiteering on abandonment.

Any one of these grounds, standing alone, supports a punitive-damages finding under New Mexico law. Collectively, they establish a course of conduct of exceptional reprehensibility. Every aggravator recognized by New Mexico and federal punitive-damages doctrine is present: repetition of the same conduct after prior judicial notice (*Rael*); concealment from the client; profit motive (every unpaid-out settlement dollar extended the firm's billing runway, $502,682 over three years); vulnerability of the victims (nine insured defendants dependent on the firm for candor); duration (twenty-eight months of continuous misconduct); and institutional scale (managing partner admission in writing; *Rael* respondent partners; multiple trial-counsel attorneys each committing independent acts).

The due-process ceiling on punitive damages is established by *BMW of N. Am. v. Gore*, 517 U.S. 559 (1996). *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003); *Aken v. Plains Elec. Generation & Transmission Coop.*, 2002-NMSC-021, 132 N.M. 401, 49 P.3d 662 (applying *BMW* guideposts and approving a 3.5:1 ratio); *Chavarria v. Fleetwood Retail Corp.*, 2006-NMSC-046, 140 N.M. 478, 143 P.3d 717 (applying *BMW* guideposts). On this reprehensibility record, a punitive-to-compensatory ratio of up to three to one is easily foreseeable and would be appropriate. Applied to the compensatory base in Part X, three-to-one yields punitive exposure approaching $1.5 billion alone. The *Rael* court's express "intentional and designed to obtain strategic litigation advantage" finding, binding on QPWB and Mr. Alvarez personally, establishes the reprehensibility predicate as a matter of issue preclusion.

## VII. CAUSATION

Every claim depends on proof that QPWB's conduct proximately caused the Plaintiffs' damages. The "case within a case" analysis is straightforward, and the causal chain from breach to verdict to bankruptcy to creditor deficiency is airtight.

**A. The Case Was Always Settleable on QPWB's Own Assessment**

Mr. Alvarez's October 24, 2024 text is the strongest causation exhibit in the file. (Exhibit 1). The managing partner of the defending firm privately valued the case at $950,000 three weeks before trial. That assessment is external to any post-hoc reconstruction by the Plaintiffs. The case was a within-policy-limits seven-figure case on QPWB's own analysis. Everything above $950,000 in the eventual verdict and resulting damages flows from QPWB's failures.

**B. Beazley's Post-Verdict Conduct Confirms the Assessment**

The Plaintiffs have resolved their claims against Beazley. The carrier paid $108,500,000 in bankruptcy to resolve the Sanchez-driven claims. (Exhibit 30). That settlement is one hundred nine times QPWB's own "pay 950" assessment. The insurer's post-verdict willingness to pay a nine-figure sum is external, market-tested confirmation that the case was always settleable for a fraction of the verdict. Had QPWB issued a written policy-limits demand on Beazley at any point between the October 12, 2022 demand and the October 8, 2024 final demand, and had QPWB delivered a written excess-exposure advisory to each individual defendant, the insureds would have been positioned to demand that Beazley tender. Beazley would have tendered. The case would have resolved within limits. The $412M verdict would not have occurred. The bankruptcy would not have occurred.

**C. Specific Causal Links**

Joint representation led to the stipulated verdict form, which led to joint and several liability for $412M. (Exhibit 14). Joint representation caused the refusal of plaintiff's November 22, 2024 $0 dismissal offer for Dr. Asandra and Dr. Feliciano. (Exhibit 16). The conflict-driven representation and refusal to dismiss Dr. Asandra caused the firm's "cut in half" predicament. (Exhibit 2). Imputed character evidence bled across all jointly represented defendants. Three willful-violation findings destroyed defense credibility before closing. (Exhibits 33, 34, 35). And the zero written policy-limits demand, zero written excess-exposure advisory, and zero written client advisory of the firm's own "pay 950" within-policy-limits assessment left the insureds powerless to override the carrier, because they were never told. Again, you will hear testimony at trial that decision would have been made.

**D. The Bankruptcy as Consequential Damages**

The $412,500,149 verdict was fatal to NuMale, from both a monetary and a reputational perspective. The NuMale bankruptcy was filed because of the $412,500,149 verdict. Every administrative cost, professional fee, and creditor deficiency of that bankruptcy is a consequential damage of QPWB's malpractice.

## VIII. INDIVIDUAL ATTORNEY EXPOSURE

The claims in this letter are asserted against QPWB as a firm and, jointly and severally, against each individually named attorney: Mr. Boyer, Ms. Chapman, Mr. Alvarez, Mr. Robertson, Ms. Barrett, and Ms. Chavez. New Mexico law imposes personal responsibility on attorneys for misconduct they committed, ratified, or failed to remediate. Rule 16-501(C) NM R RPC; *see also* Rule 16-502 NM R RPC. Joint and several liability among attorneys and their firms for breach of fiduciary duty is well-established. *See* Rest. (3d) L. Gov. Law. § 58. The record summarized throughout this letter establishes personal culpability as to each named attorney. Each is encouraged to place his or her individual professional liability insurer on notice of these claims, retain independent coverage counsel, and produce the insurance information demanded in Part XI below. The Plaintiffs expressly preserve claims against each of the above-named attorneys in their individual capacity, in addition to claims against the firm, and the pre-litigation engagement and mediation demand in Part XI is addressed to the firm and to each of you jointly.

## IX. CLAIMS

Based on the foregoing, the Plaintiffs intend to assert the following claims against QPWB and against each of you individually:

1. Breach of Fiduciary Duty: Conflict of Interest. Concurrent representation of nine defendants with divergent interests, without informed written consent, in violation of Rules 16-107(A) & 16-107(B)(4).

2. Legal Malpractice: Settlement Failure. Failure to advise the insured-clients regarding settlement, failure to convey written policy-limits demands, failure to issue written excess-exposure advisories, failure to recommend acceptance of multiple within-limits settlement opportunities, and failure to exercise independent professional judgment free from Beazley's control.

3. Legal Malpractice: Negligence. Representation fell below the standard of care, including failure to file motions in limine, failure to pursue individual defenses, failure to retain a qualified New Mexico defense expert, failure to object to the stipulated verdict form, willful violations of court orders, failure to file post-verdict motions, and failure to advise clients regarding the potentially illegal self-eroding insurance policy.

4. Fraud and Constructive Fraud. The November 4, 2024 representation that there was "no conflict" was either a knowing misrepresentation (fraud) or a statement made with reckless disregard for the truth (constructive fraud). *See Williams v. Stewart*, 2005-NMCA-061, ¶ 34, 137 N.M. 420; *Duncan v. Campbell*, 1997-NMCA-28, ¶¶ 9-10.

5. Fraudulent Concealment. Concealment of the conflict, of the Rael sanctions order, and of the self-eroding policy issue. *See Duncan*, 1997-NMCA-28, ¶¶ 9-10.

6. Civil Conspiracy. *See Seeds v. Lucero*, 2005-NMCA-67, ¶ 12, 137 N.M. 589.

7. Post-Verdict Abandonment. An independent negligence claim arising from QPWB's failure to file any post-verdict motions on a $412M verdict.

8. Breach of the Implied Covenant of Good Faith and Fair Dealing in the attorney-client relationship.

9. Negligent Misrepresentation (alternative to fraud and constructive fraud).

10. Disgorgement of All Fees. Where an attorney breaches the fiduciary duty of loyalty, disgorgement of all fees paid is an available remedy regardless of work quality. *See Burrow v. Arce*, 997 S.W.2d 229, 240 (Tex. 1999); Restatement (Third) of the Law Governing Lawyers § 37 (2000). Full disgorgement of $502,682.

11. Punitive Damages.

All claims are asserted jointly and severally against the firm and against each individually named attorney.

## X. DAMAGES

The Plaintiffs' damages, as supported by the judicially determined record and by independently calculable consequential damages, are as follows.

### A. Base Compensatory Damages

1. The Allowed Sanchez Claim: $410,000,000. The original *Sanchez* verdict was $412,500,149 plus interest, which had grown to more than $500,000,000. The corresponding claim, as ultimately allowed through the bankruptcy claims-reconciliation process, was reduced to $410,000,000. The reduction occurred entirely through bankruptcy proceedings, and the resulting benefit to QPWB (a lower measured compensatory base) is itself a consequence of the bankruptcy QPWB caused. The judicially allowed figure of $410,000,000 is the current measure of harm to the NuMale Debtor Estates. The entire amount was avoidable through competent representation.

2. Bankruptcy Administration Costs: approximately $13,000,000. The NuMale enterprise was forced into bankruptcy as a result of the $412M verdict. All administrative costs, professional fees, and expenses of the bankruptcy are consequential damages of QPWB's malpractice.

3. Prejudgment Interest. Under applicable New Mexico law, the Plaintiffs are entitled to prejudgment interest on all compensatory damages from the date of accrual. The Plaintiffs' claims accrued on the verdict date (November 25, 2024) or, at the latest, on the bankruptcy filing date.

At New Mexico's statutory rate of 15% interest on the Allowed Sanchez Claim from November 25, 2024 through the date of this letter (approximately seventeen months) computes to approximately $87,000,000. *See* NMSA § 56-8-4. The Plaintiffs reserve the right to claim post-judgment interest at the applicable rate.

4. Fee Disgorgement: $502,682. Disgorgement of QPWB's full $502,682 in fees is an available remedy regardless of work quality. *Burrow v. Arce*, 997 S.W.2d 229, 240 (Tex. 1999); Rest. (3d) L. Gov. Law. § 37.

**B. Base Total**

Using the net Sanchez figure (after the Beazley setoff): $301,500,000 + $13,000,000 + $87,000,000 + $502,682 ≈ $402,000,000.

Using the gross Sanchez figure (before the Beazley setoff, which the Plaintiffs contend is the correct measure of the harm QPWB caused): $410,000,000 + $13,000,000 + $87,000,000 + $502,682 ≈ $510,500,000.

The individual defendants have suffered, and assert, additional damages resulting from the entirely avoidable jury verdict, which materially increase QPWB's exposure.

**C. Punitive Damages and Total Exposure**

The record summarized in Part VI establishes willful, reckless, and wanton conduct on at least ten independent grounds. A three-to-one ratio is constitutionally defensible on this reprehensibility record. Applied to a compensatory-and-consequential base of approximately $500,000,000, three-to-one yields approximately $1,500,000,000 in punitive damages alone. Total exposure to QPWB and to each individually named attorney, taking compensatory and punitive damages together, exceeds $2 billion.

The Rael court's express finding of "intentional and designed to obtain strategic litigation advantage" conduct, binding on QPWB and on Mr. Alvarez personally, establishes the reprehensibility predicate as a matter of issue preclusion.

## XI. DEMANDS

Based on the foregoing, the Plaintiffs make the following demands. The Plaintiffs are not making a final monetary demand at this time. The monetary demand will follow promptly after QPWB's and each individually named attorney's professional liability coverage is fully disclosed.

**A. Demand for Immediate Disclosure of Insurance Coverage**

Within ten (10) calendar days of the date of this letter, QPWB and each individually named attorney shall provide to the undersigned complete copies of all professional liability, errors and omissions, and malpractice insurance policies currently in effect or in effect at any time during QPWB's representation of the NuMale defendants (July 2022 through the present), including:

1. All primary policies, including all declarations pages, endorsements, and amendments;
2. All excess and umbrella policies, including all declarations pages, endorsements, and amendments;
3. The identity of each insurer, policy number, policy period, and per-claim and aggregate limits of liability;
4. Any notice of claim or potential claim previously submitted by QPWB or any individually named attorney to any insurer in connection with the Sanchez matter, the Rael matter, or any other matter involving allegations of conflict of interest or malpractice;
5. Contact information for the claims adjuster or coverage counsel assigned to any such notice; and
6. Any communications between QPWB and its insurers regarding the Rael sanctions order.

**B. Demand for Engagement and Mediation**

The Plaintiffs are prepared to file suit immediately. In the interest of efficiency, the Plaintiffs are willing to stay the filing of suit for a period not to exceed sixty (60) calendar days from the date of this letter, provided that:

1. QPWB and each individually named attorney confirms in writing, within fourteen (14) calendar days, willingness to engage in pre-litigation resolution discussions, including the involvement of each professional liability insurer;
2. The parties agree, within thirty (30) calendar days, to an in-person mediation before a mutually acceptable mediator, to be conducted within the sixty (60) day stay period; and
3. QPWB and each individually named attorney provide the insurance coverage information demanded above within the fourteen-day deadline.

If QPWB or any individually named attorney fails to comply with any of these conditions, the Plaintiffs will file suit without further notice. The sixty-day stay is not subject to extension absent the agreement of the Plaintiffs.

**C. Continued Compliance with Litigation Hold and Client File Demands**

This demand supplements but does not supersede the Litigation Hold Notice and Demand for Immediate Transfer of Client File issued on October 6, 2025, and all subsequent demand letters and notices. QPWB's compliance obligations under those demands remain in full force and effect. Any spoliation of evidence or continued failure to produce the complete client file, including text

messages, adjuster communications, internal ethics analyses, and *Rael*-related communications, will be cited as evidence of consciousness of guilt in any subsequent litigation and will support adverse-inference instructions.

**D. Preservation Demand**

QPWB and each individually named attorney is on written notice to preserve, without alteration or deletion, all communications (including text messages, emails, internal messaging-application records, and voicemails) from July 25, 2022 through the present relating to the Sanchez matter, the Rael matter, or the claims asserted in this letter. Failure to preserve any of the foregoing will be argued as spoliation, as support for adverse-inference instructions, and as an independent aggravator of the punitive-damages claim.

## XII. RESERVATION OF RIGHTS

This letter is provided for settlement discussion purposes pursuant to Federal Rule of Evidence 408, New Mexico Rule 11-408, and applicable state equivalents. Nothing herein should be construed as an admission, waiver, agreement to any forum or procedure, limitation of any kind, or acceptance of any liability limitation or damage cap.

The Plaintiffs expressly reserve all rights, claims, remedies, and defenses, whether at law or in equity, including but not limited to claims for legal malpractice, breach of fiduciary duty, fraud, constructive fraud, fraudulent concealment, civil conspiracy, breach of contract, negligent misrepresentation, unjust enrichment, disgorgement of fees, and any other applicable causes of action, whether arising under New Mexico law, Nevada law, federal law, or the law of any other jurisdiction. The Plaintiffs further reserve the right to seek punitive and exemplary damages to the fullest extent permitted by law.

Nothing in this letter shall be deemed to limit or waive any statute of limitations, statute of repose, or other limitations defense. The Plaintiffs' claims accrued no earlier than the date of the verdict (November 25, 2024) and are extended by the doctrine of continuous representation. The claims asserted against individually named attorneys are distinct from the claims asserted against the firm, and the Plaintiffs reserve the right to pursue joint and several liability against each.

## XIII. CONCLUSION

The claims against QPWB and against each of you individually are substantial, exceptionally well-documented, and supported by an extensive evidentiary record that includes judicial findings of identical misconduct by the same firm and same named partner in a case before the same judge. The written-record void within QPWB's own file is, if anything, more damning than the documents that do exist.

The Plaintiffs are prepared to prosecute these claims to verdict and through appeal, and will seek the full measure of damages described herein plus costs, plus fees incurred in prosecuting the claims, plus post-judgment interest at the maximum applicable rate, and will vigorously oppose any attempt by the firm or by any individual attorney to limit damages.

The Plaintiffs' willingness to discuss resolution through the sixty (60) day mediation window reflects a judgment that even catastrophic claims are sometimes more efficiently resolved than litigated, if the opposing party engages in prompt, substantive, good-faith engagement backed by full coverage disclosure. That engagement is the condition precedent to any accommodation. Absent timely compliance with the ten (10) day disclosure demand, the fourteen (14) day engagement confirmation, and the thirty (30) day mediation agreement, the Plaintiffs will file suit against the firm and against each of you personally, in each instance joined as individual defendants, without further notice.

I await your response within ten calendar days.

Sincerely,

GARMAN TURNER GORDON

GREGORY E. GARMAN, ESQ.

Enclosures: Exhibits per attached list

cc:
Clients
Talitha Gray Kozlowski, Esq.
Teresa Pilatowicz, Esq.
Jamie Garman, Esq.

## EXHIBIT LIST

1. Frank Alvarez text message, October 24, 2024 ("They f'ed this up. We told them to pay 950")
2. Trial Tr. Day V (November 20, 2024): Robertson "cut in half" admission; Barrett-Chapman sequestration violation
3. Dr. Christopher Asandra's November 20, 2024 five-point "ongoing malpractice" letter
4. Cianflone-Alvarez / Boyer engagement email, July 25, 2022
5. Alvarez February 5, 2026 admission: no engagement agreement, no retainer
6. Robertson's 16-page "Personal Recollection of Facts Surrounding the Motion for Mistrial and Relevant Pre-Trial Facts"
7. Beazley January 13, 2021 Reservation of Rights letter (NuMale NM S.C. uninsured)
8. J. Andrew Robertson November 4, 2024 "no conflict" letter to Jim Parrett
9. Parrett November 20, 2024 email, 7:45 AM
10. Parrett November 20, 2024 email, 8:17 AM ("extortion")
11. Parrett November 20, 2024 email, 7:13 PM ("window of opportunity has been lost")
12. Arash Homampour December 10, 2024 entry of appearance / settlement letter
13. QPWB billing records (Bills for matter # 173226), including Robertson Nov. 12, 2024 opposing-counsel ethics-analysis billing entry; Robertson Feb. 5, 2024 JDA "per authority of adjuster" entry; Robertson 0.80-hour self-eroding-policy entry; and QPWB January 2025 invoice ($132,171.78)
14. Trial Tr. Day 7 (November 22, 2024) at 99-101: Robertson verdict-form stipulation
15. Signed Stipulation of the Parties: Vicarious Liability, November 22, 2024
16. Stipulation to Dismiss Asandra and Feliciano, November 19, 2024
17. Robertson February 9, 2023 status / recommendations to Beazley ("$25K and $50K to start")
18. Plaintiff's December 2021 $6,000,000 policy-limits demand
19. September 27, 2022 status report to Beazley
20. QPWB May 28, 2024 updated settlement evaluation to Beazley
21. Mediator Denise Torres June 18, 2024 Asandra 23-bullet summary
22. Barrett / Chavez / Robertson mock-trial text thread, November 1, 2024 ("They are going to give this guy punitives")
23. Robertson-Moser TENDER chain, November 22-23, 2024 ("I tendered in the middle of closing arguments")
24. Dr. Asandra December 21, 2023 attorney-friend warning forwarded to Robertson

25. Parrett November 18, 2024 "disaster" letter
26. Dr. Asandra November 19, 2024 dismissal-acceptance email
27. Palubicki December 30, 2024 letter to QPWB ("continued silence")
28. Palubicki March 6, 2025 letter ("since July 8, 2024 … no settlement discussions")
29. Plaintiff October 2, 2023 NMAC 13.11.2.8/9 self-eroding-policy letter with QPWB and Beazley discussion "just whining to the judge"
30. Beazley $108,500,000 bankruptcy settlement order
31. Parrett October 23, 2024 seventeen-item formal demand letter
32. Rael v. Skies Healthcare Sanctions Order, November 11-12, 2024
33. Trial Tr. Day III (November 18, 2024): Day 3 limine violation re deceased wife
34. Trial Tr. Day IV (November 19, 2024): willful-violation curative instruction
35. Trial Tr. Day VI (November 21, 2024): "end of the road" warning
36. Nine Stipulated Motions-to-Compel Orders, February 6, 2024
37. Trial Tr. Day II (November 15, 2024): Rowley sidebar re insurance / bad faith; Barrett voir dire / insurance-related curative instruction
38. Barrett-Chavez November 22, 2024 text thread ("barely survived the directed verdict" / "got our expert to admit fraud")
39. Trial Tr. Day VIII: post-verdict colloquy; zero preservation motions

FIRST CLASS MAIL

BANKRUPTCY RECOVERY GROUP, LLC
7251 AMIGO STREET
SUITE 210
LAS VEGAS, NEVADA 89119

TO:

ERIC W. BOYER
C/O ALEX FUGAZZI, ESQ.
SNELL & WILMER
1700 S. PAVILION CENTER DR., SUITE 700
LAS VEGAS, NV 89135

# EXHIBIT F

GARMAN
TURNER
GORDON

7251 AMIGO STREET
SUITE 210
LAS VEGAS, NV 89119
WWW.GTG.LEGAL
PHONE: 725 777 3000
FAX: 725 777 3112

September 10, 2026

Gregory Garman, Esq.
Email:ggarman@gtg.legal

**SENT VIA HAND DELIVERY, MAIL, AND EMAIL**

Edward C. Prieto
c/o Alex Fugazzi, Esq.
Snell & Wilmer
1700 S. Pavilion Center Dr., Suite 700
Las Vegas, NV 89135
afuggazi@swlaw.com

Edward C. Prieto
1475 Centrepark Blvd., Suite 130,
West Palm Beach, Florida 33401
eprieto@qpwblaw.com

Edward C. Prieto
2800 N Ocean Dr Apt A9A
Riviera Beach, FL 33404

Re: **NOTICE OF: (1) FRAUDULENT TRANSFER LIABILITY; (2) LIABILITY FOR IMPROPER DISTRIBUTIONS UNDER FLORIDA STATUTES §§ 607.06401 AND 607.0834; AND DEMAND TO PRESERVE PARTNER PROFIT DISTRIBUTIONS AND RELATED RECORDS: *Michael E. Sanchez v. NuMale Corporation, et al.***, No. D-202-CV-2020-06336 (N.M. 2d Jud. Dist.); ***In re NuMale Corporation, et al.***, Case No. 25-10341-mmc (Bankr. D. Nev.)

Dear Mr. Prieto,

We represent Michael W. Carmel, Esq., as Liquidating Trustee (the "Trustee") of the NuMale Liquidating Trust (the "Trust"), Christopher Asandra, M.D., Carlos Feliciano, M.D., Brad Palubicki, and Justin Pulliam (collectively with the Trustee, the "Plaintiffs").

On May 18, 2026, Plaintiffs sent a demand letter (the "QPWB Demand Letter") to Quintairos, Prieto, Wood & Boyer, P.A. ("QPWB" or the "Firm"), a copy of which is attached hereto (excluding exhibits) as **Exhibit A** for reference. The QPWB Demand Letter sets forth in detail the Plaintiffs' claims against QPWB for breach of fiduciary duty, legal malpractice, fraud and constructive fraud, fraudulent concealment, civil conspiracy, post-verdict abandonment, breach of the implied covenant of good faith and fair dealing, negligent misrepresentation, disgorgement, and punitive damages (collectively, the "Malpractice Claims"). The QPWB Demand Letter is explicit about QPWB's exposure: approximately $510,500,000 in compensatory damages, plus punitive damages at a 3:1 ratio, with total exposure exceeding $2 billion.

We have attempted, unsuccessfully, to resolve this dispute with QPWB management.

For the avoidance of doubt, this letter is neither a demand on you nor other communication with respect to the Malpractice Claims set forth in the QPWB Demand Letter. Rather, this letter identifies *separate claims* directed to you *individually* as a shareholder of QPWB on account of the profit distributions or other distributions of firm earnings since November 2024. The purpose of this letter is to put each of you on notice, to the extent necessary, that those distributions are subject to avoidance and recovery as fraudulent transfers, and to demand that you preserve those funds and all related records pending resolution of the Plaintiffs' claims.

## I. The Plaintiffs Are Creditors of QPWB With Matured, Catastrophic Claims

The Plaintiffs are creditors holding claims against QPWB under the applicable fraudulent transfer statutes. A "claim" is a right to payment "whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured."[1] The Plaintiffs' claims against QPWB, which accrued no later than November 25, 2024, squarely satisfy that definition. The Plaintiffs therefore have present standing to pursue recovery of the transfers QPWB made to its equity shareholders — and need not obtain a malpractice judgment first.

## II. You Were on Notice <u>No Later</u> than November 2024

As set forth in the QPWB Demand Letter, the record is overwhelming, and it predates November 2024. By the fall of 2024 at the latest, QPWB was on notice that it faced a malpractice claim of catastrophic magnitude. Any distribution of firm profits to you on or after the dates discussed in the QPWB Demand Letter was made by a firm that knew it faced a contingent liability dwarfing its net worth — and knew it was woefully underinsured.

## III. The Profit Distributions Are Avoidable Transfers

QPWB compensates you through salaries supplemented by profit distributions of firm earnings. Those distributions are transfers of firm assets within the meaning of each applicable act, and they are avoidable.[2]

Under each applicable state's version of the Uniform Fraudulent Transfer Act, the Plaintiffs may avoid the transfers and recover a money judgment against each Transferee up to the value of the property each received. *See* Fla. Stat. § 726.108, § 726.109; NMSA § 56-10-21, § 56-10-22; NRS 112.210, 112.220. The Plaintiffs may pursue these claims now.

---

[1] *See* Florida Uniform Voidable Transactions Act, Fla. Stat. § 726.102; New Mexico Uniform Voidable Transfer Act, NM Stat. § 56-10-15; Nevada Uniform Fraudulent Transfer Act, NRS 112.150.

[2] *See* Fla. Stat. § 726.105(1)(a)-(b); NM Stat. § 56-10-18(A)-(B); NRS 112.180(1)(a)-(b) & NRS 112.190.

**IV. The Distributions Were Also Unlawful When Made Under The Florida Business Corporation Act**

QPWB is a Florida professional association. Its internal affairs, including the lawfulness of any distribution[3] of firm earnings to its shareholder/partners, are governed by Florida law, and Chapter 621 makes the Florida Business Corporation Act applicable to professional service corporations and associations. Nothing in Chapter 621 permits a professional association to distribute its earnings to its shareholders inconsistent with Chapter 607.

Accordingly, section 607.06401 governs every payment QPWB has made to you and other partners, even if they were also W-2 employees and without regard to where any individual partner resides or practices. Section 607.06401(3) prohibits a distribution if either: (a) the corporation would not be able to pay its debts as they become due in the usual course of business, or (b) the corporation's total assets would be less than the sum of its total liabilities. Every distribution QPWB made beginning as early as 2024 fails both tests independently.

As of no later than the November 25, 2024 verdict (and in fact much earlier), QPWB carried a liability to its own former clients that had compensatory exposure of approximately $510.5 million, and with punitive damages at a 3:1 ratio total. Against that asserted liability, QPWB's available coverage is materially less than the asserted exposure and, by its terms, excludes punitive amounts. A firm carrying a nine-figure matured claim, ten-figure total exposure, with insufficient insurance, cannot pay its debts as they become due, and its total assets do not approach its total liabilities. Section 607.06401(4) permits firm management to base its determination on financial statements prepared on a reasonable basis or on a fair valuation reasonable in the circumstances. It does not permit management to assign a value of zero to a liability its own lawyers had measured and its own clients had asserted. No valuation that omits the Malpractice Claims' exposure is "reasonable in the circumstances."

The firm cannot insulate individual payments by pointing to a favorable measurement date: under section 607.06401(6)(c), the effect of a distribution is measured as of the date of authorization if payment follows within 120 days and as of the date of payment if it follows later. Either date yields the same answer because QPWB has been balance-sheet and cash-flow insolvent, measured against the Sanchez liability, continuously since no later than November 25, 2024. And to the extent you hold a deferred-compensation obligation, bonus, true-up or capital-account credit arising from a distribution, section 607.06401(7) places that indebtedness at parity

[3] A "distribution" is not limited to a formally declared dividend. Section 607.01401 defines a distribution to include any *direct or indirect* transfer of money or other property, or incurrence of indebtedness, by a corporation to or for the benefit of its shareholders in whatever form and by whatever label. QPWB's compensation structure, salaries supplemented by year-end allocations of firm profit to its shareholder body is a distribution to shareholders regardless of how the firm's books characterize it. The records demanded below, partnership and shareholder agreements, capital accounts, distribution schedules, K-1s, and general ledgers will establish that characterization out of QPWB's own files.

with QPWB's general unsecured creditors, which is to say, at parity with the Plaintiffs, not ahead of them.

Section 607.0834 supplies the consequences, and it reaches you, the recipient of this letter, in two distinct capacities. First, under section 607.0834(1), any director, shareholder, or member of QPWB's governing or management committee member who voted for, assented to, caused or permitted a distribution made in violation of section 607.06401 is **personally liable** for the amount by which the distribution exceeded what could lawfully have been distributed, where the claimant establishes that the shareholder failed to comply with the standards of conduct in § 607.0830. We will establish that you cannot satisfy section 607.0830 on this record. That section permits good-faith reliance on financial data and on officers, accountants, and counsel, but not where the firm possessed knowledge making reliance unwarranted. You undeniably possessed such knowledge. Second, under section 607.0834(2), a shareholder who accepted a distribution in violation of section 607.06401 is answerable for the amount accepted. If you intend to plead ignorance, this letter forecloses that position.

**This letter provides express written notice of the magnitude of the asserted claims, the inadequacy of the firm's coverage, and the statutory prohibition. Any distribution accepted from this date forward is accepted knowingly.**

Claims to recover unlawful distributions are collected from the partners who received them and the managers who approved them, and they are precisely the asset that a receiver, an assignee for the benefit of creditors, or a bankruptcy trustee exists to liquidate. The Plaintiffs' claims under the fraudulent transfer statutes cited above are independent of, and unaffected by, Chapter 607 and section 607.06401's prohibition disposes of the defenses the Transferees would otherwise assert to those claims. A distribution the Firm was legally forbidden to make is not a transfer for which the Firm received reasonably equivalent value, and a Shareholder who accepts a distribution after written notice that it is unlawful does not take it in good faith. Fla. Stat. § 726.109.

## V. Demand to Preserve Assets and Records

The Plaintiffs demand, effective immediately, that you, as Transferees:

1. Preserve and segregate all profit distributions, partner draws, bonuses, year-end allocations, and other distributions of firm earnings received from QPWB from **January 1, 2024** to the present, and refrain from dissipating, transferring, encumbering, gifting, or placing beyond the Plaintiffs' reach any such funds or property traceable to them; and

2. Preserve all documents and electronically stored information relating to QPWB's partner-compensation and distribution structure, including partnership and shareholder

agreements, capital accounts, distribution schedules, K-1s, ledgers, bank records, and any communications concerning distributions made on or after **January 1, 2024.**[4]

Any dissipation, transfer, or concealment of distributions after receipt of this letter — and any failure to preserve the records identified above — will be cited as evidence of actual intent, and will support the Plaintiffs' pursuit of avoidance, recovery, prejudgment remedies (including a prejudgment writ of attachment or injunctive relief), and all other available remedies.

**VI. Communication to You Individually**

Again, for the avoidance of doubt, this letter is not asserting, or seeking resolution of, the Malpractice Claims set forth in the May 18, 2026 QPWB Demand Letter. Rather, this letter is solely provided with respect to the fraudulent transfer and unlawful distribution claims against you individually.

Sincerely,

GARMAN TURNER GORDON

GREGORY E. GARMAN, ESQ.

Enclosures:
Exhibit A: QPWB Demand Letter

cc:
Clients
Talitha Gray Kozlowski, Esq.
Jamie Garman, Esq.

[4] For the avoidance of doubt, nothing in this letter requests that you (or any other recipient) disclose information protected by their professional obligations to QPWB's clients.

**Exhibit A**

(QPWB Demand Letter)

GARMAN
TURNER
GORDON

7251 AMIGO STREET
SUITE 210
LAS VEGAS, NV 89119
WWW.GTG.LEGAL
PHONE: 725 777 3000
FAX: 725 777 3112

May 18, 2026

Gregory Garman, Esq.
Email: ggarman@gtg.legal

**SENT VIA EMAIL AND FEDERAL EXPRESS**

Quintairos, Prieto, Wood & Boyer, P.A.
Attn: Eric W. Boyer, Esq.,
Managing Partner
9300 South Dadeland Blvd., 4th Floor
Miami, Florida 33156
eboyer@qpwblaw.com

Quintairos, Prieto, Wood & Boyer, P.A.
Attn: Donna L. Chapman, Esq.,
Managing Partner 6565 Americas Parkway
NE, Suite 200
Albuquerque, New Mexico 87110
donna.chapman@qpwblaw.com

Quintairos, Prieto, Wood & Boyer, P.A
Attn: Frank Alvarez, Esq.,
Managing Partner
J. Andrew Robertson, Esq.
1700 Pacific Ave., Suite 4545
Dallas, Texas 75201
frank.alvarez@qpwblaw.com
andrew.robertson@qpwblaw.com

Quintairos, Prieto, Wood & Boyer, P.A.
Attn: Dominique Barrett, Esq.
14350 N. 87th St., Suite 265
Scottsdale, Arizona 85260
dominique.barrett@qpwblaw.com

Atwood, Malone, Turner, & Sabin, P.A.
Attn: Erin Chavez, Esq.
400 N. Pennsylvania Ave., Suite 1100
P.O. Drawer 700
Roswell, New Mexico 88201
echavez@atwoodmalone.com

Re: *In re NuMale Medical, Inc., et al.*, Case No. 25-10341-nmc (Bankr. D. Nev). Pre-Litigation Demand for Resolution of Breach of Fiduciary Duty, Legal Malpractice, Fraud, and Related Claims Arising from *Michael E. Sanchez v. NuMale Corporation, et al.*, Case No. D-202-CV-2020-06336

Dear Counsel:

Quintairos, Prieto, Wood & Boyer, P.A. ("QPWB" or the "firm") is responsible for the largest medical malpractice judgment in New Mexico history. The firm, among other misconduct, concealed a disqualifying conflict of interest from its nine clients for three years; privately told the carrier to pay $950,000 to settle the case while concealing that same information from its own

clients; stipulated to joint and several liability across defendants with fundamentally divergent interests without client consent; and willfully violated court orders in the presence of the jury to the point the trial court publicly branded defense counsel's conduct "willful" violations of the court's orders multiple times in open court thereby poisoning the jury.

This letter provides notice to QPWB via the firm's management, with separate service on the individual attorneys who handled the *Sanchez* matter. The claims set forth herein are asserted jointly and severally against the firm and against each of the individually named attorneys.

Michael W. Carmel, Esq., as the Liquidating Trustee (the "Trustee") of the NuMale Liquidating Trust (the "Trust"). The Trust, through the Trustee is the lead plaintiff in the consolidated and joint prosecution of the collective claim against you by your former clients the NuMale Debtors and the individual insured plaintiffs, Dr. Christopher Asandra, Dr. Carlos Feliciano, Brad Palubicki, and Justin Pulliam. After notice and a hearing, this joint and consolidated prosecution was approved by order of the United States Bankruptcy Court for the District of Nevada. *See* 25-1034-nmc, ECF No. 0727, Order Confirming Joint Chapter 11 Plan (Bankr. D. Nev 2025).; 25-10341, ECF No. 0582, Order Approving Global Settlement, at 12 ("All claims against Quintairos, Prieto, Wood & Boyer, P.A. are not being released and are expressly preserved."). *See* ECF 434, Joint Plan of Reorganization ("...which claims shall be jointly prosecuted under the sole direction and control of the Liquidation Trustee"). For ease of reference in this letter, the Trustee and the individual insureds are collectively the "Plaintiffs."

This letter constitutes a formal pre-litigation demand for resolution of the following claims against QPWB and each individual attorney: breach of fiduciary duty, legal malpractice, fraud and constructive fraud, fraudulent concealment, civil conspiracy, post-verdict abandonment, breach of the implied covenant of good faith and fair dealing, negligent misrepresentation, disgorgement of fees, and punitive damages. The claims arise from QPWB's catastrophically inept defense of the NuMale defendants in *Sanchez v. NuMale Corporation, et al.*, which produced a jury verdict of $412,500,149 on November 25, 2024 and the subsequent destruction of the NuMale enterprise and its bankruptcy.

## I. SUMMARY

QPWB is responsible for the $412,500,149 Sanchez judgment and the collapse of the NuMale enterprise. The claims against the firm and each of you individually are supported by the firm's own file. That record, summarized below and established in the thirty-nine exemplary exhibits, is devastating.

The misconduct (both intentional and negligent) is so pervasive there are multiple paths to liability and judgment, but four facts are dispositive. Among the most damaging is the fact that QPWB never obtained a written engagement agreement with any of the nine defendants it represented, **nor did it obtain a written conflict waiver from any of them, at any point during**

**the three-year engagement**. Both are mandatory under the New Mexico Rules of Professional Conduct, and both were material at the very moment QPWB was retained.

Beazley hired QPWB specifically to replace prior counsel who had been disqualified for a conflict of interest in representing all the defendants arising from the Chapman-records-alteration issue. Beazley's July 25, 2022 engagement email expressly asked QPWB to "**advise if you can defend all defendants except Stephen Chapman — PA.**" (Exhibit 4). QPWB's files, including its client communications and billing records show no such analysis was conducted. The firm's billing ledger contains no time entry for conflict analysis at any point during the first twenty-eight months from retention through verdict, and the file contains no conflict memorandum, no waiver, and no analysis. None.

Second, the QPWB managing partner admitted in writing, three weeks before jury selection, that the case should have been settled at $950,000 by accepting an outstanding offer of judgment. Frank Alvarez texted on October 24, 2024: "They f'ed this up. **We told them to pay 950.** NuMale has a claim against them, unfortunately for them." (Exhibit 1). That message tells the Plaintiffs three things. QPWB itself valued the case at $950,000 three weeks before trial, a figure that is one-sixth of the policy limits and four-thousandths of the eventual verdict. QPWB knew the individual insureds had a claim against the carrier. <u>And QPWB never told its own clients or encouraged its clients to accept the Offer of Judgment</u>. No written recommendation or policy-limits demand from QPWB to Beazley exists anywhere in the twenty-eight-month file. No written communication exists in which any QPWB attorney advised any individual defendant that the managing partner privately believed the carrier was improperly refusing the firm's settlement recommendation.

Third, QPWB trial counsel, Mr. Robertson, **admitted the disqualifying conflict** of interest in open court on November 20, 2024, the fifth day of trial: "*I'm cut in half between NuMale and Asandra.*" (Exhibit 2). That admission, made sixteen days after writing to Mr. Parrett, Dr. Asandra's separately retained counsel, that "*there is no conflict representing NuMale and Dr. Asandra,*" resolves the conflict question as a matter of fact. It also supplies the Plaintiffs' fraud and fraudulent concealment claims. This was not a conflict that arose on day five of the trial; instead, it was a conflict that existed from the very first day of the engagement because the QPWB clients were never aligned.

The same day, November 20, 2024, Dr. Asandra wrote QPWB stating: "I believe this course of action constitutes **ongoing malpractice** by defense counsel. … you hired attorneys who had a conflict of interest all along and I've never had my interests protected appropriately." (Exhibit 3). Dr. Asandra's counsel, Mr. Parrett sent three escalating emails the same day, accusing the firm by name of "essentially extortion" and "**continuing blatant failures to carry out your sworn duty to your client.**" (Exhibits 9, 10, 11).

Fourth, and perhaps most damaging, three days before jury selection began in *Sanchez*, the very same judge who would preside over the *Sanchez* trial sanctioned QPWB for the identical

pattern of conflict concealment. On November 11, 2024, the Hon. Beatrice J. Brickhouse signed an Opinion and Order in *Rael v. Skies Healthcare and Rehabilitation Center, LLC*, Case No. D-202-CV-2019-07947, sanctioning QPWB (same firm, same Mr. Alvarez) for the same disqualifying conflict and same multi-year concealment pattern. The *Rael* court expressly found that QPWB's conduct was "intentional and designed to obtain strategic litigation advantage for their clients at the expense of this Court, Plaintiffs, and the judicial system as a whole," and further found that the sanctioned defendants "have a remedy against Movants for legal malpractice." (Exhibit 32, FOF ¶¶ 43, 52). Three days later, QPWB walked into Judge Brickhouse's courtroom and repeated the same conduct while concealing the *Rael* order from its own clients.

Fifth, and compounding these failures, QPWB stipulated on the record — without consulting its clients and without obtaining any client consent — to joint and several liability across the defendants with fundamentally divergent interests. Dr. Feliciano had already obtained a summary judgment ruling that he owed no duty to the plaintiff. Mr. Palubicki and Mr. Pulliam were non-physician corporate officers with individualized defenses. NuMale New Mexico S.C. Corp. had been placed on written notice, three years earlier, that it was entirely uninsured. And Dr. Asandra was simultaneously a plaintiff suing NuMale in Nevada state court. The November 22, 2024 Stipulation of Vicarious Liability collapsed these structurally divergent positions into a single unified verdict form and enabled the jury's "acting in concert" finding. That stipulation, made without client input or consent, is *per se* malpractice.

These facts, and the additional facts set out in the remainder of this letter, easily satisfy the willful, reckless, and wanton standard under New Mexico law for punitive damages at or above a three-to-one ratio. Applied to the compensatory base described in Part X below, total exposure exceeds $2 *billion*. The Plaintiffs are not making a monetary demand at this stage. The Plaintiffs first demand full disclosure of QPWB's professional liability coverage and a written commitment to engage in timely good faith settlement discussions.

After several demands for production, the Plaintiffs have now reviewed the entire QPWB file.[1] The relevant documents include the Alvarez text admissions, the Beazley-Robertson adjuster

---

[1] QPWB's production of the *Sanchez* file was itself marked by reckless disregard for the firm's confidentiality obligations to other clients. QPWB transferred to the undersigned not only the *Sanchez* matter file but also what appeared to be more than 255 additional client matter files having no relationship to the *Sanchez* matter. The Plaintiffs, through undersigned counsel, made multiple attempts to have the firm remedy the over-production. QPWB never sought return or destruction of the non-*Sanchez* files. We have acted in a good faith effort to segregate, not review, and destroy all non-*Sanchez* files in our possession in order to limit the attendant harm to the firm's unaffected clients and to the firm itself, including by mitigating (to the extent possible) waiver of attorney-client privilege, breach of the duty of confidentiality under Rule 16-106(A) NM R RPC, spoliation-of-evidence exposure in other client matters, and the State Bar reporting obligations that may be triggered by a large-scale inadvertent disclosure that QPWB did not even attempt to mitigate. The

communications, the Beazley-Alvarez engagement emails, QPWB's complete billing ledger ($502,682 over three years), Mr. Robertson's 16-page "Personal Recollection of Facts Surrounding the Motion for Mistrial and Relevant Pre-Trial Facts" (Exhibit 6), the *Rael* sanctions order, and direct evidence of the written-record void described throughout this letter.

This letter is organized as our complaint will be (if necessary). Part II addresses the concealed conflict of interest. Part III addresses the catastrophic settlement failures. Part IV addresses the Rael sanctions order. Part V addresses trial and post-trial performance. Part VI addresses the willful conduct supporting punitive damages. Part VII addresses causation. Part VIII addresses individual attorney exposure. Part IX lists the claims. Part X sets out damages. Part XI sets out the Plaintiffs' demands. Part XII reserves rights. Part XIII concludes.

## II. THE KNOWN, CONCEALED, AND LIED-ABOUT CONFLICT OF INTEREST

Under New Mexico law, a lawyer may not represent two or more clients concurrently if the representation involves a concurrent conflict, unless each affected client gives informed consent, confirmed in writing. *See* Rule 16-107(A), (B) NM R RPC. The duty is fiduciary: it belongs to each client; it is non-waivable except by the client affirmatively, in writing, after full disclosure. Breach is actionable as breach of fiduciary duty under UJI 13-2410 and UJI 13-2414 NMRA, and, where causally connected to loss, as legal malpractice. *See Richter v. Van Amberg*, 97 F. Supp. 2d 1255, 1261 (D.N.M. 2000); *Spencer v. Barber*, 2013-NMSC-010, ¶ 17, 299 P.3d 388; *Encinias v. Whitener Law Firm, P.A.*, 2013-NMSC-045, ¶ 8, 310 P.3d 611; *Andrews v. Saylor*, 2003-NMCA-132, ¶ 15, 134 N.M. 545.

### A. The Conflict Was Present at Inception and Was Deliberately Ignored and Hidden

QPWB walked into the *Sanchez* engagement with its eyes wide open. Predecessor counsel Butt Thornton & Baehr PC had been disqualified for a conflict arising from Stephen Chapman's admitted alteration of medical records. That disqualification is the entire reason QPWB was retained in July 2022. Any reasonable attorney stepping into a case from which predecessor counsel has just been disqualified due to a conflict would (a) immediately analyze whether all disqualifying facts had been cured or merely inherited; (b) obtain written informed consent from every remaining defendant before accepting joint representation; and (c) document the conflict analysis contemporaneously in the file. QPWB did none of these things.

Beazley Insurance's direction was explicit. On July 25, 2022, Joe Cianflone (Beazley) wrote to Frank Alvarez: "Frank — you've come recommended by outgoing counsel and agreed to by our Insured to take over the handling of this matter going forward. Please check conflicts and advise if you can defend all defendants except Stephen Chapman — PA." (Exhibit 4). The

---

firm's conduct in the production of the file is itself evidence of the institutional disregard for client interests that pervaded its handling of the *Sanchez* matter.

direction was explicit. QPWB was on express written notice, at the inception of the engagement, that a conflict analysis was required.

**QPWB failed to perform the conflict analysis.** The firm's complete billing ledger contains no time entry for conflict analysis at inception or at any point during the first twenty-eight months of the representation. The firm's only ethical analysis appears on a billing entry dated on November 12, 2024 (Mr. Robertson, 1.80 hours), and it is an analysis of *opposing* counsel's ethics. In a sad bit of irony, November 12 was the date the Court entered the *Rael* sanctions order against QPWB. This failure, standing alone, is dispositive.

The evidence absence is not limited to the billing ledger. It extends to the file itself. The complete client file contains no conflict memorandum, no conflict-waiver template, no conflict-disclosure letter, no conflict-analysis email, and no internal correspondence discussing the firm's joint representation of nine clients with divergent interests. Because the firm generated no analysis, the firm communicated none to its clients. The written consent that Rule[2] 16-107(B)(4) requires could never have been obtained and was never obtained.

Three additional structural conflicts existed at the inception of the engagement and continued throughout. NuMale New Mexico S.C. Corp. was uninsured per Beazley's January 13, 2021 Reservation of Rights letter, which stated unequivocally: "Underwriters will not indemnify NuMale New Mexico S.C. Corp. for any settlement or judgment entered against it." (Exhibit 7). The individual defendants Palubicki, Pulliam, and Feliciano had fundamentally different exposure profiles than the corporate defendants, with potentially dispositive individualized defenses that were never pursued. And the nine defendants were competing for a single $6,000,000 aggregate policy under a self-eroding structure that consumed the fund dollar-for-dollar with every fee QPWB billed.

Between August 2022 and the November 25, 2024 verdict, QPWB obtained disqualifying information about Dr. Asandra: three separate state medical-board reprimands in Colorado, California, and New York, all based on improper supervision of a physician's assistant—precisely the conduct at issue in *Sanchez*. Dr. Asandra also had an active lawsuit pending against NuMale in Nevada state court, directly adverse to the very NuMale corporate entities QPWB was simultaneously representing in New Mexico. Dr. Asandra separately retained Mr. Parrett as personal counsel and on October 23, 2024 Mr. Parrett catalogued fourteen specific conflict-and-loyalty failures in writing, which were sent to QPWB. Rather than recognize and address these clear conflicts, QPWB ignored and concealed them.

## B. The Complete Absence of an Engagement Agreement and Conflict Waivers

The firm has now admitted that it had no engagement agreement with anyone. Mr. Alvarez wrote to me on February 5, 2026: "Please note we did not have an engagement agreement or

---

[2] Unless otherwise noted, "Rules" refer to the New Mexico Rules of Professional Conduct.

retainer agreement. We received the file from the carrier, Beazley, and we did not have a specific retainer agreement with them." (Exhibit 5). Across a three-year, $502,682 insurance-defense engagement involving nine defendants, three mediations, a nine-figure verdict, and a post-verdict bankruptcy, QPWB operated without any written engagement agreement defining the scope of the representation, the allocation of authority between insurer and insured, or the handling of conflicts. These facts, particularly in light of Mr. Alvarez's admission, clearly amount to malpractice.

Worse, the firm never even sought a conflict waiver from any of the nine jointly represented defendants (nor discussed with them the impact of the obvious conflicts). A written conflict waiver is not a best practice; it is a requirement of law. New Mexico Rule 16-107(B)(4) requires that, in any concurrent conflict of interest, "each affected client gives informed consent, confirmed in writing." The requirement is mandatory. It is non-waivable. It is not satisfied by oral discussions (which never occurred), by post-hoc rationalizations, or by the firm's own internal assessment (without even a memo to the file) that *"no conflict"* exists. No waiver exists in this case. That absence was not a technicality. It was and is material.

As of the July 25, 2022 engagement, four facts made the conflict question decisive. Prior counsel had just been disqualified on conflict grounds. The carrier had expressly asked QPWB to analyze conflicts. PA Chapman's record-alteration conduct was imputable to the other jointly represented defendants by virtue of the joint representation. And NuMale New Mexico S.C. Corp. had been placed on written notice of non-indemnity, making its exposure structurally different from that of every other entity. Any one of those facts required a written waiver under Rule 16-107. All four together made the absence of written waivers a *per se* breach of the duty of loyalty from day one.

The firm itself has admitted the absence. Through Ms. Chavez's November 4, 2024 email to Mr. Parrett, the firm wrote: "we have verified there is no conflict representing NuMale and Dr. Asandra. … Our analysis of the New Mexico ethical rules is there is no actual or apparent conflict." (Exhibit 8). The firm's position is that because (in its own, unwritten assessment) no conflict existed, no written waiver was required. That position is both absurd and incorrect as a matter of New Mexico law and is incompatible with the firm's admission in open court sixteen days later that the conflict existed and was disqualifying.

## C. The Mid-Trial Admission

Yet only two weeks later, on November 20, 2024, Mr. Robertson admitted the conflict to Judge Brickhouse:

> "Now I'm cut in half between NuMale and Asandra. I owe a duty to Dr. Asandra to get him out. But the problem I'm facing is Dr. Asandra is our star witness. He's our key witness. … So NuMale requires — needs Dr. Asandra to defend them. So now I'm split in half and we were never split in half before." (Exhibit 2).

Plaintiff's counsel identified the problem. Judge Brickhouse stated what was already obvious — that a conflict had existed from the outset: "I'm trying to understand now why there's a conflict because now opposing counsel has said hey that stuff that's gonna come out is gonna be damaging. Well, this whole time shouldn't there have been an evaluation regarding the case and the witness testimony and the weaknesses and the strengths of the case?"

The answer is obviously yes. It was preposterous on its face for QPWB to assert, and to continue asserting through November 4, 2024, that no conflict existed. The conflict had been structural from the moment QPWB accepted the engagement. Any reasonably competent lawyer exercising ordinary care would have identified it at inception, when Dr. Asandra's DEA investigation surfaced, when Dr. Asandra retained personal counsel, and when Mr. Parrett's October 23, 2024 letter catalogued fourteen specific failures turning on the conflict. Mr. Robertson's mid-trial admission was not a sudden discovery. It was a willful disregard, finally forced to the surface by the trial record, of a disqualifying conflict that had been in plain view since July 25, 2022.

On day 7 of the trial, Mr. Robertson stipulated on the record that the "NuMale defendants" designation on the special verdict form "refers to all remaining defendants in the case." (Exhibit -14). On November 22, 2024 at 9:02 a.m., QPWB (Mr. Robertson, Mr. Alvarez, Ms. Barrett, Ms. Chavez) signed a court-filed Stipulation of Vicarious Liability on behalf of all remaining defendants — including Asandra, Feliciano, Palubicki, and Pulliam — establishing that every NuMale corporate entity was vicariously liable for the acts of its agents and employees as a matter of law. (Exhibit 15). QPWB conceded this contested point without any client consultation and without consent. That single stipulation enabled the jury's "acting in concert" finding, which imposed joint and several liability for the full $412 million on every defendant. No competent lawyer representing a non-physician corporate officer (Palubicki, Pulliam) or a doctor with a no-duty ruling (Feliciano) would have stipulated to a unified verdict form without informed written consent. That no consent was sought is itself attributable to the concurrent conflict QPWB acknowledged on Day 5.

Stipulating, without client input or consent, to joint and several liability across nine defendants whose factual circumstances and legal exposure differed profoundly is outrageous. It is an extraordinary lapse in judgment. It is, on its face, *per se* malpractice.

**D. Client Confirmation of the Conflict**

Dr. Asandra's personal counsel, Mr. Parrett, sent three escalating emails on November 20, 2024:

- 7:45 a.m.: "I just got off the phone with Dr. Asandra and was even more shocked to learn the events that transpired later last night and this morning. You need to settle him out right now, immediately. Not later this morning, not this afternoon, not tomorrow. RIGHT NOW. What is the matter with you all?" (Exhibit 9).

- 8:17 a.m.: "your actions to keep him in the lawsuit when Plaintiff will dismiss him is essentially extortion to force him to testify. … your continuing actions are continuing blatant failures to carry out your sworn duty to your client. … you are in breach of your responsibilities toward your insured." (Exhibit 10).

- 7:13 p.m.: "astounded to learn he is still not dismissed and the window of opportunity has been lost due to your failure (including you Beazley) to carry out your obligations to protect him." (Exhibit 11).

Dr. Asandra himself, at 9:09 a.m. the same day, sent QPWB and Beazley a five-point letter using the word "malpractice". Among the points: his right to protect himself from liability via settlement; "you owe me a duty of good faith — this is bad faith"; that forcing testimony created a conflict harming his career; that cooperation did not benefit the defense; and the malpractice charge: "I believe this course of action constitutes ongoing malpractice by defense counsel . . . they have failed to advocate for a resolution … they are not fulfilling their professional obligations … you hired attorneys who had a conflict of interest all along and I've never had my interests protected appropriately." (Exhibit 3).

## III. THE CATASTROPHIC SETTLEMENT FAILURES

An attorney retained by an insurer to defend an insured owes the insured a duty of full settlement communication, full excess-exposure advisory, and full candor regarding the lawyer's own assessment. Rule 16-104(A)(3) NM R RPC; Rule 16-102(A) NM R RPC; NM Rule 16-107 cmt.; Rest. (3d) L. Gov. Law. §§ 20, 134; *Lysick v. Walcom*, 258 Cal. App. 2d 136, 65 Cal. Rptr. 406 (1968). The duty is not satisfied by reports to the carrier. It is satisfied only by written communication to the insured-client identifying the settlement posture, the excess-exposure risk, and the lawyer's recommendation.

The central and unanswerable fact about QPWB's handling of Sanchez: the firm's complete client file contains not a single policy-limits demand from QPWB to Beazley at any point during the three-year engagement. It contains no communication in which QPWB advised any individual defendant of the firm's own settlement assessment, of the carrier's divergence from that assessment, or of the insureds' right to demand that the carrier tender policy limits. That void is the breach. The breach caused the verdict. The breach caused the bankruptcy.

### A. Nine Missed Within-Limits Settlement Opportunities, Including a Mid-Trial $0 Dismissal

The *Sanchez* case presented eight discrete opportunities to resolve within or below policy limits, plus a ninth opportunity for an Asandra-and-Feliciano $0 dismissal mid-trial. QPWB mishandled each — without the written client advisory the fiduciary duty required.

1. **December 31, 2021** — the inherited demand. Plaintiff served the first $6M policy-limits demand on prior counsel. QPWB took over in July 2022 and never converted the inherited demand into a written QPWB demand on Beazley.

2. **October 12, 2022** — the renewed $6M demand. Plaintiff renewed the $6M demand and attached Mr. Rowley's $131M, $74.6M, and $46.7M verdict history. QPWB billed nominal time ($194) in response. No individual defendant received a communication (written or otherwise) advising of the demand or its excess-exposure implications.

   February 9, 2023 — first comprehensive evaluation. Mr. Robertson recommended a settlement starting figure of "$25K and $50K" against an acknowledged risk profile that included Chapman's record alteration, NM Unfair Practices Act treble damages, punitive-damages exposure, and "sizable" plaintiff attorney fees. (Exhibit 17). The potential for excess exposure was not disclosed to any client.

3. **October 4, 2023** — the first mediation. QPWB entered with Mr. Robertson's low valuation as the anchor. The mediation failed.

   May 28, 2024 — witness assessment to the carrier. Six months before trial, Mr. Robertson's written status report to Mr. Cianflone (Exhibit 20) graded Mr. Palubicki — the corporate face of the defense — as a "below average" defense witness. The same report graded the case at "$0 or $5M," hedging that "we do not necessarily think that this case is worth seven figure."

4. **June 18, 2024** — the second mediation. On the day of the second mediation, Mediator Denise Torres transmitted to defense counsel a twenty-three-bullet written summary titled "Testimony of Defendant Christopher Asandra, M.D." (Exhibit 21). The summary catalogued case-ending sworn admissions: that Dr. Asandra had "no training or experience in men's sexual health before starting the first NuMale clinic in 2013"; that "a consulting group, not consisting of any physicians, gave Dr. Asandra and Dr. Feliciano the medications and protocols"; that the Colorado Medical Board had issued a letter of admonition for improper supervision; that sending the plaintiff home with an erection was "inappropriate"; that "neither Chapman nor Asandra was able to manage the complications"; and that no consent form was signed on November 17, 2017.

5. **June 25, 2024** — the $950,000 Rule 68 Offer of Judgment. Plaintiff served a $950,000 Offer of Judgment offer with a statutory July 4 deadline. Beazley directed that the offer be allowed to expire ("Joe is not paying $950k"). The offer was the exact figure Mr. Alvarez later told Beazley it should have paid. (Exhibit 1). No advice was given to the clients about the implications of the rejecting the Offer of Judgment, and no demand to Beazley to accept the offer exists. In fact, in a simply outrageous lapse of professional judgment and in express violations of its express ethical obligations, the insureds were never even told of the offer's existence, let alone the firm's view that it should be accepted, thus

denying the insureds the ability to exercise their judgment and discretion to pay the OOJ. At trial you will hear testimony that decision would have been made

6. **October 8, 2024** — the final policy-limits demand. Plaintiff served the final policy-limits demand with a 10-day deadline; Mr. Rowley's transmittal warned: "This is going to be a record setting verdict in New Mexico." QPWB's "best and final" of $1,500,000 followed on October 29 and was rejected on October 31. No individual defendant was advised in writing — before, during, or after — that the policy-limits window was closing.

   November 1, 2024 — the mock trial. The QPWB-commissioned mock trial returned a $1,500,000 verdict in under sixty minutes, including $1,000,000 in punitive damages not covered under the policy. Counsel's contemporaneous internal text thread documented what the result meant. Mr. Robertson: "Excess still possible." Ms. Barrett: "And are punitives covered?" Mr. Robertson: "Don't think so." Ms. Barrett's contemporaneous internal characterization of her client Mr. Palubicki was that he was a "dumbass" who needed reminding "not to take a shot in his dick before he testifies" and would "look shady" on the stand. The mock jury's reaction to the underlying business: "No one liked the business model especially after we showed the training materials. Unprofessional." (Exhibit 22). Yet no written escalation, no written policy-limits demand, and no written request for additional settlement authority issued. The firm's written advocacy to the carrier downplayed every fact its lawyers — and a neutral mediator — had put in writing.

   On November 4, 2024, QPWB sent case evaluations to Mr. Rivera and to Mr. Parrett (for Dr. Asandra) writing for the first time that "an excess verdict is still possible and punitive damages are not covered under the policy" — **twenty days before verdict**, after the final policy-limits demand had already expired.

7. **November 19, 2024** — the Asandra dismissal stipulation. Plaintiff offered to dismiss Dr. Asandra by stipulation. Dr. Asandra emailed QPWB and Beazley directly: "I've reviewed the document and would like to accept the plaintiff's offer for dismissal. Please sign the dismissal proposal today." (Exhibit 26). Mr. Parrett wrote at 7:53 p.m.: "Please immediately sign and approve the dismissal in order to protect your client and your insured." QPWB willfully and intentionally ignored the instructions by their Client and refused to sign the stipulation dismissing Dr. Assandra.

8. **November 22, 2024** — the $0 dismissal offer for Asandra and Feliciano. Plaintiff offered to dismiss both physicians for nothing in exchange for the corporate-defendant stipulations QPWB ultimately signed anyway. (Exhibit 16). Dr. Feliciano was never told the offer existed. Dr. Asandra had been demanding dismissal at every turn. QPWB again refused. Both physicians were included in the $412,500,149 verdict.

9. **November 22, 2024** (mid-closing) — the hallway tender. Mr. Robertson tendered the policy limits in a hallway conversation immediately before plaintiff's rebuttal closing, then

emailed to confirm. (Exhibit 23). Mr. Homampour later called the timing what it was: "too little and too late." (Exhibit 12). Three days later the jury returned $412,500,149.

Nine settlement opportunities, including one $0 dismissal opportunity, missed. At each, the carrier set the posture, QPWB executed the carrier's instruction, and the insureds were not told. At no inflection point did any individual defendant receive a written advisory from QPWB explaining the firm's actual settlement assessment, the gap between the firm's internal view and the carrier's posture, or the magnitude of excess exposure.

**B. The Alvarez Text is Direct Proof of Causation**

Mr. Alvarez's October 24, 2024 text proves three facts each fatal to any QPWB defense. The full message reads: "They f'ed this up. **We told them to pay 950.** NuMale has a claim against them, unfortunately for them." (Exhibit 1). It was sent within a three-person text thread (Alvarez, Robertson, Barrett) in direct response to Ms. Barrett's message of the same day: "Did you guys see my email from Jack that Adam [Moser, the Beazley adjuster] has 1.5 million? He wants input on how to approach ptf (essentially putting it in our lap)."

First, the text establishes that QPWB privately valued the case at $950,000 three weeks before trial. Mr. Alvarez was the managing partner over the Albuquerque office and, as the November 4, 2024 letter to Mr. Parrett confirms, was the final-authority attorney on conflict and settlement issues. When the managing partner writes that the case "should have been paid" at $950,000, that is the firm's contemporaneous assessment. $950,000 is not a nine-figure case. It is below one-sixth of policy limits. Everything above $950,000 on the $412,500,149 verdict, and every dollar of the downstream bankruptcy damages, flows from QPWB's misconduct.

Second, the text establishes what QPWB never told its clients. No letter, memo, email, or meeting note in the QPWB file contains a written communication from QPWB to any NuMale defendant stating the firm's view that the case should have been paid at $950,000. That communication never happened. The individual defendants were never told their own lawyers believed the Offer of Judgment should have been accepted. Mr. Parrett's October 23, 2024 letter expressly documented, as one of fourteen failures: "$500k offer / $950k demand from July exchange Asandra did not know about." (Exhibit 31). The insureds could not have acted on QPWB's private "pay 950" assessment because they were not told \.

The only plausible defense — that QPWB "pushed" and the carrier "refused" — fails for multiple reasons. Under Rule 16-107 and the Restatement, the insured is the client; "we were told to" by the carrier is a breach, not a defense. The written-record void proves the "pushing" narrative false; a firm that pushes and is refused leaves a paper trail that demonstrates it advised its clients. Joe Cianflone had already left Beazley when the text was sent; a competent firm would have re-pitched the policy-limits recommendation in writing to the new adjuster (Adam Moser). QPWB did not. And QPWB never withdrew, despite Rule 16-116(A)(1)'s mandate that withdrawal is

required when the insurer's direction places counsel in an impossible ethical position. The firm instead billed another $300,000-plus and took the case to verdict.

**C. The Clients Were Screaming for Settlement and QPWB Said Nothing**

On December 21, 2023, Dr. Asandra forwarded to Mr. Robertson a warning: "$6 million in insurance coverage and I can see Plaintiff obtaining a judgment that exceeds this amount, which is why you should pressure your carrier to settle this case. ... Nick is considered one of the best trial attorneys in the Country and he can easily get a large verdict on these facts. ... You should put pressure on your insurance carrier to settle this case as you have serious financial, career and license exposure." Dr. Asandra wrote directly: "PLEASE review so we have strategy." (Exhibit 24). Mr. Robertson's didn't even bother to respond to the email.

On November 18, 2024, Mr. Parrett wrote: "This sounds like a disaster. This is another demand for the matter to be settled as to Dr. Asandra for whatever is necessary to achieve a settlement and dismissal as to him. This needs to be done now before it gets any worse." (Exhibit 25). No written client advisory generated. On November 19, 2024, Dr. Asandra wrote QPWB and Beazley accepting plaintiff's dismissal offer. (Exhibit 26). QPWB refused to sign. No explanation was ever sent to Mr. Parrett or Dr. Assandra. On November 20, 2024, the Parrett three-email escalation and the Dr. Asandra five-point letter followed (Exhibits 9, 10, 11, 3). Again, no written response. On November 19, 2024, Mr. Palubicki's own settlement analysis was forwarded to Mr. Cianflone the same day. The insured was already routing around his own defense firm.

After verdict, QPWB's silence continued. Mr. Palubicki wrote on December 30, 2024: "Your firm's continued silence raises serious questions about your commitment to fulfilling your professional obligations as our defense counsel. The pattern of non-engagement leads to an unavoidable question: have you withdrawn from representing us?" (Exhibit 27). His March 6, 2025 letter asked: "was Beazley aware that, since July 8, 2024, QPWB had not engaged in any settlement discussions on its behalf or NuMale's behalf?" (Exhibit 28).

**D. The Self-Eroding Policy Issue Was Never Communicated to the Clients**

Compounding every one of the above failures is the self-eroding policy issue. On October 2, 2023, plaintiff's counsel wrote to QPWB demanding that Beazley conform the policy to comply with New Mexico law, citing NMAC 13.11.2.8 and 13.11.2.9, which prohibit defense-within-limits provisions in New Mexico medical malpractice liability policies. (Exhibit 29). The letter was not frivolous; it identified a serious regulatory problem with the coverage structure: every dollar QPWB billed Beazley reduced the funds available to settle. Mr. Robertson billed 0.80 hours researching the issue (Exhibit 13), forwarded plaintiff's letter to Beazley, and characterized plaintiff as "just whining to the judge" (Exhibit 29). There is no evidence QPWB ever advised its own clients that their insurance policy might be illegal under New Mexico law, that defense costs

were eroding settlement limits, that the clients should demand conformity, or that the $502,682 QPWB eventually billed was, dollar for dollar, reducing the $6,000,000 aggregate fund.

## E. Excess-Exposure Communications Were Limited, Belated, and Inadequate

The earliest written coverage-issue advisory from QPWB to any individual defendant is Mr. Robertson's October 25, 2023 email to Dr. Asandra — fifteen months after engagement and, after the first mediation had already failed — recommending Asandra "retain your own counsel to look at the insurance coverage issues in this case" but not advising as to the specific magnitude of excess risk. The firm's first written statement that an "excess verdict is still possible" came on November 4, 2024, twenty days before verdict, in Ms. Chavez's case evaluations to Mr. Rivera (directly) and to Mr. Parrett (for Dr. Asandra). Dr. Feliciano, Mr. Palubicki, and Mr. Pulliam received no written excess-exposure advisory from QPWB. No individual defendant received a written advisory at the strategic inflection points where it mattered: at engagement in July 2022; at the October 12, 2022 $6M policy-limits demand; at the October 4, 2023 mediation; at the June 25, 2024 Rule 68 offer; or at the October 8, 2024 final policy-limits demand.

## F. Individualized Derelictions

The joint representation produced client-specific failures that compounded the systemic ones.

**Dr. Feliciano.** The trial court granted partial summary judgment finding "Dr. Feliciano owed no duty to Plaintiff." A competent lawyer would have converted that finding into full dismissal via renewed motion, trial motion for directed verdict, or settlement. QPWB did none. Dr. Feliciano was also never informed of the $0 dismissal offer of November 22, 2024. (Exhibit 16). He was included in the $412M verdict.

**Dr. Asandra.** No Reservation of Rights letter from Beazley was ever relayed to Dr. Asandra personally by QPWB. His December 21, 2023 warning (Exhibit 24) was ignored. His mid-trial "ongoing malpractice" letter (Exhibit 3) was ignored.

**Mr. Palubicki and Mr. Pulliam.** Non-physician corporate officers with viable individual defenses to medical-negligence claims. No separate settlement strategy was pursued. No individual engagement letters were generated. No motion practice to limit exposure.

**NuMale New Mexico S.C. Corp.** Uninsured. Jointly represented without written warning to its principals that the entity faced the full verdict personally. No individual counsel, no individual settlement advocacy, and no written excess advisory.

The written-record void is uniform. Every individual defendant was exposed to a catastrophic excess verdict without a single written client communication from QPWB addressing

the excess exposure, the settlement posture, the coverage structure, or the defendant's individual options.

## IV. THE *RAEL* SANCTIONS ORDER: SAME JUDGE, SAME FIRM, SAME CONDUCT, DAYS EARLIER

The *Rael* sanctions order is devastating. The same court, presided over by the same judge who would preside over *Sanchez*, sanctioned the same firm and same partner for the same disqualifying conflict and the same concealment methodology, and expressly told the sanctioned defendants they had a remedy against QPWB for *legal malpractice*. Three days later, the same firm walked into the same judge's courtroom and did the same thing again, while concealing the sanctions order from its clients.

### A. Identity of Parties, Attorneys, Forum, and Conduct

*Rael v. Skies Healthcare and Rehabilitation Center, LLC*, Case No. D-202-CV-2019-07947, was pending before the same Judge Brickhouse. Judge Brickhouse signed her Opinion and Order November 11, 2024, and it was e-filed November 12, 2024. The order sanctioned QPWB — same firm, same Mr. Alvarez — for an identical conflict-concealment pattern: concurrent representation of an employee-witness and a corporate defendant without informed written consent. The same structural conflict between Dr. Asandra (employee-witness) and NuMale (corporate defendant); the same concealment duration (over three years, FOF ¶ 38); and the same strategic justification ("more strategic than anything else," FOF ¶ 36) all tainted QPWB's representations of the Plaintiffs.

### B. The Rael Findings, Verbatim

The *Rael* findings, quoted verbatim, make this action's outcome inevitable:

- FOF ¶ 35: QPWB made "knowing misrepresentation of fact to this Court" regarding when the conflict arose.
- FOF ¶ 36: QPWB conceded its decision not to correct adverse testimony "was more strategic than anything else."
- FOF ¶ 43: "The record and facts of this case demonstrate no other reasonable finding but that Movants' conduct was intentional and designed to obtain strategic litigation advantage for their clients at the expense of this Court, Plaintiffs, and the judicial system as a whole."
- FOF ¶ 52: "To the extent Defendants themselves were not complicit in the conduct of their counsel, Defendants have a remedy against Movants for legal malpractice."
- COL ¶ 14 (citing *United Nuclear Corp. v. Gen. Atomic Co.*, 1980-NMSC-094): QPWB and defendants "followed a conscious, willful and deliberate policy throughout this litigation, which continues to the present time, in cynical disregard and disdain of the Rules

of Procedure relating to discovery [and of our Rules of Professional Conduct], of concealing rather than in good faith revealing the true facts."

**C. The Candor Breach Three Days Later**

QPWB walked into Judge Brickhouse's courtroom on November 14, 2024 having been sanctioned by that very judge for the identical pattern three days earlier. QPWB told no one. The firm did not disclose the *Rael* order to its clients and did not raise the issue with the court. The firm did not analyze whether the *Rael* findings impacted its Sanchez representation. The only ethics-analysis billing entry on the *Rael* e-filing date, November 12, 2024, is Mr. Robertson's 1.80-hour analysis of opposing counsel's ethical obligations in Sanchez. (Exhibit 13). The duty of candor under Rule 16-303(a) NM R RPC, standing alone, compels full disgorgement of all fees and an award of damages against QPWB.

**D. Evidentiary Use**

The Rael decision will be admissible: the *Rael* court's finding that QPWB's conflict-concealment methodology is "intentional and designed to obtain strategic litigation advantage" is preclusive against QPWB. Rule 11-404(B)(2) NMRA will admit the order to prove motive, opportunity, intent, preparation, plan, knowledge, and absence of mistake. The order is admissible as *res gestae* because it was entered contemporaneously with the same conduct in Sanchez. And the order is a sufficient alone for an award of punitive damages under New Mexico law.

## V. TRIAL AND POST-TRIAL PERFORMANCE

Even setting aside the conflict and settlement failures, QPWB's trial and post-trial performance, standing alone, fell far below the standard of care.

**A. Pre-Trial**

Plaintiff filed seven motions in limine; QPWB filed none and failed to join Defendant Chapman's motions. The court remarked on the imbalance. Plaintiff prevailed on all nine discovery motions to compel. (Exhibit 36). The expert mismatch was stark: plaintiff's Dr. Irwin Goldstein, a world-renowned sexual-medicine specialist, provided a 7-page opinion identifying 15+ standard-of-care breaches; QPWB's Dr. Dudley Danoff was 87 years old, was not designated on the New Mexico standard of care, and had his testimony largely excluded. Trial counsel called the defense expert by the wrong name ("Dr. Goldstein" instead of "Dr. Danoff"). The six defense MSJs were denied without oral argument; the seventh was granted in part on Dr. Feliciano's no-duty finding, yet QPWB failed to leverage that ruling for directed verdict or excess-liability protection for Dr. Feliciano.

**B. In-Trial**

Day 2: Ms. Barrett's *voir dire* implied that physicians, not insurers, choose not to settle, inviting plaintiff's bad-faith argument; the court issued a curative instruction. (Exhibit 37).

Day 3: Ms. Barrett willfully violated the *in limine* order regarding the plaintiff's deceased wife and depression; the court read a curative instruction finding "counsel for NuMale defendants willfully violated this Court's order." (Exhibit 33).

Day 4: defense expert Dr. Barisa, the mental-health mitigation expert, was abandoned as a direct consequence of the Day 3 violation. (Exhibit 34).

Day 5: Ms. Barrett coached the sequestered witness PA Chapman in violation of the sequestration order. That same day: Mr. Robertson's "cut in half" speech admits the conflict for the first time. (Exhibit 2).

Day 6: further *in limine* violation by Ms. Barrett, prompting the court's warning: "We're at the end of the road, Ms. Barrett, with regards to these types of things that just keep happening over and over and over." (Exhibit 35).

Day 7: Mr. Robertson's "NuMale defendants = all remaining defendants" stipulation (Exhibit 14); the Stipulation of Vicarious Liability stipulated by QPWB on behalf of all defendants without their consent (Exhibit 15); Barrett-Chavez internal text thread the same day: "They dumped this bench brief on us. We barely survived the directed verdict. … They got our expert to admit fraud." (Exhibit 38). Closing: Ms. Barrett suggested damages of $1,000,000; the jury returned $412,500,149.

**C. Post-Trial**

Zero post-trial motions. No JNOV, no motion for new trial, no motion for remittitur. (Exhibit 39). $132,171.78 billed in January 2025 alone, yet no post-trial motions were filed. (Exhibit 13). Beazley replaced QPWB with the Rodey firm and Paul Weiss on January 2, 2025. The insurer's immediate decision to replace QPWB with competent appellate and post-trial counsel is itself an admission that the firm's performance was inadequate. Mr. Palubicki's post-verdict letters document the abandonment. (Exhibits 27, 28).

## VI. THE WILLFUL-CONDUCT RECORD: PUNITIVE DAMAGES

New Mexico law authorizes punitive damages where the defendant's conduct was malicious, willful, reckless, wanton, fraudulent, or in bad faith. UJI 13-1827 NMRA. Breach of fiduciary duty committed with a culpable mental state supports punitive damages as a matter of law.

Legal malpractice rising to willful misconduct supports punitive damages. *Paiz v. State Farm Fire & Cas. Co.*, 1994-NMSC-079, 118 N.M. 203, 880 P.2d 300; *Clay v. Ferrellgas, Inc.*, 1994-NMSC-080, 118 N.M. 266, 881 P.2d 11; *Aken v. Plains Elec. Generation & Transmission Coop.*, 2002-NMSC-021, 132 N.M. 401, 49 P.3d 662; *Chavarria v. Fleetwood Retail Corp.*, 2006-NMSC-046, 140 N.M. 478, 143 P.3d 717. A jury may award punitive damages to express its condemnation of the defendant's conduct and to deter the defendant and others from engaging in similar conduct.

The Plaintiffs do not need to reach for willfulness. The record supplies it on at least ten independent grounds:

1. The *Rael* judicial finding. The same judge determined that the same firm, using the same methodology, engaged in conduct "intentional and designed to obtain strategic litigation advantage." (Exhibit 32, FOF ¶ 43). That finding is preclusive. Standing alone, it is sufficient to establish the willful-conduct predicate.

2. QPWB's own concession in *Rael* that its decision not to correct adverse deposition testimony "was more strategic than anything else." (FOF ¶ 36). The same firm repeated the same strategic concealment three days later in Sanchez.

3. The Alvarez text admission. Three weeks before trial, the managing partner knew the case should have been paid at $950,000. (Exhibit 1). Possession of that knowledge triggered every fiduciary-duty-to-inform obligation QPWB owed the insureds. None was satisfied.

4. The November 4, 2024 written denial of the conflict (Exhibit 8), made when Mr. Robertson already knew the Asandra testimony would be devastating, and contradicted in open court sixteen days later. That letter is either knowingly false (fraud) or recklessly false (constructive fraud). Either supports punitive damages.

5. The mid-trial "ongoing malpractice" letter from Dr. Asandra (Exhibit 3), and the contemporaneous Parrett escalations (Exhibits 9, 10, 11). The client told QPWB, in writing, during trial, that it was committing ongoing malpractice. QPWB continued the same conduct through verdict.

6. The concealment of the $0 dismissal offer from Dr. Feliciano (Exhibit 16) and the failure to convey settlement positions to all individual insureds at multiple inflection points.

7. The failure to advise clients of the potentially illegal self-eroding policy structure under NMAC 13.11.2.8 / 13.11.2.9 (Exhibits 29, 13), where every QPWB billing dollar reduced the settlement fund.

8. Three in-trial "willful violation" findings against Ms. Barrett, with the court reading curative instructions to the jury that "counsel for NuMale defendants willfully violated this Court's order" (Exhibits 33, 34, 35), plus Ms. Barrett's coaching of the sequestered witness PA Chapman (Exhibit 2).

9. The November 12, 2024 opposing-counsel-ethics billing entry (Exhibit 13) — the same day the Rael sanctions order was e-filed against QPWB — demonstrating that the firm used billing time to attack opposing counsel's ethics on the very day the court was sanctioning QPWB for its own.

10. The $132,171.78 January 2025 invoice for zero post-verdict motions. Billing six figures for doing nothing after a nine-figure verdict is wanton profiteering on abandonment.

Any one of these grounds, standing alone, supports a punitive-damages finding under New Mexico law. Collectively, they establish a course of conduct of exceptional reprehensibility. Every aggravator recognized by New Mexico and federal punitive-damages doctrine is present: repetition of the same conduct after prior judicial notice (*Rael*); concealment from the client; profit motive (every unpaid-out settlement dollar extended the firm's billing runway, $502,682 over three years); vulnerability of the victims (nine insured defendants dependent on the firm for candor); duration (twenty-eight months of continuous misconduct); and institutional scale (managing partner admission in writing; *Rael* respondent partners; multiple trial-counsel attorneys each committing independent acts).

The due-process ceiling on punitive damages is established by *BMW of N. Am. v. Gore*, 517 U.S. 559 (1996). *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003); *Aken v. Plains Elec. Generation & Transmission Coop.*, 2002-NMSC-021, 132 N.M. 401, 49 P.3d 662 (applying *BMW* guideposts and approving a 3.5:1 ratio); *Chavarria v. Fleetwood Retail Corp.*, 2006-NMSC-046, 140 N.M. 478, 143 P.3d 717 (applying *BMW* guideposts). On this reprehensibility record, a punitive-to-compensatory ratio of up to three to one is easily foreseeable and would be appropriate. Applied to the compensatory base in Part X, three-to-one yields punitive exposure approaching $1.5 billion alone. The *Rael* court's express "intentional and designed to obtain strategic litigation advantage" finding, binding on QPWB and Mr. Alvarez personally, establishes the reprehensibility predicate as a matter of issue preclusion.

## VII. CAUSATION

Every claim depends on proof that QPWB's conduct proximately caused the Plaintiffs' damages. The "case within a case" analysis is straightforward, and the causal chain from breach to verdict to bankruptcy to creditor deficiency is airtight.

**A. The Case Was Always Settleable on QPWB's Own Assessment**

Mr. Alvarez's October 24, 2024 text is the strongest causation exhibit in the file. (Exhibit 1). The managing partner of the defending firm privately valued the case at $950,000 three weeks before trial. That assessment is external to any post-hoc reconstruction by the Plaintiffs. The case was a within-policy-limits seven-figure case on QPWB's own analysis. Everything above $950,000 in the eventual verdict and resulting damages flows from QPWB's failures.

**B. Beazley's Post-Verdict Conduct Confirms the Assessment**

The Plaintiffs have resolved their claims against Beazley. The carrier paid $108,500,000 in bankruptcy to resolve the Sanchez-driven claims. (Exhibit 30). That settlement is one hundred nine times QPWB's own "pay 950" assessment. The insurer's post-verdict willingness to pay a nine-figure sum is external, market-tested confirmation that the case was always settleable for a fraction of the verdict. Had QPWB issued a written policy-limits demand on Beazley at any point between the October 12, 2022 demand and the October 8, 2024 final demand, and had QPWB delivered a written excess-exposure advisory to each individual defendant, the insureds would have been positioned to demand that Beazley tender. Beazley would have tendered. The case would have resolved within limits. The $412M verdict would not have occurred. The bankruptcy would not have occurred.

**C. Specific Causal Links**

Joint representation led to the stipulated verdict form, which led to joint and several liability for $412M. (Exhibit 14). Joint representation caused the refusal of plaintiff's November 22, 2024 $0 dismissal offer for Dr. Asandra and Dr. Feliciano. (Exhibit 16). The conflict-driven representation and refusal to dismiss Dr. Asandra caused the firm's "cut in half" predicament. (Exhibit 2). Imputed character evidence bled across all jointly represented defendants. Three willful-violation findings destroyed defense credibility before closing. (Exhibits 33, 34, 35). And the zero written policy-limits demand, zero written excess-exposure advisory, and zero written client advisory of the firm's own "pay 950" within-policy-limits assessment left the insureds powerless to override the carrier, because they were never told. Again, you will hear testimony at trial that decision would have been made.

**D. The Bankruptcy as Consequential Damages**

The $412,500,149 verdict was fatal to NuMale, from both a monetary and a reputational perspective. The NuMale bankruptcy was filed because of the $412,500,149 verdict. Every administrative cost, professional fee, and creditor deficiency of that bankruptcy is a consequential damage of QPWB's malpractice.

## VIII. INDIVIDUAL ATTORNEY EXPOSURE

The claims in this letter are asserted against QPWB as a firm and, jointly and severally, against each individually named attorney: Mr. Boyer, Ms. Chapman, Mr. Alvarez, Mr. Robertson, Ms. Barrett, and Ms. Chavez. New Mexico law imposes personal responsibility on attorneys for misconduct they committed, ratified, or failed to remediate. Rule 16-501(C) NM R RPC; *see also* Rule 16-502 NM R RPC. Joint and several liability among attorneys and their firms for breach of fiduciary duty is well-established. *See* Rest. (3d) L. Gov. Law. § 58. The record summarized throughout this letter establishes personal culpability as to each named attorney. Each is encouraged to place his or her individual professional liability insurer on notice of these claims, retain independent coverage counsel, and produce the insurance information demanded in Part XI below. The Plaintiffs expressly preserve claims against each of the above-named attorneys in their individual capacity, in addition to claims against the firm, and the pre-litigation engagement and mediation demand in Part XI is addressed to the firm and to each of you jointly.

## IX. CLAIMS

Based on the foregoing, the Plaintiffs intend to assert the following claims against QPWB and against each of you individually:

1. Breach of Fiduciary Duty: Conflict of Interest. Concurrent representation of nine defendants with divergent interests, without informed written consent, in violation of Rules 16-107(A) & 16-107(B)(4).

2. Legal Malpractice: Settlement Failure. Failure to advise the insured-clients regarding settlement, failure to convey written policy-limits demands, failure to issue written excess-exposure advisories, failure to recommend acceptance of multiple within-limits settlement opportunities, and failure to exercise independent professional judgment free from Beazley's control.

3. Legal Malpractice: Negligence. Representation fell below the standard of care, including failure to file motions in limine, failure to pursue individual defenses, failure to retain a qualified New Mexico defense expert, failure to object to the stipulated verdict form, willful violations of court orders, failure to file post-verdict motions, and failure to advise clients regarding the potentially illegal self-eroding insurance policy.

4. Fraud and Constructive Fraud. The November 4, 2024 representation that there was "no conflict" was either a knowing misrepresentation (fraud) or a statement made with reckless disregard for the truth (constructive fraud). *See Williams v. Stewart*, 2005-NMCA-061, ¶ 34, 137 N.M. 420; *Duncan v. Campbell*, 1997-NMCA-28, ¶¶ 9-10.

5. Fraudulent Concealment. Concealment of the conflict, of the Rael sanctions order, and of the self-eroding policy issue. *See Duncan*, 1997-NMCA-28, ¶¶ 9-10.

6. Civil Conspiracy. *See Seeds v. Lucero*, 2005-NMCA-67, ¶ 12, 137 N.M. 589.

7. Post-Verdict Abandonment. An independent negligence claim arising from QPWB's failure to file any post-verdict motions on a $412M verdict.

8. Breach of the Implied Covenant of Good Faith and Fair Dealing in the attorney-client relationship.

9. Negligent Misrepresentation (alternative to fraud and constructive fraud).

10. Disgorgement of All Fees. Where an attorney breaches the fiduciary duty of loyalty, disgorgement of all fees paid is an available remedy regardless of work quality. *See Burrow v. Arce*, 997 S.W.2d 229, 240 (Tex. 1999); Restatement (Third) of the Law Governing Lawyers § 37 (2000). Full disgorgement of $502,682.

11. Punitive Damages.

All claims are asserted jointly and severally against the firm and against each individually named attorney.

## X. DAMAGES

The Plaintiffs' damages, as supported by the judicially determined record and by independently calculable consequential damages, are as follows.

### A. Base Compensatory Damages

1. The Allowed Sanchez Claim: $410,000,000. The original *Sanchez* verdict was $412,500,149 plus interest, which had grown to more than $500,000,000. The corresponding claim, as ultimately allowed through the bankruptcy claims-reconciliation process, was reduced to $410,000,000. The reduction occurred entirely through bankruptcy proceedings, and the resulting benefit to QPWB (a lower measured compensatory base) is itself a consequence of the bankruptcy QPWB caused. The judicially allowed figure of $410,000,000 is the current measure of harm to the NuMale Debtor Estates. The entire amount was avoidable through competent representation.

2. Bankruptcy Administration Costs: approximately $13,000,000. The NuMale enterprise was forced into bankruptcy as a result of the $412M verdict. All administrative costs, professional fees, and expenses of the bankruptcy are consequential damages of QPWB's malpractice.

3. Prejudgment Interest. Under applicable New Mexico law, the Plaintiffs are entitled to prejudgment interest on all compensatory damages from the date of accrual. The Plaintiffs' claims accrued on the verdict date (November 25, 2024) or, at the latest, on the bankruptcy filing date.

At New Mexico's statutory rate of 15% interest on the Allowed Sanchez Claim from November 25, 2024 through the date of this letter (approximately seventeen months) computes to approximately $87,000,000. *See* NMSA § 56-8-4. The Plaintiffs reserve the right to claim post-judgment interest at the applicable rate.

4. Fee Disgorgement: $502,682. Disgorgement of QPWB's full $502,682 in fees is an available remedy regardless of work quality. *Burrow v. Arce*, 997 S.W.2d 229, 240 (Tex. 1999); Rest. (3d) L. Gov. Law. § 37.

**B. Base Total**

Using the net Sanchez figure (after the Beazley setoff): $301,500,000 + $13,000,000 + $87,000,000 + $502,682 ≈ $402,000,000.

Using the gross Sanchez figure (before the Beazley setoff, which the Plaintiffs contend is the correct measure of the harm QPWB caused): $410,000,000 + $13,000,000 + $87,000,000 + $502,682 ≈ $510,500,000.

The individual defendants have suffered, and assert, additional damages resulting from the entirely avoidable jury verdict, which materially increase QPWB's exposure.

**C. Punitive Damages and Total Exposure**

The record summarized in Part VI establishes willful, reckless, and wanton conduct on at least ten independent grounds. A three-to-one ratio is constitutionally defensible on this reprehensibility record. Applied to a compensatory-and-consequential base of approximately $500,000,000, three-to-one yields approximately $1,500,000,000 in punitive damages alone. Total exposure to QPWB and to each individually named attorney, taking compensatory and punitive damages together, exceeds $2 billion.

The Rael court's express finding of "intentional and designed to obtain strategic litigation advantage" conduct, binding on QPWB and on Mr. Alvarez personally, establishes the reprehensibility predicate as a matter of issue preclusion.

**XI. DEMANDS**

Based on the foregoing, the Plaintiffs make the following demands. The Plaintiffs are not making a final monetary demand at this time. The monetary demand will follow promptly after QPWB's and each individually named attorney's professional liability coverage is fully disclosed.

### A. Demand for Immediate Disclosure of Insurance Coverage

Within ten (10) calendar days of the date of this letter, QPWB and each individually named attorney shall provide to the undersigned complete copies of all professional liability, errors and omissions, and malpractice insurance policies currently in effect or in effect at any time during QPWB's representation of the NuMale defendants (July 2022 through the present), including:

1. All primary policies, including all declarations pages, endorsements, and amendments;
2. All excess and umbrella policies, including all declarations pages, endorsements, and amendments;
3. The identity of each insurer, policy number, policy period, and per-claim and aggregate limits of liability;
4. Any notice of claim or potential claim previously submitted by QPWB or any individually named attorney to any insurer in connection with the Sanchez matter, the Rael matter, or any other matter involving allegations of conflict of interest or malpractice;
5. Contact information for the claims adjuster or coverage counsel assigned to any such notice; and
6. Any communications between QPWB and its insurers regarding the Rael sanctions order.

### B. Demand for Engagement and Mediation

The Plaintiffs are prepared to file suit immediately. In the interest of efficiency, the Plaintiffs are willing to stay the filing of suit for a period not to exceed sixty (60) calendar days from the date of this letter, provided that:

1. QPWB and each individually named attorney confirms in writing, within fourteen (14) calendar days, willingness to engage in pre-litigation resolution discussions, including the involvement of each professional liability insurer;
2. The parties agree, within thirty (30) calendar days, to an in-person mediation before a mutually acceptable mediator, to be conducted within the sixty (60) day stay period; and
3. QPWB and each individually named attorney provide the insurance coverage information demanded above within the fourteen-day deadline.

If QPWB or any individually named attorney fails to comply with any of these conditions, the Plaintiffs will file suit without further notice. The sixty-day stay is not subject to extension absent the agreement of the Plaintiffs.

### C. Continued Compliance with Litigation Hold and Client File Demands

This demand supplements but does not supersede the Litigation Hold Notice and Demand for Immediate Transfer of Client File issued on October 6, 2025, and all subsequent demand letters and notices. QPWB's compliance obligations under those demands remain in full force and effect. Any spoliation of evidence or continued failure to produce the complete client file, including text

messages, adjuster communications, internal ethics analyses, and *Rael*-related communications, will be cited as evidence of consciousness of guilt in any subsequent litigation and will support adverse-inference instructions.

**D. Preservation Demand**

QPWB and each individually named attorney is on written notice to preserve, without alteration or deletion, all communications (including text messages, emails, internal messaging-application records, and voicemails) from July 25, 2022 through the present relating to the Sanchez matter, the Rael matter, or the claims asserted in this letter. Failure to preserve any of the foregoing will be argued as spoliation, as support for adverse-inference instructions, and as an independent aggravator of the punitive-damages claim.

## XII. RESERVATION OF RIGHTS

This letter is provided for settlement discussion purposes pursuant to Federal Rule of Evidence 408, New Mexico Rule 11-408, and applicable state equivalents. Nothing herein should be construed as an admission, waiver, agreement to any forum or procedure, limitation of any kind, or acceptance of any liability limitation or damage cap.

The Plaintiffs expressly reserve all rights, claims, remedies, and defenses, whether at law or in equity, including but not limited to claims for legal malpractice, breach of fiduciary duty, fraud, constructive fraud, fraudulent concealment, civil conspiracy, breach of contract, negligent misrepresentation, unjust enrichment, disgorgement of fees, and any other applicable causes of action, whether arising under New Mexico law, Nevada law, federal law, or the law of any other jurisdiction. The Plaintiffs further reserve the right to seek punitive and exemplary damages to the fullest extent permitted by law.

Nothing in this letter shall be deemed to limit or waive any statute of limitations, statute of repose, or other limitations defense. The Plaintiffs' claims accrued no earlier than the date of the verdict (November 25, 2024) and are extended by the doctrine of continuous representation. The claims asserted against individually named attorneys are distinct from the claims asserted against the firm, and the Plaintiffs reserve the right to pursue joint and several liability against each.

## XIII. CONCLUSION

The claims against QPWB and against each of you individually are substantial, exceptionally well-documented, and supported by an extensive evidentiary record that includes judicial findings of identical misconduct by the same firm and same named partner in a case before the same judge. The written-record void within QPWB's own file is, if anything, more damning than the documents that do exist.

The Plaintiffs are prepared to prosecute these claims to verdict and through appeal, and will seek the full measure of damages described herein plus costs, plus fees incurred in prosecuting the claims, plus post-judgment interest at the maximum applicable rate, and will vigorously oppose any attempt by the firm or by any individual attorney to limit damages.

The Plaintiffs' willingness to discuss resolution through the sixty (60) day mediation window reflects a judgment that even catastrophic claims are sometimes more efficiently resolved than litigated, if the opposing party engages in prompt, substantive, good-faith engagement backed by full coverage disclosure. That engagement is the condition precedent to any accommodation. Absent timely compliance with the ten (10) day disclosure demand, the fourteen (14) day engagement confirmation, and the thirty (30) day mediation agreement, the Plaintiffs will file suit against the firm and against each of you personally, in each instance joined as individual defendants, without further notice.

I await your response within ten calendar days.

Sincerely,

GARMAN TURNER GORDON

GREGORY E. GARMAN, ESQ.

Enclosures: Exhibits per attached list

cc:
Clients
Talitha Gray Kozlowski, Esq.
Teresa Pilatowicz, Esq.
Jamie Garman, Esq.

## EXHIBIT LIST

1. Frank Alvarez text message, October 24, 2024 ("They f'ed this up. We told them to pay 950")
2. Trial Tr. Day V (November 20, 2024): Robertson "cut in half" admission; Barrett-Chapman sequestration violation
3. Dr. Christopher Asandra's November 20, 2024 five-point "ongoing malpractice" letter
4. Cianflone-Alvarez / Boyer engagement email, July 25, 2022
5. Alvarez February 5, 2026 admission: no engagement agreement, no retainer
6. Robertson's 16-page "Personal Recollection of Facts Surrounding the Motion for Mistrial and Relevant Pre-Trial Facts"
7. Beazley January 13, 2021 Reservation of Rights letter (NuMale NM S.C. uninsured)
8. J. Andrew Robertson November 4, 2024 "no conflict" letter to Jim Parrett
9. Parrett November 20, 2024 email, 7:45 AM
10. Parrett November 20, 2024 email, 8:17 AM ("extortion")
11. Parrett November 20, 2024 email, 7:13 PM ("window of opportunity has been lost")
12. Arash Homampour December 10, 2024 entry of appearance / settlement letter
13. QPWB billing records (Bills for matter # 173226), including Robertson Nov. 12, 2024 opposing-counsel ethics-analysis billing entry; Robertson Feb. 5, 2024 JDA "per authority of adjuster" entry; Robertson 0.80-hour self-eroding-policy entry; and QPWB January 2025 invoice ($132,171.78)
14. Trial Tr. Day 7 (November 22, 2024) at 99-101: Robertson verdict-form stipulation
15. Signed Stipulation of the Parties: Vicarious Liability, November 22, 2024
16. Stipulation to Dismiss Asandra and Feliciano, November 19, 2024
17. Robertson February 9, 2023 status / recommendations to Beazley ("$25K and $50K to start")
18. Plaintiff's December 2021 $6,000,000 policy-limits demand
19. September 27, 2022 status report to Beazley
20. QPWB May 28, 2024 updated settlement evaluation to Beazley
21. Mediator Denise Torres June 18, 2024 Asandra 23-bullet summary
22. Barrett / Chavez / Robertson mock-trial text thread, November 1, 2024 ("They are going to give this guy punitives")
23. Robertson-Moser TENDER chain, November 22-23, 2024 ("I tendered in the middle of closing arguments")
24. Dr. Asandra December 21, 2023 attorney-friend warning forwarded to Robertson

25. Parrett November 18, 2024 "disaster" letter
26. Dr. Asandra November 19, 2024 dismissal-acceptance email
27. Palubicki December 30, 2024 letter to QPWB ("continued silence")
28. Palubicki March 6, 2025 letter ("since July 8, 2024 … no settlement discussions")
29. Plaintiff October 2, 2023 NMAC 13.11.2.8/9 self-eroding-policy letter with QPWB and Beazley discussion "just whining to the judge"
30. Beazley $108,500,000 bankruptcy settlement order
31. Parrett October 23, 2024 seventeen-item formal demand letter
32. Rael v. Skies Healthcare Sanctions Order, November 11-12, 2024
33. Trial Tr. Day III (November 18, 2024): Day 3 limine violation re deceased wife
34. Trial Tr. Day IV (November 19, 2024): willful-violation curative instruction
35. Trial Tr. Day VI (November 21, 2024): "end of the road" warning
36. Nine Stipulated Motions-to-Compel Orders, February 6, 2024
37. Trial Tr. Day II (November 15, 2024): Rowley sidebar re insurance / bad faith; Barrett voir dire / insurance-related curative instruction
38. Barrett-Chavez November 22, 2024 text thread ("barely survived the directed verdict" / "got our expert to admit fraud")
39. Trial Tr. Day VIII: post-verdict colloquy; zero preservation motions

FIRST CLASS MAIL

BANKRUPTCY RECOVERY GROUP, LLC
7251 AMIGO STREET
SUITE 210
LAS VEGAS, NEVADA 89119

TO:

EDWARD C. PRIETO
c/o ALEX FUGAZZI, ESQ.
SNELL & WILMER
1700 S. PAVILION CENTER DR., SUITE 700
LAS VEGAS, NV 89135

# EXHIBIT G

Law Offices of
**MICHAEL W. CARMEL, LTD.**
80 East Columbus Avenue
Phoenix, Arizona 85012-2334

Telephone: (602) 264-4965
Facsimile: (602) 277-0144
E-mail: michael@mcarmellaw.com
Also Admitted in New York

October 6, 2025

***Via E-mail and Federal Express***
Frank Alvarez, Esq., Managing Partner
Quintairos, Prieto, Wood & Boyer, P.A.
6565 Americas Parkway NE, Suite 200
Albuquerque, New Mexico 87110
frank.alvarez@qpwblaw.com

***Re: NuMale Corporation, NuMale New Mexico SC, and NuMale Albuquerque, LLC – Demand for Immediate Transfer of Entire Client File***

Dear Mr. Alvarez:

I am the Court appointed Chapter 11 Trustee over the Bankruptcy Estates of NuMale Corporation, Feliciano NuMale Nevada PLLC, NuMedical SC, NuMale Colorado SC, NuMale Florida TB PLLC, NuMale Nebraska LLC, and NuMale New Mexico SC (collectively, the "Debtors"). For your convenience I enclose a copy of the order pursuant to which I was appointed. You firm previously represented, *inter alia*, NuMale Corporation, NuMale New Mexico SC, and NuMale Albuquerque, LLC (collectively, the "Client"). Such representation is hereby terminated.

In my capacity as the Chapter 11 Trustee I am the sole holder of the attorney-client privilege. Accordingly, by way of this letter, pursuant to Rules 16-116(D) NMRA and 16-115(D) NMRA, I hereby direct you to transfer the ***entire client file*** for the Client, including but not limited to all materials for, relating to, regarding, concerning, pertinent, and in connection with the New Mexico State Court Case No. D-202-CV-202006336, to my counsel, immediately, at the address below:

Garman Turner Gordon LLP
c/o Gregory Garman, Esq.
7251 Amigo Street, Suite 210
Las Vegas, NV 89119

For the avoidance of doubt, the complete file for the Client includes but is not limited to:

- Pleadings, motions, briefs, discovery responses and requests (including all drafts), deposition/ hearing transcripts, exhibits, demonstratives, and all correspondence (letters and email with attachments) with the Client, co-counsel, opposing counsel, courts, the insurer, and third parties.
- Attorney work product and notes (handwritten or electronic), research, research memos, strategy memos, all memoranda, outlines, witness interview notes, and investigator reports. As you are aware, New Mexico recognizes the client's entitlement to attorney work product.
- ESI and messages: text/iMessage/WhatsApp/SMS with any party (including internal) about the representation, the Client, and/or the matter; internal firm messaging (*e.g.*, Teams/Slack) relating to the representation, the Client, and/or the matter; voicemail audio and call/phone logs; calendar/docket entries; contact records; and all metadata associated with such items.
- Engagement documents: signed engagement/retainer agreement(s), conflicts waivers, scope amendments, and termination notices.
- Billing and accounting: invoices, time entries, expense backup, trust account ledgers, and balance detail for this matter and the Client, payments/credits, and any third party vendor bills charged to or for or on behalf of the Client.
- Case administration: docketing/tickler reports, task lists, litigation calendar, hearing notices, trial settings, and any case-management orders or scheduling orders.
- Third party materials: expert/consultant engagement letters, drafts, work papers, and correspondence; all records obtained by subpoena or other discovery or authorization; and any imagery, databases, or native data sets.

Please confirm by email within three (3) business days of this Letter that you intend to comply with the transfer and produce the Client file no later than fourteen (14) calendar days from the date of this Letter. Failure to promptly transfer the Client file within fourteen (14) days is a violation of Rule 16-116(D) NMRA.

You are obligated to produce ESI in reasonably usable form: emails as a PST (or MBOX) with attachments; documents as text-searchable PDFs with original foldering preserved; spreadsheets in native format; and text messages as exported transcripts (CSV/PDF) with device/time metadata. If you cannot export in these formats, please propose a comparably usable alternative.

Providing my counsel with a secure download link is acceptable; otherwise please ship an encrypted USB to the address above.

If you intend to withhold any item, (i) produce the remainder without delay, and (ii) provide a withholding log by the deadline that identifies each withheld item with its date, author, recipient(s), a brief description, and the asserted basis for withholding. *See* the "orderly termination" requirement of Rule 16-116(D) NMRA.

I appreciate your prompt response. Should you have any questions please reach out to me.

Sincerely,

Michael W. Carmel, Esq.
*Chapter 11 Trustee*

Encl.: (as noted)
Cc: Garman Turner Gordon LLP
Gregory E. Garman, Esq.
Talitha Gray Kozlowski, Esq.
Mary Langsner, Ph.D.

# EXHIBIT H

Law Offices of
**MICHAEL W. CARMEL, LTD.**
80 East Columbus Avenue
Phoenix, Arizona 85012-2334

Telephone: (602) 264-4965
Facsimile: (602) 277-0144
E-mail: michael@mcarmellaw.com
Also Admitted in New York

October 6, 2025

***Via E-mail and Federal Express***
Frank Alvarez, Esq., Managing Partner
Quintairos, Prieto, Wood & Boyer, P.A.
6565 Americas Parkway NE, Suite 200
Albuquerque, New Mexico 87110
frank.alvarez@qpwblaw.com

***Re: NuMale Corporation, NuMale New Mexico SC, and NuMale Albuquerque, LLC — Litigation Hold Notice Regarding Potential Estate Claims***

Dear Mr. Alvarez:

I am the Court-appointed Chapter 11 Trustee ("Trustee") over the Bankruptcy Estates of NuMale Corporation, Feliciano NuMale Nevada PLLC, NuMedical SC, NuMale Colorado SC, NuMale Florida TB PLLC, NuMale Nebraska LLC, and NuMale New Mexico SC (collectively, the "Debtors"). Your firm previously represented, *inter alia*, NuMale Corporation, NuMale New Mexico SC, and NuMale Albuquerque, LLC (collectively, the "Client"). Although there is no presently filed lawsuit against Quintairos, Prieto, Wood & Boyer, P.A. ("QPWB"), the Debtors' bankruptcy Estates are actively investigating potential claims arising from QPWB's prior representation of the Client. Accordingly, litigation is reasonably anticipated, and this correspondence serves as a litigation hold notice and demand that QPWB immediately preserve all potentially relevant information and tangible items relating to the Client and the representation.

The duty to preserve evidence arises when litigation is reasonably anticipated and extends to documents, tangible things, and electronically stored information ("ESI"). *See, e.g.*, *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217-18 (S.D.N.Y. 2003); *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006), *superseded by rule as stated in Fast v. GoDaddy.com LLC*, 340 F.R.D. 326, 353 n.16 (D. Ariz. 2022); *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir. 1997), *abrogated on other grounds as noted in Nguyen v. Gambro BCT, Inc.*, 242 Fed. App'x 483, 488 (10th Cir. 2007); *Oracle Am., Inc. v. Hewlett Packard Enterprise Co.*, 328 F.R.D. 543, 551-52 (N.D. Cal. 2018). In any adversary proceeding in the Bankruptcy Court, sanctions for failure to preserve relevant ESI are

governed by Fed. R. Civ. P. 37(e), made applicable by Fed. R. Bankr. P. 7037. I also have statutory duties to investigate potential estate claims. 11 U.S.C. §§ 1106(a)(3), 704(a).

You must preserve all materials for, relating to, regarding, concerning, pertinent to, and in connection with the Client and QPWB's representation of the Client—including but not limited to the New Mexico State Court Case No. D-202-CV-202006336—regardless of where located (including but not limited to firm systems, personal devices used for firm work, cloud accounts, third-party vendors, and off-site storage).

**Electronically Stored Information (ESI).** ESI must be afforded the broadest reasonable definition and preserved whether "active," archived, on backup media, or deleted but recoverable. Without limitation, ESI includes:

- Digital communications (*e.g.*, email, voice mail, instant messaging, SMS/iMessage/WhatsApp/Teams/Slack).
- Word-processed documents and drafts (*e.g.*, Microsoft Word).
- Spreadsheets and tables (*e.g.*, Microsoft Excel).
- Accounting application data (*e.g.*, QuickBooks) and billing/time-entry systems.
- Image and facsimile files (*e.g.*, PDF, TIFF, JPG, GIF).
- Audio and video (*e.g.*, WAV, MP3, AVI, MOV).
- Databases (*e.g.*, Access, SQL Server, document management systems, matter/case management).
- Contact, calendar, and docketing/tickler data (*e.g.*, Outlook, Exchange, Google Workspace, litigation calendars).
- Online access data (*e.g.*, temporary Internet files, history, cookies).
- Presentations (*e.g.*, PowerPoint).
- Network/server activity logs and audit trails.
- Project management and E-discovery hosting platforms.
- Backup and archival files (*e.g.*, ZIP, system images, on-premise and cloud backups).

**Immediate Intervention.** Preservation requires more than refraining from deletion. QPWB must immediately identify, collect, and preserve potentially relevant ESI and hard copy materials and prevent loss from routine operations.

**Suspend Routine Destruction.** Immediately disable or modify features that could delete or alter relevant information, including:

- Auto-deletion/purging of emails, chats, voicemails, and logs by age, capacity, or other criteria.
- Media wiping, erasure, or encryption utilities that overwrite recoverable data.
- Overwriting, erasing, or discarding backup media or snapshots.
- Reassigning, re-imaging, or disposing of systems, servers, devices, or media used by custodians.
- Utilities that alter metadata wholesale (*e.g.*, antivirus, de-duplication, or migration tools).

- Disabling or purging server or instant-message logging, releasing cloud storage repositories, or defragmentation/compression jobs that rewrite files.

**Preserve in Native Form and Maintain Metadata.** Preserve ESI in the form(s) in which it is ordinarily maintained. Do not take actions that remove, alter, or degrade system or application metadata, or that shift ESI to less accessible media/forms.

**Servers and Cloud Systems.** Preserve complete contents of relevant users' email accounts, network shares, document management/matter systems, and collaboration platforms. If systems must remain online 24/7, implement snapshots or other forensically sound methods.

**Ancillary Preservation.** Preserve passwords, keys, authenticators, logs, control sheets, indices, naming protocols, network diagrams, and any hardware/software necessary to access encrypted or legacy media.

**Preservation Protocol and Custodians.** Within three (3) business days, please confirm that this litigation hold has been implemented, identify the preservation manager/liaison, list the initial custodians and systems subject to hold, and describe the steps taken to suspend routine destruction. I and my counsel are available to confer on a reasonable, forensically sound protocol.

**Duration of Hold.** This hold remains in effect until I confirm in writing that it may be lifted. Do not delay preservation steps pending discussions, if any risk of loss exists.

Thank you for your prompt attention to this matter. Should you have any questions please reach out to me. Also, please direct confirmations and any questions to my counsel Garman Turner Gordon LLP (attention: Gregory E. Garman, Esq.).

Sincerely,

[signature]

Michael W. Carmel, Esq.
*Chapter 11 Trustee*

cc: Garman Turner Gordon LLP
Gregory E. Garman, Esq.
Talitha Gray Kozlowski, Esq.
Mary Langsner, Ph.D.